## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## (Trenton Vicinage)

**HANNAH LOVAGLIO**, et al.

        *Plaintiffs,*

v.

**KAITLAN BASTON**, et al.

        *Defendants.*

Hon. Georgette Castner, U.S.D.J.

Hon. Rukhsanah L. Singh, U.S.M.J.

**Civil Action No.: 3:23-cv-21803**

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

**INSTITUTE FOR JUSTICE**
Brian A. Morris*
Robert Frommer*
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
bmorris@ij.org
rfrommer@ij.org

Christen Mason Hebert*
816 Congress Ave., Suite 970
Austin, Texas 78701
(703) 682-9320
chebert@ij.org

*Counsel for Plaintiffs*

*admitted Pro Hac Vice

**PASHMAN STEIN WALDER HAYDEN, P.C.**
CJ Griffin (NJ Bar No. 031422009)
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201) 270-4930
cgriffin@pashmanstein.com

*Local Counsel for Plaintiffs*

i

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Background ................................................................................................... 2

    A.    The Newborn Screening Program—Testing for Disorders. ......................... 2

    B.    Defendants' Retention Policy—New Jersey Keeps the Blood Spots For However Long It Wants. ........................................................................ 3

    C.    Defendants Give Blood Spots to Third Parties. ............................................ 4

    D.    Defendants Make Voluntary and Non-Binding Changes to the Newborn Screening Program and Retention Policy. ................................... 5

    E.    Procedural History. ........................................................................................ 7

Standard of Review ...................................................................................... 8

Argument ...................................................................................................... 8

I.    Defendants' Voluntary and Non-Binding Changes Do Not Impact Or Change the Court's Analysis. ................................................................... 9

II.    Plaintiffs Have Standing to Challenge Defendants' Retention of Their Children's Blood. ............................................................................ 12

    a.    Plaintiffs' Injuries are Traceable to Defendants' Policy. ..................... 14

        i.    Defendants' Argument About Traceability Contradicts U.S. Supreme Court Precedent That Says the Opposite. .................. 15

        ii.    The U.S. Constitution Requires Voluntary and Informed Consent, Which Any "Opt-Out" Approach Fails to Obtain. ....... 18

    b.    Plaintiffs' Injury Is Not "Speculative"—Defendants Are Keeping Blood Spots Without Consent. ............................................................... 21

III.    Plaintiffs Alleged a Valid Fourth Amendment Claim. .................................. 22

    a.    Plaintiffs Have a Fourth Amendment Right in Their Own Blood and DNA. ....................................................................................... 22

b.    Plaintiffs' Blood and DNA is Not Medical Waste.................................. 27

c.    Parents Should Have the Default Choice About What To Do with Their Children's Blood Spots. .............................................. 30

IV.    Application of the Special-Needs Exception Requires Discovery. ................. 31

V.    Plaintiffs Alleged a Valid Substantive Due Process Claim........................... 37

Conclusion.................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asinor v. District of Columbia,*
   111 F.4th 1249 (D.D.C. 2024).......................................................................... 29, 30

*Bd. of Educ. v. Earls,*
   536 U.S. 822 (2002) ............................................................................................. 32

*Beleno v. Lakey,*
   306 F. Supp. 3d 930 (W.D. Tex. 2009) .................................................. 11, 13, 20, 26

*Birchfield v. North Dakota,*
   579 U.S. 438 (2016) ............................................................................................. 25

*Brewster v. Beck,*
   859 F.3d 1194 (9th Cir. 2017) ............................................................................. 29

*Bumper v. North Carolina,*
   391 U.S. 543 (1968) ...................................................................................... 19, 20

*Chandler v. Miller,*
   520 U.S. 305 (1997) ............................................................................................. 32

*City of Mesquite v. Aladdin's Castle, Inc.,*
   455 U.S. 283 (1982) ............................................................................................. 10

*Clapper v. Amnesty International USA,*
   568 U.S. 398 (2013) .............................................................................. 14, 15, 16, 17

*Const. Party of Pa. v. Aichele,*
   757 F.3d 347 (3d Cir. 2014)................................................................................... 8

*Cordoba v. DIRECTV, LLC,*
   942 F.3d 1259 (11th Cir. 2019) ............................................................................ 16

*Delaware v. Prouse,*
   440 U.S. 648 (1979) ............................................................................................. 32

iv

*Dep't of State v. Muñoz*,
    144 S. Ct. 1812 (2024) ........................................................................ 39

*Doe v. Adams*,
    53 N.E.3d 483 (Ind. Ct. App. 2016),....................................................... 18

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
    725 F.3d 406 (3d Cir. 2013) .................................................................. 15

*FBI v. Fikre*,
    601 U.S. 234 (2024) ......................................................................... 10, 12

*Fed. Election Comm'n v. Cruz*,
    596 U.S. 289 (2022) ........................................................... 13, 15, 16, 17

*Florida v. Royer*,
    460 U.S. 491 (1983) .............................................................................. 19

*Flynn v. Holder*,
    684 F.3d 852 (9th Cir. 2012 .................................................................. 25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................ 9

*Gardner v. N.J. Pinelands Comm'n*,
    593 A.2d 251 (N.J. 1991) ...................................................................... 23

*Green v. Berge*,
    354 F.3d 675 (7th Cir. 2004) ................................................................. 25

*Greenberg v. Miami Children's Hosp. Rsch. Inst., Inc.*,
    264 F. Supp. 2d 1064 (S.D. Fla. 2003) ................................................. 26

*Gruenke v. Seip*,
    225 F.3d 290 (3d Cir. 2000) .............................................................. 38, 39

*Hartnett v. Pa. State Educ. Ass'n*,
    963 F.3d 301 (3d Cir. 2020) .................................................................. 12

*Hickey v. Univ. of Pittsburgh,*
    81 F.4th 301 (3d Cir. 2023) .................................................................. 33, 34

*Higgins v. Tex. Dep't of Health Servs.,*
    801 F. Supp. 2d 241 (W.D. Tex. 2011) .................................................... 18

*Horton v. California,*
    496 U.S. 128 (1990) ................................................................................ 22

*Jakubowicz v. Dittemore,*
    No. 05-cv-4135, 2006 WL 2623210 (W.D. Mo. Sept. 12, 2006) .............. 31

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,*
    684 F. Supp. 3d 637 (E.D. Mich. 2023) ................................. 20, 21, 33, 36

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,*
    927 F.3d 396 (6th Cir. 2019) ......................................................... *passim*

*Khodara Env't, Inc. ex rel. Eagle Env't, L.P. v. Beckman,*
    237 F.3d 186 (3d Cir. 2001) ................................................................... 12

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ................................................................................ 23

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................ 13

*L.W. ex rel. Williams v. Skrmetti,*
    73 F.4th 408 (6th Cir. 2023) ................................................................... 38

*Maryland v. King,*
    569 U.S. 435 (2013) ................................................................................ 25

*Mich. Dep't of State Police v. Sitz,*
    496 U.S. 444 (1990) ................................................................................ 32

*Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.,*
    231 F. Supp. 2d 942 (S.D. Iowa 2002) ................................................... 26

*Missouri v. McNeely,*
    569 U.S. 141 (2003) ........................................................................... 24, 25

*Mitan v. U.S. Postal Inspection Serv.,*
    656 F. App'x 610 (3d Cir. 2016) ............................................................. 23

*Mitchell v. Wisconsin,*
    588 U.S. 840 (2019) ............................................................................... 24

*Moore v. Regents of the University of California,*
    51 Cal. 3d 120 (Cal. 1990) ............................................................... 26, 27

*Nat'l Treasury Emps. Union v. Von Raab,*
    489 U.S. 656 (1989) ............................................................................... 31

*Neumeyer v. Beard,*
    421 F.3d 210 (3d Cir. 2005) .............................................................. 31, 32

*N.J. Bankers Ass'n v. Att'y Gen.,*
    49 F.4th 849 (3d Cir. 2022) ................................................................... 15

*Norman-Bloodsaw v. Lawrence Berkley Lab.,*
    135 F.3d 1260 (9th Cir. 1998) ............................................................... 25

*Phillips v. County of Allegheny,*
    515 F.3d 224 (3d Cir. 2008) .................................................................... 8

*Schmerber v. California,*
    384 U.S. 757 (1966) ............................................................................... 24

*Schneckloth v. Bustamonte,*
    412 U.S. 218 (1973) ............................................................................... 19

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ............................................................................... 35

*Skinner v. Ry. Lab. Execs.' Ass'n,*
    489 U.S. 602 (1989) .......................................................................... 24, 32

*State v. LaRosa,*
   179 N.E.3d 89 (Ohio 2021) ........................................................................ 26

*State v. Medina,*
   102 A.3d 661 (Vt. 2014) ....................................................................... 25, 26

*Torres v. Madrid,*
   592 U.S. 306 (2021) .................................................................................. 22

*United States v. Amerson,*
   483 F.3d 73 (2d Cir. 2007) ........................................................................ 25

*United States v. Ferguson,*
   33 F. App'x 849 (3d Cir. 2002) .............................................................. 28, 29

*United States v. Fulani,*
   368 F.3d 351 (3d Cir. 2004) .................................................................. 27, 28

*United States v. Harrison,*
   689 F.3d 301 (3d Cir. 2012) ...................................................................... 28

*United States v. Jacobsen,*
   466 U.S. 109 (1984) .................................................................................. 22

*United States v. Kim,*
   27 F.3d 947 (3d Cir. 1994) ........................................................................ 19

*United States v. Moody,*
   485 F.2d 531 (3d Cir. 1973) ...................................................................... 28

*United States v. Price,*
   558 F.3d 270 (3d Cir. 2009) ...................................................................... 19

*Wash. Univ. v. Catalona,*
   437 F. Supp. 2d 985 (E.D. Mo. 2006) ....................................................... 26

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) .................................................................................. 39

*Wilcher v. City of Wilmington,*
    139 F.3d 366 (3d Cir. 1998) ................................................................ 31

*Zimmerman v. City of Austin,*
    881 F.3d 378 (5th Cir. 2018) ............................................................. 16

**Constitutional Provisions**

U.S. Const. amend IV .......................................................... *passim*

U.S. Const. amend XIV.......................................................... *passim*

**Statutes & Regulations**

16 Del. Code Ann. tit. 16, § 805C(a) .................................................. 3

42 U.S.C. § 1982 ............................................................................. 25

Fla. Stat. § 383.14(4) ....................................................................... 3

N.J. Admin. Code § 7:26-3A.6(a) ................................................... 28

N.J. Admin. Code § 7:26-3A.11 ...................................................... 28

N.J. Admin. Code § 7:26-3A.12 ...................................................... 28

N.J. Rev. Stat. § 10:5-44 ................................................................. 23

N.J. Rev. Stat. § 10:5-45(a) ............................................................ 24

N.J. Stat. Ann. § 13:1E-48.3 .......................................................... 28

S.D. Admin. Code § 44:19:03:03 ...................................................... 3

**Rules**

Fed. R. Civ. P. 12(d) ...................................................................... 34

**Other Authorities**

Del. Health & Social Servs.,
    *Newborn Screening Options* 2 ....................................................................... 3

Elizabeth R. Pike,
    *Securing Sequences: Ensuring Adequate Protections for*
    *Genetic Samples in the Age of Big Data*,
    37 Cardozo L. Rev. 1977, 1994 (2016) .......................................................... 27

Ind. Dept. Health,
    *Newborn Screening Program Manual* 10 (2022) ......................................... 3

## INTRODUCTION

This case is about one thing: Parental consent. If Defendants want to keep blood from children in a government-run database, they certainly can. But to do so, they need either a warrant or consent from parents. Unable to get the former, New Jersey must ask for the latter. And to be constitutionally sufficient, that consent must be voluntary, informed, and obtained *before* Defendants retain the blood. But throughout this litigation, that remains the one thing Defendants refuse to do.

When this lawsuit was filed, Defendants were secretly stockpiling blood from hundreds of thousands of babies every year and keeping it in a government database for twenty-three years. Defendants told parents *nothing* about this secret retention policy. And there were no limitations on how Defendants could use the blood—or to whom they could give the blood. Indeed, when Defendants were eventually caught, it was revealed that New Jersey was turning over children's blood to law enforcement agencies without a warrant. That is not mere "speculation," some "hypothetical risk[]," or "Plaintiffs' imagined dystopian future," MTD 18, 25; it's exactly what Defendants were doing when Plaintiffs filed this lawsuit. In other words, Defendants got caught red-handed violating the Fourth and Fourteenth Amendments. In their Motion to Dismiss, Defendants do not meaningfully defend their original policy.

Instead, Defendants (and their amicus)[1] prefer to focus on the benefits of the initial testing program and some recent voluntary and non-binding changes

---

[1] The Court granted leave to the Newborn Screening Alliance (NSA) and the Association for Creatine Deficiencies (ACD) to appear as amici curiae and file briefs. Doc. 42 (text order). Only NSA filed a brief. Doc. 44.

Defendants made to their retention policy. But Plaintiffs are ***not*** challenging the original seizure of the blood or the newborn screening and testing program. *See* First Am. Compl. ("FAC"), Doc. 31, ¶ 2. Indeed, as Plaintiffs readily admit, "This testing is not particularly controversial—every state does it." *Id.* And no doubt it saves children's lives. But the actual issue in this case is Defendants' retention of Plaintiffs' children's blood following that testing, all of which occurs without parental consent.

As for Defendants' non-binding changes to the retention policy, the voluntary cessation doctrine renders them irrelevant. After getting sued, Defendants cannot make changes today—that can be reversed tomorrow—in hopes of getting the case dismissed. Still, with or without Defendants' new policy changes, Plaintiffs have textbook standing to move forward in this case: Defendants are *still* retaining the blood of every baby born in New Jersey—and they are *still* refusing to obtain parental consent to do so. That violates the Fourth and Fourteenth Amendments no matter how long Defendants want to keep the blood, how they use the blood, or with whom they decide to share the blood. The Court should deny the Motion to Dismiss.

## BACKGROUND

### A.    The Newborn Screening Program—Testing for Disorders.

New Jersey requires every baby born in the state to be tested for a wide range of disorders. FAC ¶ 16. Within forty-eight hours of birth, hospitals prick the heel of each newborn and collect the blood on a paper card—creating "blood spots." FAC ¶ 17. The blood spots are sent to the Newborn Screening Laboratory, which is run by the New Jersey Department of Health. FAC ¶ 18. New Jersey does not obtain informed

consent from parents before it takes blood from each newborn. FAC ¶ 20. Rather, parents receive a short handout providing an overview of the program.[2] FAC ¶¶ 21–24. Plaintiffs are **not** challenging this initial prick or the testing program. FAC ¶ 2.

New Jersey completes the newborn screening tests within a week or two after the baby is born. FAC ¶¶ 33–34. After these tests are complete, there is some unused (or "residual") blood left on the paper card. FAC ¶¶ 38–39. DOH keeps the blood spots for fourteen days before placing them in storage boxes. FAC ¶ 37. Once in boxes, DOH transfers the blood spots to a temperature-controlled storage area within its facility. FAC ¶¶ 18, 37, 40. Before Plaintiffs filed this lawsuit, New Jersey never told parents that it would store their baby's blood after the testing was complete—so Parents were left completely in the dark. FAC ¶ 44.

## B. Defendants' Retention Policy—New Jersey Keeps the Blood Spots For However Long It Wants.

Once in storage, New Jersey keeps the blood spots for however long it wants. FAC ¶ 45. No statute requires Defendants to destroy the blood, but no statute authorizes them to keep the blood either. FAC ¶¶ 41–42. The result is that DOH just

---

[2] New Jersey parents can object to the testing only on religious grounds. FAC ¶¶ 27–28. Many states allow parents to opt out of the newborn screening tests for any reason. *See*, *e.g.*, Fla. Stat. § 383.14(4); 16 Del. Code Ann. tit. 16, § 805C(a)(1). Some states automatically destroy the blood after testing is complete, *see*, *e.g.*, S.D. Admin. Code § 44:19:03:03, unless parents "opt-in" to retention. Ind. Dept. Health, *Newborn Screening Program Manual* 10 (2022) (kept for 6 months if parents opt out, 3 years if they opt in ), *available at* https://tinyurl.com/Ind-DBS-Policy; Del. Health & Social Servs., *Newborn Screening Options* 2 (explaining that "parents have several options," including to "request to have their infant's remaining blood spot card returned"), *available at* https://tinyurl.com/Del-DBS-Policy.

does whatever it wants. For instance, before this lawsuit was filed, DOH kept the blood spots for twenty-three years. FAC ¶ 40. But just before Defendants' response to this lawsuit was due, DOH voluntarily shortened its retention period from twenty-three years to either two or ten years.[3] FAC ¶ 83. All it took was a public statement from Defendants. FAC ¶¶ 81–83, 86. DOH could change its retention period, again, to whatever it wants, whenever it wants. FAC ¶¶ 86, 124.

But no matter how long Defendants want to keep the blood, they have no lawful authority to do so. FAC ¶¶ 46–47, 164–74. Defendants do not—and never have—ask parents for consent to keep their baby's blood after the newborn screening is complete. FAC ¶ 46. Nor does it obtain a warrant to retain the blood. FAC ¶ 47. Instead, Defendants unilaterally decided to retain the blood spots of every child born in New Jersey for however long it wants—whether for two years, ten years, twenty-three years, or any other amount of time post-testing. FAC ¶¶ 43, 192.

## C. Defendants Give Blood Spots to Third Parties.

New Jersey has been caught giving the retained blood spots to third parties. FAC ¶¶ 48–50. For instance, New Jersey has handed over blood spots to law enforcement officers without a warrant at least five times. FAC ¶¶ 49, 65. Plaintiffs

---

[3] Under Defendants' new policy, they will keep all blood spots with positive test results for up to ten years without parental consent—and they will keep negative test results without parental consent for two years. FAC ¶ 83. Defendants say, because Plaintiffs' test results were negative, the 10-year policy about positive results is "not before this Court." MTD 12 n.12. Defendants are wrong. No matter the test results, Plaintiffs are retaining *all* blood spots without parental consent. So the injuries are identical between class members. *See* FAC ¶¶ 136–37.

also expect discovery to reveal that Defendants have given blood spots to researchers, companies, or other government agencies, FAC ¶ 51, which has been true in every other state where plaintiffs have challenged similar retention policies. FAC ¶ 66.

In their Motion to Dismiss, Defendants confirm that they are, in fact, giving blood spots to third parties. They try to downplay these disclosures as "rare occurrences" or as having an "extremely low" or "minimal" risk of happening. MTD 10, 35–37. But Defendants' characterization (and unsworn statements) of how, when, to whom, and under what circumstances they are giving blood to third parties is a merits question for discovery. At this stage, Defendants have released blood spots to third parties—and they continue to have the discretion to do so. FAC ¶¶ 113–21.

## D. Defendants Make Voluntary and Non-Binding Changes to the Newborn Screening Program and Retention Policy.

Plaintiffs filed their original complaint back in November 2023. FAC ¶ 77. For six months, the parties tried to resolve this lawsuit. FAC ¶¶ 78–79. But negotiations broke down once it became clear that Defendants wanted to keep retaining blood from the newborn screening program without parental consent. FAC ¶ 79.

Five days before Defendants' response to the original complaint was due, New Jersey made a surprise announcement. FAC ¶¶ 80–81. DOH and the New Jersey Attorney General, Matthew Platkin, made contemporaneous public statements that they were making changes to Defendants' retention policy of newborn blood spots. FAC ¶ 82. These voluntary changes include, among other things, shortening the retention period and changing the process for law enforcement officials to obtain blood

spots. FAC ¶¶ 83, 112–20. Unlike other states, however, New Jersey did not categorically bar law enforcement officials from obtaining blood spots. FAC ¶ 121.

Several weeks later, Defendants announced yet another voluntary change. This time, Defendants revised the handout it gives to parents in the hospital. *Compare* FAC ¶ 22, *with* FAC ¶¶ 88–90. The new handout explains that DOH will retain all blood spots "for 2 years to ensure the integrity of your baby's test results (for example, to rule out false positive or false negative results)." FAC ¶ 89. The revised handout also includes a "QR Code" where parents can "submit either a destruction form or an extended-retention form." *Id.* DOH says it will destroy a child's blood spot if parents fill out and submit the destruction form. FAC ¶ 91. In contrast, if parents fill out the extended-retention form, Defendants will retain the blood spot for up to ten years. FAC ¶ 96. If parents fill out neither form, Defendants say they will destroy the blood after two years. FAC ¶ 98. As a result, Defendants will continue to retain the blood of every child born in New Jersey post-testing without parental consent. FAC ¶ 101. This card becomes effective November 1, 2024. FAC ¶¶ 88–89.

Of course, these voluntary changes are non-binding and can be reversed at any time. FAC ¶¶ 86, 122–23. Indeed, nothing prevents Defendants, or the Attorney General, from rescinding, amending, or modifying their policy changes tomorrow, in a year, or in five years. FAC ¶ 124. And nothing prevents the next administration, the next DOH commissioner, or the next Attorney General from rescinding, amending, or modifying any of these voluntary changes at any time and for any reason (or for no reason at all). FAC ¶ 125.

6

Defendants also announced their unilateral decision to destroy every blood spot they currently possess for children that are now older than two years old. FAC ¶ 100. But that automatic destruction is not the relief Plaintiffs seek. Rather, Plaintiffs want parents to be the ones who decide what happens to the blood spots. For existing blood spots, parents should have the choice to either: (a) consent to Defendants' retention of the blood spot, (b) ask for the blood spot to be returned to the parents, or (c) instruct Defendants to destroy the blood spot. FAC ¶¶ 177, 179.

### E.    Procedural History.

Plaintiffs' original complaint raised two claims about Defendants' retention policy: (1) Plaintiff-Children's Fourth Amendment claim for Defendants' continued seizure of their blood, and (2) Plaintiff-Parents' Fourteenth Amendment Claim for Defendants' interference with their fundamental due process rights as parents. Doc. 1. Both claims asked the Court for class certification under Rule 23(b)(2) and for declaratory and injunctive relief.

After several stipulations extending the time for Defendants to respond to the complaint, the parties agreed to hold Defendants' response in abeyance pending settlement discussions. Docs. 12, 19, 21. But the discussions weren't successful and, following a conference with the Court, Doc. 30, Plaintiffs filed their First Amended Complaint, raising the same two claims and asking for the same relief. FAC ¶¶ 156–199. Defendants served their Motion to Dismiss in response.

## STANDARD OF REVIEW

This case is still at the motion to dismiss stage. Under Rules 12(b)(1) and 12(b)(6), Defendants' motion tests the sufficiency of the First Amended Complaint's allegations, which must be taken as true. *See* MTD 13. When a party's motion under Rule 12(b)(1) makes a facial attack on the allegations of a complaint as to the existence of subject-matter jurisdiction, the district court "must consider the allegations of the complaint as true" to determine whether subject-matter exists. *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358–59 (3d Cir. 2014). Similarly, a court reviewing a 12(b)(6) motion must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

## ARGUMENT

To avoid Plaintiffs' claims, Defendants raise five arguments: (1) Defendants have a new policy that fixes things, (2) Plaintiffs lack standing because their injuries are "self-inflicted" and "speculative," (3) Plaintiffs have no interest in their own blood under the Fourth Amendment, (4) Defendants' retention policy is reasonable under the special-needs exception to the Fourth Amendment, and (5) Defendants are not interfering with any fundamental parental choices. But these arguments all fail.

First, Defendants cannot rely on their recent non-binding policy changes to sidestep constitutional scrutiny. That's precisely what the voluntary cessation doctrine prohibits. Second, Defendants are directly harming Plaintiffs with their

retention policy that keeps their children's blood without consent. Third, Plaintiffs have a Fourth Amendment right in their own blood and DNA, which includes the fundamental property right of excluding others from having it. Fourth, the government has the burden of showing that its nonconsensual retention policy is constitutionally reasonable under the special-needs exception to the warrant requirement. That inquiry turns on facts in evidence and requires discovery, which hasn't happened yet. And finally, Defendants are interfering with a simple yet fundamental right of every New Jersey parent: Whether to retain their child's blood for any amount of time post-testing, and to what uses that blood can be put. For these reasons, the Court should deny the Motion to Dismiss.

## I.     Defendants' Voluntary and Non-Binding Changes Do Not Impact Or Change the Court's Analysis.

To start, it's important to remember that Defendants cannot escape or change this case by making voluntary and non-binding policy changes. Under the voluntary cessation doctrine, "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). If it did, this Court would be "compelled to leave [defendants] free to return to [their] old ways," *id.* (cleaned up), meaning that DOH could freely change the retention policy back to 23 years, 50 years, or any other length of time it wanted as soon as the Court dismissed the lawsuit. The same would be true of Defendants' sharing of the blood spots with third parties.

The voluntary cessation doctrine prevents such gamesmanship. Constitutional claims (and a court's analysis of those claims) do not fall away simply because Defendants voluntarily modified their conduct. *FBI v. Fikre*, 601 U.S. 234, 241–42 (2024); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

Defendants' motion to dismiss ignores this principle. They ask the Court to dismiss Plaintiffs' lawsuit, in part, because of their new policy changes. *See* MTD 1, 8–10, 12, 15–16, 18, 34. But those voluntary changes show that Defendants still fail to obtain parental consent to keep and use the blood. For instance, when Plaintiffs filed this lawsuit, "Defendants had no oversight or limits on how they could use that blood—or to whom they could give the blood." FAC ¶ 3. Defendants unilaterally changed that policy and now claim that "DOH may only use the residual spots for three purposes during retention unless it receives express parental consent." MTD 8. But that's a new policy that Defendants could rescind or modify at any point. FAC ¶ 112. And even under that policy, DOH is *still* storing and using children's blood without parental consent.

Defendants also say that, under their new policies, "DOH expressly forbids transfer of any residual blood spots linked with a child's identifying information to a private third party without consent." MTD 18 (citing FAC ¶ 89). Again, that's an entirely new policy adopted in response to this lawsuit—one that could be changed at any time. Indeed, in support of their new policy, Defendants cite to only their new card they created in July 2024—more than six months after this lawsuit was filed—and which hasn't even taken effect yet. *See* FAC ¶ 89 ("Effective November 1, 2024").

10

Defendants repeatedly rely on this new card in their Motion to Dismiss, pointing out that it includes a "QR Code" that links to the destruction request form. MTD 16 (citing FAC ¶¶ 89–92) (relying on the new card to argue that it's actually Plaintiffs' fault that Defendants retained their children's blood spots).

As Defendants see it, creating this new card was all it took to dismiss this lawsuit. *See id.* But under the voluntary cessation doctrine, that new card is wholly irrelevant. *Compare id.*, *with* FAC ¶ 22 (showing that DOH's handout said nothing about retention). Indeed, in a similar lawsuit in Texas challenging its retention policy, the district court applied the voluntary cessation doctrine and "declined to find that a claim is moot under circumstances such as these where a defendants' proposed conduct is voluntary, as opposed to mandated by statute." *Beleno v. Lakey*, 306 F. Supp. 3d 930, 949–50 (W.D. Tex. 2009) (collecting cases).

The same is true of Defendants' voluntary changes to DOH's secret twenty-three-year retention policy and its practice of turning blood spots over to law enforcement without a warrant. Defendants repeatedly talk about the new "two-year retention period" and how that shortened period does not burden parents, "is a permissible default rule," and is a short enough period that "[a]ny risk of disclosure to others . . . is minimal." MTD 3, 32, 35. And Defendants promise that "DOH will not voluntarily share residual blood spots with law enforcement." MTD 10 n.8. But those are all new policies, unilaterally declared by DOH and the Attorney General. FAC ¶¶ 114–20. In fact, Plaintiffs first learned about New Jersey's policy of retaining blood spots because Defendants *were* sharing blood spots with law enforcement

11

without parental consent or a warrant. FAC ¶¶ 49, 65. In other words, Defendants were caught with their hand in the cookie jar, and now they're saying: "Just trust us, we won't do it again."

The Court should decline Defendants' invitation to forget about the real issue in this case: DOH is keeping the blood of every baby born in New Jersey (a) without parental consent, (b) for however long it wants, and (c) with no restrictions on how they can use that blood or with whom they can share it. FAC ¶¶ 3, 39–47. No intervening statute or court decision would bar Defendants from resuming their original policies at any point. *See Khodara Env't, Inc. ex rel. Eagle Env't, L.P. v. Beckman*, 237 F.3d 186, 194 (3d Cir. 2001) (statutory change); *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 307 (3d Cir. 2020) (intervening U.S. Supreme Court decision). Nor have Defendants repudiated their original policy as unconstitutional. *See Fikre*, 601 U.S. at 244. As a result, Plaintiffs' challenge remains live, and the Court should resolve the Motion to Dismiss by looking at whether Plaintiffs have standing and whether they state a claim for relief in the Amended Complaint. As discussed in the sections that follow, Plaintiffs' Amended Complaint meets both requirements.

## II.    Plaintiffs Have Standing to Challenge Defendants' Retention of Their Children's Blood.

Plaintiffs are two New Jersey families—Hannah Lovaglio and her two sons; Erica and Jeremiah Jedynak and their son. FAC ¶¶ 1, 12–13. When this lawsuit was filed, Hannah's boys were five years old and a year-and-a-half. Both were born in New Jersey. FAC ¶ 54. The Jedynaks' son was also born in New Jersey and turned two

years old a few weeks after the lawsuit was filed. FAC ¶ 67. For all three kids, Defendants retained their blood, without consent, after their respective newborn screening tests were completed. FAC ¶¶ 58, 71. Plaintiffs ask the Court to declare that Defendants' retention of blood from the newborn screening program without first obtaining voluntary, informed consent violates the Fourth and Fourteenth Amendments to the U.S. Constitution. FAC at 52, Prayer for Relief.

Under Supreme Court caselaw, these simple points demonstrate that Plaintiffs have standing to bring these claims. To satisfy Article III's standing requirement, "[a] plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Here, the injury is the retention of the blood spots without parental consent. FAC ¶ 7. Defendants do not argue that the underlying retention, on its own, somehow fails to satisfy Article III. *See* MTD 15–19.

Indeed, every federal court to address this injury has recognized that "plaintiffs have standing" to challenge "the storage of [ ] infants' blood samples." *Beleno*, 306 F. Supp. 3d at 942. When the Sixth Circuit heard a similar challenge to Michigan's nonconsensual retention of baby blood, it held that the plaintiffs had standing for the same two claims Plaintiffs allege here—i.e., "parents' substantive due process rights" and "the children's Fourth Amendment rights"—that "Defendants' retention and ongoing storage of [the] children's blood samples" allegedly violated. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 412 (6th Cir. 2019). That result

13

makes perfect sense: The injury *is* the retention itself, which Defendants are admittedly doing, and the Court can order them to stop. That's textbook Article III standing. *See id.* at 409 ("Assuming that the storage is a Fourth Amendment violation, it is the sort of actual, ongoing harm that affords a plaintiff standing to sue for damages, as well as injunctive and declaratory relief.").

Defendants, however, argue that Plaintiffs still lack standing for two reasons: (1) "the only reason those spots have been retained is that [Plaintiffs] have chosen not to request destruction," so the harm is "self-inflicted," MTD 16, and (2) Defendants' uses of the blood spots, and the risks associated with those uses, are "hypothetical" and "purely speculative." MTD 14, 17–19. But neither argument fixes the underlying injury. Thus, as explained below, so long as Defendants keep retaining blood spots without consent, Plaintiffs maintain their Article III standing.

### a.    Plaintiffs' Injuries are Traceable to Defendants' Policy.

Defendants say Plaintiffs' injuries are not traceable to their retention policy because parents can "easily avoid retention by opting out of [Defendants'] default policy." MTD 15. Thus, Defendants say, Plaintiffs' injuries are "self-inflicted" and "manufacture[d]" because they did not request destruction. MTD 14–17. To build this argument, Defendants rely on one main case: *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013). *See* MTD 15–17 (relying on *Clapper* repeatedly).

Defendants are wrong for at least two reasons. First, the U.S. Supreme Court has squarely rejected Defendants' argument and their reading of *Clapper*. And second, Defendants' argument fails to recognize that, to be constitutionally sufficient,

14

consent must be informed and voluntary, something that only an "opt-in" choice accomplishes. As such, Defendants "opt-out" option neither fixes the policy's constitutional problem nor breaks the causal chain between Defendants' policy and Plaintiffs' injuries.[4]

### i.    Defendants' Argument About Traceability Contradicts U.S. Supreme Court Precedent That Says the Opposite.

For an injury to be "fairly traceable," it must have been "caused by the challenged action of the defendant as opposed to an independent action of a third party." *N.J. Bankers Ass'n v. Att'y Gen.*, 49 F.4th 849, 855 & n.1 (3d Cir. 2022). To establish this "causal relationship," allegations of "but-for causation is sufficient to satisfy traceability." *See id.* (citing *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013)). That's exactly what Plaintiffs have alleged: Plaintiffs would not be harmed "but-for" Defendants' policy of retaining blood spots without parental consent. *See* FAC ¶ 7. Defendants, however, fight that straightforward result by blaming Plaintiffs for not opting out of the retention policy. So, Defendants say, Plaintiffs lack standing because "they are effectively bringing the alleged harm 'on themselves.'" MTD 17 (quoting *Clapper*, 568 U.S. at 416).

But the U.S. Supreme Court has rejected Defendants' exact argument. In *Cruz*, the government created a repayment rule for campaigns. 596 U.S. at 294–95. Senator Ted Cruz wanted to challenge the rule, so he "knowingly triggered" the limitation and

---

[4] Defendants' new destruction policy—including its new card that notifies parents about the retention policy and the request-for-destruction form—is also irrelevant and cannot be the basis for dismissal. *See supra* pp. 9–12.

refused an "alternative" that would have avoided the injury. *Id.* at 296–98. The government argued that Cruz lacked standing because he didn't take the proffered "alternative," and thus, the government said any injury was "self-inflicted." *Id.* at 296. But the Supreme Court said Cruz still had an Article III injury "even if the injury could be described in some sense as willingly incurred." *Id.* at 297 (collecting cases).

The Supreme Court then distinguished *Clapper* and explained why those plaintiffs, unlike Cruz, lacked standing. *Id.* In *Clapper*, the plaintiffs wanted to challenge the constitutionality of a surveillance program. *Clapper*, 568 U.S. at 401–04. To do so, the plaintiffs spent time and money doing things "that they said were necessary to protect the confidentiality of their communications in light of the Government surveillance policy." *Cruz*, 596 U.S. at 297. In that sense, the plaintiffs' injuries were "self-inflicted" because they voluntarily chose to spend the time and money protecting their communications. *See* MTD 16 (quoting *Clapper*, 568 U.S. at 418).

So how was that "self-inflicted" injury different from the injury in *Cruz*? In *Clapper*, the plaintiffs weren't actually under surveillance.[5] *Cruz*, 596 U.S. at 297. That missing piece, the Supreme Court said, is different from *Cruz* where the Senator was, in fact, suffering an injury under the campaign rule even if he chose to subject

---

[5] Defendants' other non-binding cases suffer from the same problem as in *Clapper*. *See* MTD 15 (citing *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271–72 (11th Cir. 2019) (plaintiffs that lacked standing weren't actually on the "do-not-call list"); *Zimmerman v. City of Austin*, 881 F.3d 378, 389–90 (5th Cir. 2018) (plaintiff lacked standing because he did not actually accept campaign funds over the relevant limit).

himself to that injury. *Id.* As for the "alternative" option, which Cruz refused to accept, the Supreme Court dismissed that alleged escape hatch as "largely miss[ing] the point." *Id.* at 298. For standing purposes, the Supreme Court "accept[s] as valid the merits of [the plaintiffs'] legal claims, so [it] must assume that [the campaign rule] unconstitutionally burdens speech." *Id.* As a result, the government could not create an alternative choice that would avoid the ultimate injury but, in accepting that option, required the plaintiffs to abandon their constitutional rights. Such a choice, the Supreme Court said, "finds no support in our standing jurisprudence." *Id.*

Here, Plaintiffs find themselves in the same position as the plaintiffs in *Cruz*. Plaintiffs ***are*** suffering an injury at the hands of the government: Defendants did, in fact, retain Plaintiffs' blood spots under DOH's retention policy. FAC ¶¶ 58–60, 71–73. So unlike the plaintiffs in *Clapper*, Plaintiffs aren't hopeful that the government will violate their rights—Defendants *already have*. As for the Defendants' proposed "alternative" of requesting destruction, they are trying to put Plaintiffs in the same Catch-22 that the government tried in *Cruz*. Defendants want Plaintiffs to abandon their constitutional rights by filling out their new request-for-destruction form. MTD 16–17. But that choice, between pursuing their constitutional rights and accepting New Jersey's preferred alternative, cannot deprive Plaintiffs of Article III standing.

That is not a novel conclusion. Rather, the Sixth Circuit reached the same conclusion about Michigan's retention policy, which also has a request-for-destruction option. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 409 n.5 (6th Cir. 2019). Due to that option, Michigan argued that the plaintiffs lacked

17

standing because they could "request that a sample be destroyed" or "not be . . . used for research" by contacting the state. *Id.* But the Sixth Circuit rejected those alternative options as having zero effect on the court's standing analysis. *Id.* Indeed, requiring a plaintiff to accept some alternative, the Sixth Circuit explained, would amount to an exhaustion-of-remedies requirement "which Supreme Court precedent has expressly rejected." *Id.* This Court should reach the same conclusion here.[6]

### ii. The U.S. Constitution Requires Voluntary and Informed Consent, Which Any "Opt-Out" Approach Fails to Obtain.

Further, the Defendants' "opt-out" option doesn't fix the underlying policy's constitutional problem or break the causal chain between Defendants' policy and Plaintiffs' injuries. That's because, to be constitutionally sufficient, consent must be informed and voluntary, which means that only an "opt-in" choice is constitutionally sufficient. As such, Defendants "opt-out" choice only perpetuates Plaintiffs' injuries.

---

[6] Defendants cite two cases they say reach the opposite conclusion. MTD 15–16 (citing *Doe v. Adams*, 53 N.E.3d 483, 498 (Ind. Ct. App. 2016); *Higgins v. Tex. Dep't of Health Servs.*, 801 F. Supp. 2d 241, 553 (W.D. Tex. 2011). Defendants are wrong. *Higgins* involved a narrow (and different) claim about whether plaintiffs had standing to challenge blood spots that Texas distributed to third parties—like researchers. 801 F. Supp. 2d at 552–53. Plaintiffs lacked standing because they didn't know whether their children's blood was actually distributed to third parties. *Id.* at 553. Here, however, Plaintiffs know that Defendants retained their blood. FAC ¶¶ 58, 71. Similarly, in *Doe*, a plaintiff challenged a blood-spot-retention policy because she was worried about how her child's blood spot could be used. The Indiana court did not dismiss the case just because there was a request-for-destruction option. *Doe*, 53 N.E.3d at 494–95, 498. Rather, on summary judgment, the court found that Indiana did not use the child's blood for any reason, so the plaintiff lacked standing. *Id.* at 498. Again, here, Plaintiffs know that Defendants retained their blood without consent, which *is* the alleged injury. FAC ¶¶ 58, 71. Thus, neither case applies.

Under the Fourth Amendment, *how* the government obtains consent matters. As both the U.S. Supreme Court and the Third Circuit have recognized, consent must be "freely and voluntarily given." *United States v. Price*, 558 F.3d 270, 277–78 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). In contrast, consent cannot be implied, coerced, assumed, or the product of acquiescence. *Bumper*, 391 U.S. at 548–49; *Florida v. Royer*, 460 U.S. 491, 502–07 (1983). In each of those situations, the missing piece is the government's failure to ask for consent without first putting its thumb on the scale. *Cf. Price*, 558 F.3d at 279 (analyzing *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994), and explaining the importance that the government "asked for consent" and, in turn, both individuals "replied to the [government's] request")).

Requiring parents to "opt out" of New Jersey's retention policy doesn't actually *ask* parents if Defendants can keep their children's blood. FAC ¶¶ 5, 7–8, 59–60, 72–73, 84. Rather, at best, it assumes that "Parents have chosen not to request destruction." MTD 16. And at worst, it coerces implied consent from parents "only in submission to a claim of lawful authority." *See Schneckloth*, 412 U.S. at 233–34 (citing *Bumper*, 391 U.S. at 548–49). Indeed, telling parents that, under DOH "policy, the sample taken from your baby ***will*** be securely stored for 2 years to ensure the integrity of your baby's tests results" ***is*** an affirmative assertion by Defendants that they have the lawful authority to keep the blood, period. FAC ¶ 89 (emphasis added).

19

Either way, New Jersey is manufacturing "consent." And where, as here, "there is coercion[,] there cannot be consent." *Bumper*, 391 U.S. at 550.

It is no surprise, then, that other federal courts facing Defendants' precise argument have rejected the idea that the ability to "opt out" of a blood spot retention policy amounts to "free and voluntary" consent. Take the district court's latest decision in Michigan, for instance, *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 684 F. Supp. 3d 637 (E.D. Mich. 2023). After the Sixth Circuit explained that the plaintiffs had standing and remanded the case to determine whether Michigan obtained informed consent to retain the blood, *Kanuszewski*, 927 F.3d at 420, 425, the district court found that "under every possible standard," "Michigan has failed to obtain informed consent[.]" *Kanuszewski*, 684 F. Supp. 3d at 646–47. As for the request-for-destruction option, the court found that the parents' "silence"—i.e., their failure to request destruction—did *not* amount to informed consent. *Id.* at 647. That's because, as the court explained, it's wrong to assume that the plaintiffs' silence amounted to "accepting . . . the implications of the [policy]." *Id.* It pointed out that such an assumption is especially wrong when "[t]he silence of Plaintiffs might well have been the product of the opacity of the system, the infants' nascent existence in the world, or the result of the overwhelmed state of their new parents." *Id.* Or even simpler, a parent's silence might just be that they didn't know the state was keeping the blood in the first place. *See Beleno*, 306 F. Supp. 3d at 949; FAC ¶¶ 59–61, 72–74. In contrast, there's only one way to know if parents "freely and voluntarily" consent to retaining their children's blood: Ask them. But that is the one thing New Jersey

still refuses to do. For standing purposes, then, Defendants' option to "opt-out" does not break the causal chain of Plaintiffs' constitutional injuries—it perpetuates it.

### b. Plaintiffs' Injury Is Not "Speculative"—Defendants Are Keeping Blood Spots Without Consent.

Defendants also argue that Plaintiffs lack standing because it is too speculative to complain about what Defendants might (or might not) do with the blood spots. MTD 17–19. In making this argument, however, Defendants fundamentally misunderstand Plaintiffs' complaint. Plaintiffs' constitutional injury arises not from what New Jersey may or may not do with the blood spots, but from the fact that Defendants are retaining the blood spots after the newborn testing is complete without obtaining informed consent to do so. FAC ¶¶ 164, 171, 174, 193–95. This "continuing seizure" violates the Fourth and Fourteenth Amendments even if, as Defendants allege, they have decided to keep their seized blood spots "in a secure government facility." MTD 34. That's precisely how the Sixth Circuit framed the same injury to the Michigan plaintiffs—it's the "ongoing, indefinite seizure" of the blood that raises constitutional concerns. *Kanuszewski*, 927 F.3d at 424–25. And on remand, that's exactly what the district court found: "Defendants' assertion that retention is harmless lacks merit" because "[t]he very act of retention implicates a potential intrusion: misuse or abuse. . . . [For] [i]t is not the realization of harm that constitutes the privacy intrusion, but the risk and the lack of control and consent." *Kanuszewski*, 684 F. Supp. 3d at 651. As a result, Defendants' policy of retention, standing alone, is an Article III injury.

21

III.    **Plaintiffs Alleged a Valid Fourth Amendment Claim.**

On the merits, Defendants argue that the Fourth Amendment has nothing to do with their retention of the blood from every baby born in New Jersey. MTD 19–25. Rather, Defendants say, "Plaintiffs do not have a possessory interest in residual blood spots from a heel-pick draw," MTD 20, which they liken to "medical waste," such as "blood left on gauze" "after a routine blood test, or mucus left of the nasal swab after a Covid-19 test." MTD 21, 23. Defendants also argue that Plaintiffs implicitly agree that they have no possessory interest in their children's blood spots because, after all, they ask the Court to order their destruction.[7] MTD 23. Defendants are incorrect.

a.    **Plaintiffs Have a Fourth Amendment Right in Their Own Blood and DNA.**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects." U.S. Const. amend IV. This protection extends to both searches and seizures. For the latter, a "seizure deprives the individual of dominion over his or her person or property." *Horton v. California*, 496 U.S. 128, 133 (1990) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). And since "the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'" *Torres v. Madrid*, 592 U.S. 306, 312 (2021) (citation omitted). Defendants do not challenge whether a "seizure" has occurred. Nor could they. Defendants have taken possession of Plaintiffs' blood spots and continue to keep

---

[7] Defendants also ask the Court, again, to ignore the underlying retention policy in favor of their new policy. MTD 24–25. But for the reasons already explained, *supra* pp. 9–12, the Court should disregard this argument out-of-hand.

possession of the blood spots through their retention policy. FAC ¶¶ 17–19, 38–45. The same seizure occurs for every baby born in New Jersey each year. FAC ¶ 19.

Defendants, however, say that Plaintiffs can't challenge that seizure because they "do not have a possessory interest" in their blood spots. MTD 20. Defendants are wrong. To have "standing to challenge [a] seizure," an individual must have "a possessory interest in the property at the time of the seizure." *Mitan v. U.S. Postal Inspection Serv.*, 656 F. App'x 610, 615 (3d Cir. 2016). And whether someone has a possessory interest in something turns on whether that individual has the "right to exclude" others. *Gardner v. N.J. Pinelands Comm'n*, 593 A.2d 251, 262 (N.J. 1991) (noting plaintiff's right to exclude is "arguably a more fundamental element of the bundle of property rights than even the freedom to use property as desired"); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights"). When it comes to blood and DNA, both the Supreme Court and New Jersey law recognize that individuals have the right to exclude others from taking or seizing their blood and DNA.

Start with New Jersey. Under N.J. Rev. Stat. § 10:5-44, the New Jersey General Assembly explicitly declared that "Genetic information," which includes DNA, "is personal information that should not be collected, retained or disclosed without the individual's authorization." In other words, New Jersians have the right to exclude others from seizing their DNA. That's a possessory interest. And although Defendants are also allowed, under New Jersey law, to "obtain genetic information"

23

from newborns through the newborn screening program, *id.* § 10:5-45(a)(6), that does not change Defendants' baseline recognition that individuals have a "possessory interest" in their own blood and DNA.

The U.S. Supreme Court agrees. The Court has "long recognized" that taking someone's blood implicates the Fourth Amendment. *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 616 (1989) (collecting cases). That's because, "[i]n light of our society's concern for the security of one's person," "it is obvious" that taking someone's blood and using the sample to "obtain physiological data" implicates deep privacy concerns. *Id.* And so, time and again, the Supreme Court has been clear that "the collection and subsequent analysis of . . . biological samples must be deemed Fourth Amendment searches." *Id.* at 618; *Mitchell v. Wisconsin*, 588 U.S. 840, 849 (2019) ("A blood draw is a search of the person."); *Schmerber v. California*, 384 U.S. 757, 767–68 (1966) ("Such [blood] testing procedures plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of that Amendment").

The Supreme Court has recognized that that same reasoning extends to seizures. In *Skinner*, for instance, although the Supreme Court analyzed the taking of blood or urine as a search, it explained that its analysis would be the same for a seizure: "Taking a blood or urine sample might also be characterized as a Fourth Amendment seizure, since it may be viewed as a meaningful interference with the employee's possessory interest in his bodily fluids." *Skinner*, 489 U.S. at 617 n.4; *see also Missouri v. McNeely*, 569 U.S. 141, 148 (2003) (explaining that taking someone's blood "implicates an individual's 'most personal and deep-rooted expectation of

privacy'"). That reasoning makes perfect sense: DNA collection—even if intended for a limited, lawful purpose—"put[s] into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained." *Birchfield v. North Dakota*, 579 U.S. 438, 463 (2016); *Maryland v. King*, 569 U.S. 435, 481 (2013) (Scalia, J., dissenting) (noting the "vast (and scary) scope" of DNA collection). As such, individuals absolutely have the right to block access to their own blood, DNA, and bodily fluids from unwanted government intrusion. That's a textbook "possessory interest."[8]

Courts throughout the country have confirmed the importance of an individual being able to safeguard their own blood and DNA. *See, e.g.*, *Norman-Bloodsaw v. Lawrence Berkley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998) ("One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's . . . genetic make-up."); *Green v. Berge*, 354 F.3d 675, 676–77 (7th Cir. 2004) (explaining that "the taking of a DNA sample" clearly implicates the Fourth Amendment, but finding the search reasonable on the merits); *United States v. Amerson*, 483 F.3d 73, 86 (2d Cir. 2007) (same); *State v. Medina*, 102 A.3d 661, 682 (Vt. 2014) (finding that a DNA collection program for certain defendants is unconstitutional because of the privacy concerns with DNA, which "provide[s] a massive amount of unique, private information about a person that goes beyond

---

[8] Further, one's property right and possessory interest in their own body is why individuals have the widely recognized right to sell their own blood plasma and to direct the use of their organs and blood for transplants or donations, even if not for sales. *See Flynn v. Holder*, 684 F.3d 852, 862 (9th Cir. 2012); 42 U.S.C. § 1982.

identification of that person"); *see also Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 231 F. Supp. 2d 942, 953–54 (S.D. Iowa 2002) ("Genetic information can be property, and, therefore, can form the basis for a common law conversion claim.").

It is unsurprising, then, that the federal courts in Texas and Michigan did *not* dismiss those identical claims under Defendants' theory that plaintiffs have no Fourth Amendment rights in their own blood and DNA. Rather, both courts addressed the merits of the Fourth Amendment claims. *See Kanuszewski*, 927 F.3d at 424; *Beleno*, 306 F. Supp. 3d at 942–44.

On the other side, Defendants cite no case saying that, for Fourth Amendment purposes, an individual has no interest or right in their own blood and DNA. Rather, Defendants rely on *Moore v. Regents of the University of California* and its progeny, which was about informed consent and conversion following a doctor's use of a patient's cells in research. 51 Cal. 3d 120 (Cal. 1990) (en banc).[9] MTD 22–23. The patient had leukemia, and after the doctor removed his spleen, the doctor successfully used the patient's cells in his research. *Moore*, 51 Cal. 3d at 125–27. The patient had two sets of claims—one against the doctor, and one against third parties the doctor

_____

[9] Defendants' other cases also boil down to informed consent. *See Wash. Univ. v. Catalona*, 437 F. Supp. 2d 985, 990, 997 (E.D. Mo. 2006) (finding that research participants "all singed informed consent forms" that donated their biological materials); *Greenberg v. Miami Children's Hosp. Rsch. Inst., Inc.*, 264 F. Supp. 2d 1064, (S.D. Fla. 2003) (relying on *Moore* while also explaining that "the property right in blood and tissue samples also evaporates once the sample is *voluntarily given* to a third party") (emphasis added); *see also State v. LaRosa*, 179 N.E.3d 89, 95 (Ohio 2021) (explaining that a criminal defendant did not have an expectation of privacy for his urine that was on someone else's property, which didn't even matter because the police had a warrant to obtain it anyways).

worked with (i.e., other researchers or companies who eventually used the cells). The court recognized that the patient *did* have a valid claim against the doctor for failing to obtain informed consent to use the cells in his research. *Id.* at 131–32. But for the other third parties, "into whose hands the cells come," the court held that they should not be liable under conversion—"a strict liability tort"—given that they likely did not know that the doctor had violated the patient's rights. *Id.* at 143–44.

Applying *Moore*'s principle here, Defendants would be liable for retaining and using Plaintiffs' blood without first obtaining informed consent. Defendants are akin to the doctor who improperly took the patient's cells. And while, under *Moore*'s logic, Plaintiffs may not have a state-law conversion claim against researchers to whom New Jersey gave blood spots, Plaintiffs absolutely have a viable claim against Defendants for improperly retaining their blood in the first place. *See* Elizabeth R. Pike, *Securing Sequences: Ensuring Adequate Protections for Genetic Samples in the Age of Big Data*, 37 Cardozo L. Rev. 1977, 1994 (2016) (explaining *Moore*'s application, or lack thereof, to newborn screening without parental consent). That's exactly what Plaintiffs have been saying all along: Just ask parents for informed consent.

### b.    Plaintiffs' Blood and DNA is Not Medical Waste.

Next, Defendants' claim that Plaintiffs have no possessory interest in their own blood because the blood spots "are a kind of medical waste." MTD 21. Generally, "medical waste" is considered a form of "abandoned property." *Pike*, *supra*, at 2014. And if property is abandoned, an individual "forfeits" their possessory interest in that property, along with any Fourth Amendment protections. *United States v. Fulani*,

368 F.3d 351, 354 (3d Cir. 2004). But here, Plaintiffs' blood spots are neither "medical waste," nor have they been "abandoned."

To start, Defendants' own conduct establishes that the blood spots are not "medical waste." Defendants cite to New Jersey's medical waste statutes, MTD 21 (citing N.J. Stat. Ann. § 13:1E-48.3; N.J. Admin. Code § 7:26-3A.6(a)), but those statutes impose strict conditions on how medical waste is packaged, stored, and disposed of. *See, e.g.*, N.J. Admin. Code 7:26-3A.11–.12. When it comes to the blood spots, Defendants are following none of those requirements. *See* FAC ¶ 37. Nor are Defendants following the mandate that "[a]ll regulated medical waste shall be disposed of within one year of the date of generation, or sooner." N.J. Admin. Code § 7:26-3A.12(b)(2). In other words, under Defendants' own policies, they do not treat the blood spots as "medical waste." This is not a serious argument.

Next, Defendants' argument also fails to appreciate that, for property to be "abandoned," an individual must "sufficiently manifest an intent to abandon" the property. *United States v. Harrison*, 689 F.3d 301, 307–08 (3d Cir. 2012). It is the government's burden to establish, "by clear and unequivocal evidence," that an individual intended to abandon his property. *See United States v. Moody*, 485 F.2d 531, 534 (3d Cir. 1973). This is "a difficult standard to meet, and one that requires a careful analysis of all the facts and circumstances of a particular case," *Harrison*, 689 F.3d at 309, including evidence of the "possessor's intent," *Moody*, 485 F.2d at 533– 34, and whether "the person so relinquished his interest in the property that he no

longer retained a reasonable expectation of privacy." *United States v. Ferguson*, 33 F. App'x 849, 850 (3d Cir. 2002) (such as denying ownership).

Here, nothing in Plaintiffs' complaint suggests they have abandoned their blood spots. Nor could they—Plaintiffs had no idea about the retention policy until recently and, if they had, they would "not have agreed to allow New Jersey to keep [their] children's blood for any length of time following [the] testing." FAC ¶¶ 60–62, 72–74. And when they did find out about the retention of the blood spots, they filed this class-action lawsuit to stop the practice. Plus, if Defendants want to continue to argue that Plaintiffs intended to abandon their blood spots, they need to present facts and evidence, something that can only happen following discovery.

If anything, Defendants' hypothetical Covid-19 swab analogy underscores the problems with their blood spot retention policy. New Jerseyans would be shocked to learn that Defendants were retaining Covid-19 swabs to create a state-wide database of everyone's DNA. That's when (and why) the Fourth Amendment and the continuing seizure doctrine kicks in. When people give consent to take mucus for a Covid-19 nasal swab, that authorizes the government's initial swab. But once that testing is complete, the government's justification for holding onto the swab ends. To continue holding onto the swab, Defendants must either get consent from patients or demonstrate some other constitutionally reasonable justification. FAC ¶¶ 164–73; *see also Brewster v. Beck*, 859 F.3d 1194, 1196–97 (9th Cir. 2017); *Asinor v. District of Columbia*, 111 F.4th 1249, 1255–58 (D.D.C. 2024). Just like the cars in *Brewster* and

the cell phones in *Asinor*, Defendants here cannot keep the blood spots for however long they want—and to use them however they want—without a warrant or consent.

### c. Parents Should Have the Default Choice About What To Do with Their Children's Blood Spots.

Defendants also suggest that the Fourth Amendment doesn't apply because Plaintiffs just want the blood spots destroyed. MTD 23 ("That they welcome widescale destruction as the default proves the logical inconsistency in their own claims."). But that argument mischaracterizes the actual relief that Plaintiffs request.

Plaintiffs don't want the default to be destruction—they want the default to be that Defendants *ask parents and get their consent about* what to do with the blood spots. Those options include: (a) obtaining consent to continue DOH's retention of the blood spots, (b) returning the blood spots to the parent or to the person from whom the blood was drawn (if they are now 18 years old), or (c) destroying the blood spot. FAC ¶ 177. Plaintiffs ask for the same relief for the blood spots DOH already has *and* for all blood spots moving forward. FAC ¶¶ 177, 179. Plaintiffs made this point in the Amended Complaint, explaining that a less-restrictive means to accomplish Defendants' goals was to give the blood spots to parents so they "can then properly safeguard the blood without the risk of government or third-party abuse." FAC ¶¶ 104–07. But Defendants have ignored that requested relief. And now, it's actually Defendants—not Plaintiffs—that made the unilateral decision to destroy millions of blood spots without asking parents for consent to do so, essentially violating the rights of New Jersey families all over again. *See* FAC ¶ 100; MTD 10 n.10.

**IV.    Application of the Special-Needs Exception Requires Discovery.**

Defendants also argue that the retention of the blood spots is reasonable under the special-needs exception to the Fourth Amendment. MTD 25–37. This argument is *by far* the longest in Defendants' Motion to Dismiss. But, as discussed below, it is one wholly unsuited for resolution on the pleadings.

Generally, the government needs a warrant or probable cause to seize property. *Wilcher v. City of Wilmington*, 139 F.3d 366, 373 (3d Cir. 1998). "There are, however, several well-established exceptions to the warrant and probable cause requirements." *Id.* The special-needs exception, as the name suggests, is one of those exceptions. *Neumeyer v. Beard*, 421 F.3d 210, 213–14 (3d Cir. 2005). When a search or seizure "serves *special government needs*, beyond the normal need for law enforcement," a Fourth Amendment intrusion may still be reasonable if the government's interests outweigh an individual's privacy expectations. *Id.* (quoting *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989)). This is a fact-intensive and context-specific balancing test. *See id.*; *Wilcher*, 139 F.3d at 374.

Under this exception, the burden is on the government, which "must prove" that it actually has some special need. *Neumeyer*, 421 F.3d at 214. And, as courts agree, that burden requires the government to produce evidence of that "special need" before it can meet its evidentiary burden. *Jakubowicz v. Dittemore*, No. 05-cv-4135, 2006 WL 2623210, at *5 (W.D. Mo. Sept. 12, 2006) (citing *Neumeyer* and collecting cases from courts of appeals and district courts across the country). Only then can the

31

Court balance the government's needs and interests against the severity of the government's interference with privacy interests. *Skinner*, 489 U.S. at 619–20.

That task is best left for summary judgment *after* a record is developed during discovery. Only then would the Court have real evidence to balance the governmental needs, the context of the Fourth Amendment intrusion, and whether there are less intrusive means to accomplish the same government goals. *Id.* at 612, 619–20 (making this determination after "the District Court granted summary judgment"); *Bd. of Educ. v. Earls*, 536 U.S. 822, 830–38 (2002) (evaluating the record evidence after summary judgment to determine whether a public school's drug testing policy met the special-needs exception); *see also Delaware v. Prouse*, 440 U.S. 648, 653–58 (1979) (evaluating the reasonableness of a Fourth Amendment intrusion after an evidentiary hearing on a motion to suppress). Indeed, even the cases Defendants cite confirm that discovery is needed to evaluate this Fourth Amendment question. *See Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 448 (1990) (evaluating a highway sobriety checkpoint program only after a "trial, at which the court heard extensive testimony concerning, *inter alia*, the 'effectiveness' of [the checkpoints]"); *Chandler v. Miller*, 520 U.S. 305, 311, 318–22 (1997) (evaluating the stipulated facts to determine whether the special-needs exception applied); *Neumeyer*, 421 F.3d at 211 (resolving at summary judgment).

This is exactly what the Sixth Circuit did in the Michigan retention case. To evaluate the reasonableness of retaining the blood spots, the Sixth Circuit explained that "[t]he case should proceed to discovery so that the parties may produce

evidence of the state's purposes for retaining, storing, and using the children's blood samples after they have been screened for diseases." *Kanuszewski*, 927 F.3d at 425. Then, on remand, the district court held "a bench trial . . . to complete the fact finding." *Kanuszewski*, 684 F. Supp. 3d at 645. And after that, the district court evaluated the record and balanced the governmental interests against the plaintiffs' privacy concerns and constitutional rights. *Id.* at 650–55. That evaluation included whether "there are less intrusive alternatives that could serve the same purpose without retaining [the blood] samples indefinitely." *Id.* at 652.

Accordingly, Defendants are jumping the gun by asking this Court to resolve the merits of the special-needs exception at the motion to dismiss stage. Defendants' motion goes to great lengths to marshal its own evidence and explanations about the alleged benefits of retaining the blood spots, MTD 26–33, while also trying to marginalize the risks involved in retaining the blood spots, MTD 33–37. This is also the purpose of the amicus brief supporting the retention policy. *See* NSA Br., Doc. 44 at 5–8, Doc. 44-2 (providing outside research and comments from clinicians, families, and researchers about the alleged benefits of retaining blood spots).

But weighing the evidence is wholly inappropriate at the pleadings stage. Defendants and their amicus may have compelling arguments—or maybe not. *See Kanuszewski*, 684 F. Supp. 3d at 649 (finding that Michigan's interests in retaining blood spots without parental consent did not outweigh the plaintiffs' personal privacy rights). But that's a question for the merits and discovery, not a Rule 12(b)(6) motion to dismiss, where the Court must accept the allegations in the complaint as true and

evaluate only whether those facts state a valid claim. *Hickey v. Univ. of Pittsburgh*, 81 F.4th 301, 308 (3d Cir. 2023). In making that determination, the Court relies solely on the allegations in the complaint—not on outside evidence. *See* Fed. R. Civ. P. 12(d).

The Court should follow *Kanuszewski* and let this case go to discovery. In fact, the First Amended Complaint, Defendants' Motion to Dismiss, and the amicus brief all underscore the need for discovery on the special-needs exception. Plaintiffs' complaint includes allegations that directly contradict Defendants' alleged interests in retaining the blood spots, FAC ¶¶ 126–31, 170, and the complaint proposes alternatives that would protect Plaintiffs' constitutional rights while still achieving Defendants' alleged interests. FAC ¶¶ 197–98. There are also, as the complaint alleges, many class-wide questions that need answering before the Court can resolve the merits of the underlying Fourth Amendment question. FAC ¶ 143(a)–(k).

Defendants' Motion to Dismiss also confirms the need for discovery. For instance, Defendants say that "[r]etention primarily benefits the individual child (and family) by allowing follow-up testing" in certain situations. MTD 27. How do we know whether that's true or needed? We don't. Defendants cite nothing; nor could they. No one has been deposed. There has been no discovery. So there is simply zero evidence about the benefits or risks of retention (or what Defendants are actually doing with the retained blood spots). *See* MTD 27. The same is true for every other alleged

34

"benefit" or "interest" Defendants have in retaining the blood spots—and for every "risk" that Defendants say isn't actually dangerous.[10]

For all of those alleged "benefits" and "hypothetical risks," Defendants ask the Court—on a motion to dismiss—to just take them at their word.[11] *See, e.g.*, MTD 31 (asserting that "there are compelling reasons to use an 'opt-out' for some period of retention after the initial testing is complete"). But the Complaint contradicts Defendants' statements and alleges that any government interest *is* outweighed by Plaintiffs' privacy concerns and constitutional rights. FAC ¶¶ 2, 48–52, 126–31, 193–98. And while the evidence may (or may not) support Defendants' alleged interests—or instead confirm Plaintiffs' allegations—that's a question for discovery and summary judgment. Indeed, there are many questions to answer in discovery just

---

[10] *See* MTD 18–19 (downplaying the risk that DOH will again misuse the blood spots as "hypothetical," "miniscule," "unduly speculative," "conjecture," and "misguided"); MTD 28 (stating that New Jersey "has a particularly strong interest" in retaining the blood spots to enable new testing, and that the blood spots can be sent to labs for various beneficial reasons); MTD 29 (asserting that siblings can benefit from the retention, and that the blood sports are "critical to maintaining and improving the NBS program for all children"); MTD 30 (insisting that DOH needs "a robust, broad-based range of samples" to perform tests, without any understanding of what that means, and that retention is needed to make the tests better); MTD 31 (alleging that the retention policy is needed to develop new tests); MTD 32–33 (stating that "logistics" with hospitals and birthing centers justify the "opt-out" policy); MTD 34–37 (characterizing the "risk[s]" associated with retention as "hardly [ ] serious," "rare," "extremely low," "dramatically mismatched," "implausible," and an "outlier attack").

[11] Defendants also incorrectly characterize what other states do. *See, e.g.*, *supra* p. 3, n.2. But even if the other states are doing the same thing, that doesn't mean New Jersey's policy is then constitutional. Retaining newborn blood without parental consent is a "modern and contested" problem that deserves no historical weight. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 222 (2020); *see also* FAC ¶ 16.

about Defendants' default "opt-out" policy and whether an "opt-in" policy could achieve the same alleged interests. For instance, both Defendants and the amicus argue that an "opt-in" policy would harm the overall newborn testing program because New Jersey would not have "a complete representative sample" of blood spots related to the overall population. NSA Br. 5–6; MTD 30–31. But that just raises more questions for discovery on this one issue:

- How many blood spots are needed for "quality control (QC) and quality assurance (QA) for DOH"? MTD 1, 30.

- How many blood spots are needed for "new-test development"? MTD 8.

- What rate of "opt-in" would be needed to achieve Defendants' alleged interests in retention?

- How many blood spots are needed to retain a statistically significant representative sample?

- How many blood spots are needed to "retain[ ] a broad-based population of residual blood spots"? MTD 30.

These are not just hypothetical questions. In the Michigan blood spot litigation, the state said it had the same interests as New Jersey: "to increase the accuracy of the screening process, to develop new tests, and to calibrate the equipment they use for the initial screening." *Kanuszewski*, 684 F. Supp. 3d at 651 (citations omitted). But during discovery, it was revealed that the state "only need[ed] some '5 to 10,000' spots to maintain the [program]" despite stockpiling "'millions' of blood spots . . . in a freezer" and collecting another "600,000 blood spots per year." *Id.* at 651–52.

With those numbers, it's no surprise that the district court in *Kanuszewski* found that "a robust and thorough consent process" could achieve the same results

while also protecting the parents' and children's constitutional rights. *Id.* at 652. The same may be revealed through discovery here, especially where New Jersey is collecting over 100,000 blood spots each year. FAC ¶¶ 19, 141; *see also* Pike, *supra*, at 2024–25 (explaining the problems with Texas's "opt-out" program).

There are countless other questions about the alleged benefits and the perceived risks of New Jersey's retention policy. (Such as, what third parties DOH gave blood spots to, including universities, like Rutgers and Princeton, or to companies, like Natera, Inc., and how many times DOH actually turned over blood spots to law enforcement officers. *See* FAC ¶¶ 48, 51, 113, 143.) To answer those questions, this case, just like the Michigan case, needs discovery.

## V.    Plaintiffs Alleged a Valid Substantive Due Process Claim.

Finally, Defendants argue that its "default retention policy does not implicate any fundamental right of the Parent-Plaintiffs," so the substantive due process claim should be dismissed. MTD 37–40. In doing so, Defendants say that their retention policy, that admittedly retains Plaintiffs' blood "in a government facility" without asking the parents, does not "usurp[ ]" any "family decision." MTD 39. Defendants ignore that *this* medical choice, "about whether to retain a child's blood for any amount of time post-testing," violates the parents' fundamental rights to make decisions about their children. FAC ¶¶ 188–98. As Plaintiffs allege, "after the newborn testing is completed, there is a choice about whether to retain a child's blood for any amount of time post-testing." FAC ¶ 188. But Defendants "have taken that choice away from every parent in New Jersey," choosing instead "*in lieu of* parents"

37

that Defendants should "automatically retain the blood of every child after the testing is complete." FAC ¶¶ 189–90. It is that usurpation that "strip[s] parents of their fundamental rights without a compelling reason to do so." FAC ¶ 191.

Again, the Sixth Circuit's decision in *Kanuszewski* is instructive. In rejecting a similar argument to the one Defendants make here, the Sixth Circuit said that holding onto children's blood without parent consent "constitute[s] a denial of the parents' fundamental right to direct the medical care of their children." *Kanuszewski*, 927 F.3d at 420. And with that denial of a fundamental right, the Sixth Circuit explained, the state's "actions must survive strict scrutiny." *Id.*; *see also id.* at 420 n.13 ("We emphasize that a fundamental right is at stake[.]"). The Sixth Circuit then remanded the substantive due process claim to the district court to determine the scope of parental consent, if any, and whether the state's interest in retaining the blood absent parental consent could survive strict scrutiny. *Id.* at 421. The Sixth Circuit reaffirmed *Kanuszewski's* holding last year, explaining that the "Michigan health program collected blood samples from newborns and stored the samples for future use," and that "[t]his compulsory storage program . . . violated nonconsenting parents' rights 'to make decisions concerning the medical care of their children.'" *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 418 (6th Cir. 2023) (distinguishing *Kanuszewski*, 927 F.3d at 403–04, 418).

The Court should follow the same steps here. "No one disputes that parents have rights to direct the upbringing on their children," MTD 38, and that right includes the fundamental right to make medical decisions. FAC ¶ 187 (citing *Gruenke*

*v. Seip*, 225 F.3d 290, 306–07 (3d Cir. 2000)). As such, Defendants are violating those rights of "nonconsenting parents" through its mandatory storage program. *Williams*, 783 F.4th at 418. That triggers strict scrutiny, which requires Defendants to show that its retention policy is "narrowly tailored" to "serve a compelling state interest." *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1821 (2024) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Plaintiffs allege that Defendants cannot meet strict scrutiny, FAC ¶¶ 193–98, but that's ultimately a question for discovery.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint in its entirety.

Dated: October 23, 2024.        Respectfully submitted,

/s/ CJ Griffin
CJ Griffin (NJ Bar No. 031422009)
PASHMAN STEIN WALDER HAYDEN, P.C.

*Counsel for Plaintiffs*

39