**CJ Griffin**
Partner
cgriffin@pashmanstein.com
Direct: 201.270.4930



May 8, 2025

**FILED AND SERVED VIA CM/ECF**
Hon. Georgette Castner, U.S.D.J.
United States District Court, District of New Jersey
402 E. State Street, Trenton, NJ 08608

**Re:** *Lovaglio v. Baston*, No.: 3:23-cv-21803-GC-RLS

Dear Judge Castner:

Pursuant to the Court's April 17 Order (ECF 48), Plaintiffs submit this response to Defendants' supplemental briefing (ECF 52). As explained here and in Plaintiffs' opposition to the motion to dismiss (ECF 47), this case is not moot, and Plaintiffs still have standing to challenge the unconstitutional policy that remains in effect.

**1. Defendants Are Still Violating the Constitution.** Plaintiffs filed this class-action lawsuit because Defendants were keeping the blood of every baby born in New Jersey in a state-run facility without first obtaining parental consent.[1] That hasn't changed. Under the new policy, Defendants are *still* keeping the blood of every baby born in New Jersey without parental consent. FAC ¶¶ 77–125. That violates the Constitution no matter the length of time Defendants decide to keep the blood, whether it be two weeks, two months, or two years. As such, Defendants' voluntary policy change, which shortened its retention period from 23 years to 2 years, accomplishes nothing with respect to this lawsuit. Under Count I, Plaintiffs explained that "retaining blood from the newborn screening program absent voluntary, informed consent violates the Fourth Amendment." FAC ¶ 175. And under Count II, Plaintiffs explained that "New Jersey's stockpiling of blood from the newborn screening program absent voluntary, informed consent violates Plaintiff Parents' fundamental right to make medical decisions for their children." *Id.* ¶ 195. Those claims remain live today. As a result, Defendants' "change" wasn't really a change at all: They are still violating the Constitution today in the precise way they were violating the Constitution 18 months ago when Plaintiffs filed the original complaint.[2] So this case is simply not moot as a factual matter.

That conclusion matches the Supreme Court's instructions on mootness. The Court has said that, when a case or controversy exists, the court "has a 'virtually unflagging obligation' to hear and resolve questions properly before it." *Id.* (quoting *Colorado River Water Conservation Dist. v.*

---

[1] *See generally* First Am. Compl. ("FAC"), ECF 31.

[2] Defendants frame this case incorrectly. They say the "alleged wrongful behavior" is the "23-year retention policy." *See* ECF 52 at 4. But this case is not about how long Defendants can keep the blood; it's about whether Defendants obtain *consent* to keep the blood in the first place.

Court Plaza South    Phone: 201.488.8200
21 Main Street, Suite 200    Fax: 201.488.5556
Hackensack, NJ 07601    www.pashmanstein.com

*United States*, 424 U.S. 800, 817 (1976)). In contrast, a case is moot if (and only if) "the alleged violation has ceased." *Finberg v. Sullivan*, 658 F.2d 93, 97 (3d Cir. 1980). So unless a defendant can "demonstrate that the constitutional violations . . . have ceased and will never recur," the case is *not* moot and the court retains jurisdiction to resolve the controversy. *Id.* at 98. To help make this determination, courts look at the relief requested in the complaint. If a court can still grant even a "partial remedy," the case is not moot. *Calderon v. Moore*, 518 U.S. 149, 150 (1996).

Here, Defendants have not ceased their constitutional violations. To actually moot Plaintiffs' case, Defendants would need to end the nonconsensual retention at the heart of Plaintiffs' complaint. That would require Defendants to begin obtaining voluntary, informed consent from parents before retaining the blood spots for *any* amount of time post testing, and to return or otherwise destroy blood spots of those from whom it could not obtain that consent. *See* FAC ¶¶ 161–74. But Defendants steadfastly refuse to do that; indeed, they continue to claim that the Constitution doesn't require it. *See* ECF 45-1 at 36–44. Thus, Plaintiffs have not obtained, as Defendants suggest, "all the relief they seek."[3] ECF 52 at 5; *see also id.* at 3 ("Plaintiffs are refusing complete relief simply to keep this case alive.").

Far from it. Plaintiffs asked the Court for declaratory judgments, on a class-wide basis, that Defendants' nonconsensual retention of blood from the newborn screening program violates the Fourth and Fourteenth Amendments. FAC at 52, Prayer for Relief, ¶¶ E–F. And they asked for injunctive relief that prevents Defendants from retaining any blood spots after the testing is completed absent voluntary, informed consent. *Id.* ¶¶ G–H (citing ¶¶ 177, 179). Because Defendants still retain blood without parents' consent, the Court can still grant that declaratory and injunctive relief. So even if the Court cannot order the return or destruction of particular blood spots that Defendants have unilaterally destroyed, there is still ample relief for the Court to grant. That makes the case very much "live."

Indeed, the Sixth Circuit recently confirmed that a near-identical challenge was not moot just because some of the blood was returned or destroyed. After Michigan's newborn-blood-retention policy was found to violate the Constitution, *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 684 F. Supp. 3d 637 (E.D. Mich. 2023), the state returned the plaintiffs' blood spots. The plaintiffs then moved to dismiss the defendants' appeal, arguing that the "debate about the constitutionality of retaining those samples is now moot." *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, No. 23-1733, at 2 (6th Cir. Nov. 4, 2024) (order) (copy attached as **Exhibit B**). But the Sixth Circuit disagreed, explaining that even though the plaintiffs' blood

---

[3] To factually moot this case, New Jersey would need to adopt something like what Utah enacted earlier this year. Under the "Newborn Infant Testing Privacy Amendments," which the Utah governor signed into law on March 26, 2025, the Utah Department of Health and Human Services "may retain, in accordance with the department's retention policy, a biological sample and any genetic data . . . only if a parent or guardian consents to the retention policy on the privacy consent form." Utah H.B. 363 at 4 (creating Utah Code § 26B-4-319(1)(b)(iii) (attached as **Exhibit A**)). And "if the newborn infant's parent or guardian does not consent to the department's retention policy," then the blood spot "shall be destroyed" "upon completion of the newborn infant's testing under this section." *Id.* (creating Utah Code § 26B-4-319(1)(c)). Defendants here, however, continue to refuse to give parents that choice. As a result, the case is *not* moot, and the Court can order Defendants to do so. *See* FAC, Prayer for Relief, ¶¶ E–H.

samples had been returned, the case was not moot. That was because the parties could still "obtain [] review of the constitutionality of the[] retention and use" of the blood spots, which would "have a concrete and meaningful effect on the ongoing operation of the Newborn Screening Program." *Id.* In other words, the case was not moot because a "partial remedy" still existed even if the plaintiffs' individual blood spots did not. *Id.* (emphasis added). That result makes perfect sense given that Michigan's policy of retaining blood without parental consent was still in full effect, even if some of that blood had been returned or destroyed. That reasoning applies equally here.

For their part, Defendants ignore the full relief that Plaintiffs seek. Instead, Defendants point to their policy change and say the case is moot just because Plaintiffs' individual blood spots could be destroyed. *See* ECF 52 at 3. But as the Third Circuit explained in a similar situation, "[t]he fundamental problem" with Defendants' argument "is that it begs the central question on which the defendants' motion turns," i.e., "whether the [case] is now moot." *Finberg*, 658 F.2d at 97. "Pointing to a change in the law . . . does not demonstrate that the constitutional violations . . . have ceased and will never recur." *Id.* Rather, to moot the case, Defendants must actually show that they have "completely and irrevocably eradicated" the constitutional violations. *Id.* at 98. But as already detailed, that has simply not happened. Thus, even under the new policy, the case is not moot.

None of Defendants' cases compel a different result. *See* ECF 52 at 2. That's because, in all those cases, there *was* complete relief that eradicated the constitutional violations. For instance, in *Clark v. Governor of New Jersey*, the Third Circuit said a church's challenge to a COVID-era restriction was "facially moot" because the governor "ceased to disfavor religion" in his restrictions. 53 F.4th 769, 776 (3d Cir. 2022). More simply, the governor completely stopped the unconstitutional conduct that plaintiffs sought to enjoin. The same was true in *New York State Rifle & Pistol Association v. City of New York*, where the plaintiffs "challenged a New York City rule regarding the transport of firearms." 590 U.S. 336, 337 (2020). The case became factually moot when New York "City amended the rule so that [plaintiffs] may now transport firearms" in a way that matched "the precise relief that petitioners requested in the prayer for relief in their complaint." *Id.* at 338–39. In each case,[4] the intervening event mooted the case because it ended the unconstitutional conduct writ large.

But Defendants cannot moot this case by claiming they are unilaterally complying with one small part of Plaintiffs' proposed injunction, all while keeping the rest of their unconstitutional policy in place. Defendants are *still* retaining the blood of every baby born in New Jersey without first obtaining voluntary, informed consent from parents. FAC ¶¶ 77–125. That constitutional injury will continue for whatever amount of time post-testing Defendants decide to keep the blood.

---

[4] *See also Khodara Env't, Inc. ex rel. Eagle Env't, L.P. v. Beckman*, 237 F.3d 186, 194 (3d Cir. 2001) (explaining how Congress "enacted legislation" that "discontinue[d] [the] challenged practice" in full); *Gulf of Maine Fishermen's All. v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002) (explaining that a challenge asking the court to invalidate a regulation was moot because the regulation was "now defunct" and the alleged "deficiencies have been eliminated"); *Akiachak Native Cmty. v. United States Dep't of Interior*, 827 F.3d 100, 105–06 (D.C. Cir. 2016) (same); *F.V. v. Cherry Hill Twp. Bd. of Educ.*, No. 1:21-cv-18096, 2023 WL 2662697, at *6 (D.N.J. Mar. 28, 2023), *aff'd*, No. 24-1344, 2025 WL 572396, at *1 (3d Cir. Feb. 21, 2025) (explaining that the defendant "voluntarily agreed to provide [the plaintiff] with *all* of the relief Plaintiffs demanded in both of their Petitions" (emphasis added)).

FAC ¶ 174. Perhaps that is why, until last week, Defendants "never claimed that this case is moot." *See* Defs.' Reply in Support of MTD, ECF 46 at 10.

  **2. Plaintiffs Still Have Standing.** With the unconstitutional policy still in place, Plaintiffs retain their standing to challenge it. That's true even if Defendants offered to destroy the Children-Plaintiffs' blood. Indeed, Defendants relied heavily on the same argument in their motion to dismiss, saying that Plaintiffs' injuries were "self-inflicted" because they didn't accept Defendants' previous invitation to destroy the blood. *See* ECF 45-1 at 25–30. Plaintiffs explained why Defendants were wrong then. ECF 47 at 24–28. And they are still wrong now.

  But even if the destruction of the Children-Plaintiffs' blood could single-handedly moot this case, several exceptions to mootness apply. Generally speaking, exceptions to the mootness doctrine are designed to prevent situations like this, where Defendants make a unilateral policy change in response to litigation to stop judicial review of the policy. *See Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024). As Plaintiffs have already explained at length, "[t]he voluntary cessation doctrine prevents such gamesmanship." ECF 47 at 20–22. That blackletter law has not changed: When the government simply issues a memorandum rescinding or changing its own policy, a case does *not* become moot.[5]

  Even were that not the case, the "capable-of-repetition-yet-evading-review" exception to mootness applies to the Parent-Plaintiffs' claim. *See* FAC ¶¶ 181–99. And the "inherently transitory" exception to mootness applies to the Children-Plaintiffs' claim. *See* FAC ¶¶ 156–80. Under both doctrines, the claims are not moot just because the children aged out of the new policy. *See* ECF 48 at 1 (flagging that "all three minor Plaintiffs are [now] over two years old"). Rather, these exceptions prevent a case from becoming moot when the challenged policy, like Defendants' new policy here, is too short to fully litigate while Plaintiffs remain subject to the policy.

  ***Parent-Plaintiffs.*** Under the "capable-of-repetition" exception, a case will not become moot "where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). When the challenged action will likely happen again, but "its duration [is] too short to be litigated prior to its cessation," the exception allows "a case [to] continue." *Praxis Props., Inc. v. Colonial Sav. Bank, S.L.A.*, 947 F.2d 49, 61 (3d Cir. 1991) (citation omitted). For instance, when the challenged action is the result of a "pattern" or "policy," recurrence is likely to occur, and the exception applies. *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985) (collecting cases); *accord Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 446 (3d Cir. 2025). In contrast, when the challenged conduct was just an isolated incident, the exception does not apply. In *Lyons*, for instance, a plaintiff claimed "that he was illegally strangled" by the police. 461 U.S. at 109. But the Supreme Court said it was unlikely to happen again because "no formal policy . . . sanctioned the application of the choke hold." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 345 (2d Cir. 1998). And without a policy,

---

[5] *See, e.g., Texas v. Biden*, 20 F.4th 928, 941–42 (5th Cir. 2021) (recognizing that the issuance of a memorandum alone does not moot a case), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022); *see also id.* at 956–57 (distinguishing the repeal of a statute from the issuance of a new memorandum); *Flynn v. Big Spring Sch. Dist.*, No. 1:22-cv-00961, 2024 WL 4244832, at *6 (M.D. Pa. Sept. 19, 2024) (explaining why the voluntary cessation doctrine applied when a school board just rescinded a policy in response to litigation).

recurrence was speculative. But where there *is* an official policy in place, courts routinely find "evidence of recurrence" because the policy itself would compel it. *Id.* (collecting cases).

The Parent-Plaintiffs easily meet that standard. They allege that they're likely to have more children. *See* FAC ¶¶ 55, 68. And when they do, Defendants admit (as they must) that the Parent-Plaintiffs will suffer the same constitutional violations under the new policy. *See* ECF 52 at 5; *see also* FAC ¶¶ 56, 69 (alleging that "when [Plaintiffs] have their next child, their child will be subject to New Jersey's unconstitutional blood-retention policy"). As a result, it is not just "reasonably likely" that Plaintiffs will suffer the identical injury when they have more children—it is certain.[6]

***Children-Plaintiffs.*** The "inherently transitory" exception is similar to the "capable-of-repetition" exception. It also applies when the duration of the challenged conduct is too short to fully litigate. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980). But unlike the "capable-of-repetition" exception, it applies when "there is no chance" that the plaintiff will suffer the same injury again. *Id.* In this situation, the plaintiff can still represent a class (and the case is not moot) if "it is certain that other persons similarly situated will [suffer] under the allegedly unconstitutional procedures." *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). For the Children-Plaintiffs, that's exactly what will happen. As Defendants point out, it's impossible to take newborn blood spots from the Children-Plaintiffs again. ECF 52 at 5. But under the new policy, Defendants will continue to retain bloodspots without consent for every newborn. FAC ¶¶ 83–101. Thus, the proposed class will suffer the same constitutional injury as the Children-Plaintiffs. *Id.* ¶¶ 136, 138.

That leaves just the timing. For both exceptions to apply, the policy must be short enough to evade full judicial review. *See Gulden v. Exxon Mobil Corp.*, 119 F.4th 299, 309 (3d Cir. 2024). Defendants say they will keep the blood for two years, which they think is enough time. ECF 52 at 5. But there must be "enough time to ***fully litigate*** a claim," including appeals. *Lara*, 125 F.4th at 446 (emphasis added). As the history of this case shows, that cannot happen in two years. Plaintiffs filed their original complaint on November 2, 2023. ECF 1. It has now been 18 months (or 553 days)—with the case still at the motion to dismiss stage. Even if new plaintiffs filed a lawsuit from the hospital, it would take more than two years to litigate these constitutional claims through appeal. Indeed, in Michigan, nearly identical claims are still pending in the Sixth Circuit ***7 years*** after the complaint was filed. *See* ECF 3, *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, No. 1:18-cv-10472 (E.D. Mich. Feb. 17, 2018). And similar claims in Minnesota took ***5 years*** from start to finish. *See* Minn. Dep't of Health, *Lawsuit Settlement Allows Newborn Screening Program to Move Forward* (Jan. 13, 2014), https://tinyurl.com/MN-Baby-Blood.

For these reasons, and those briefed in Plaintiffs' opposition to the motion to dismiss (ECF 47), this case is not moot. The Court should deny Defendants' motion to dismiss.

---

[6] Defendants try to downplay this reality, arguing that "even if [the Parent-Plaintiffs] did have more children, the new policy allows parents to request destruction of their child's bloodspots." ECF 52 at 5. But that just goes to the merits of the case and whether New Jersey's "opt-out" option satisfies the Fourth and Fourteenth Amendments. *See* ECF 47 at 28–31.

Respectfully submitted,

/s/ CJ Griffin
CJ Griffin, Esq. (NJ Bar No. 031422009)
PASHMAN STEIN WALDER HAYDEN, P.C.

Brian A. Morris, Esq.*
Robert Frommer, Esq.*
Christen M. Hebert, Esq.*
INSTITUTE FOR JUSTICE

*Attorneys for Plaintiffs*
*\*Pro Hac Vice Counsel*

cc: All counsel of record (via CM/ECF)

# EXHIBIT A

Enrolled Copy                                                                                    H.B. 363

## Maternal and Infant Amendments
### 2025 GENERAL SESSION
### STATE OF UTAH
### Chief Sponsor: Candice B. Pierucci
Senate Sponsor: Heidi Balderree

**LONG TITLE**

**General Description:**
    This bill addresses newborn infant testing.

**Highlighted Provisions:**
    This bill:
- requires the Department of Corrections and the county jails to ensure that each female individual admitted to a correctional facility is tested for pregnancy;
- amends the membership of the Correctional Postnatal and Early Childhood Advisory Board (the board);
- extends the repeal date of the board;
- requires the Department of Health and Human Services (department) to publish a privacy consent form pertaining to newborn infant testing;
- requires that the privacy consent form be provided to a newborn infant's parent or guardian prior to conducting a newborn infant heelstick screen;
- makes hearing loss a required newborn infant test, regardless of the number of annual births that occur at the hospital or setting where the infant was born;
- provides for giving a parent or guardian the option to consent to the department's retention policy for biological samples or genetic data collected through newborn infant testing;
- requires the department to destroy a biological sample or any genetic data collected through newborn infant testing; and
- makes technical changes.

**Money Appropriated in this Bill:**
    None

**Other Special Clauses:**

| | |
|---|---|
| 28 | None |
| 29 | **Utah Code Sections Affected:** |
| 30 | AMENDS: |
| 31 | **17-22-8**, as last amended by Laws of Utah 2023, Chapters 119, 420 |
| 32 | **26B-4-319**, as renumbered and amended by Laws of Utah 2023, Chapter 307 |
| 33 | **63I-1-264**, as last amended by Laws of Utah 2024, Third Special Session, Chapter 5 |
| 34 | **64-13-46**, as last amended by Laws of Utah 2024, Chapter 182 |
| 35 | **64-13-46.1**, as renumbered and amended by Laws of Utah 2024, Chapter 182 |

37 *Be it enacted by the Legislature of the state of Utah:*
38     Section 1. Section **17-22-8** is amended to read:
39     **17-22-8 . Care of prisoners -- Funding of services -- Private contractor.**
40 (1) As used in this section, "medication assisted treatment plan" means a prescription plan
41     to use buprenorphine, methadone, or naltrexone to treat substance use withdrawal
42     symptoms or an opioid use disorder.
43 (2) Except as provided in Subsection (7), a sheriff shall:
44     (a) receive each individual committed to jail by competent authority;
45     (b) provide each prisoner with necessary food, clothing, and bedding in the manner
46         prescribed by the county legislative body;
47     (c) provide each prisoner medical care when:
48         (i) the prisoner's symptoms evidence a serious disease or injury;
49         (ii) the prisoner's disease or injury is curable or may be substantially alleviated; and
50         (iii) the potential for harm to the person by reason of delay or the denial of medical
51             care would be substantial;
52     (d) provide each prisoner, as part of the intake process, with the option of continuing any
53         of the following medically prescribed methods of contraception:
54         (i) an oral contraceptive;
55         (ii) an injectable contraceptive;
56         (iii) a patch;
57         (iv) a vaginal ring; or
58         (v) an intrauterine device, if the prisoner was prescribed the intrauterine device
59             because the prisoner experiences serious and persistent adverse effects when using
60             the methods of contraception described in Subsections (2)(d)(i) and (ii);[ and]
61     (e) cooperate with medical personnel to continue a medication assisted treatment plan

| | |
|---|---|
| 62 | for an inmate if the inmate was an active client before arrest and commitment[.] ; and |
| 63 | (f) ensure that each female prisoner younger than 50 years old who has been |
| 64 | incarcerated for longer than 72 hours on a state or local criminal offense is offered, |
| 65 | which the prisoner may reject, a test for pregnancy. |
| 66 | (3) A sheriff may provide the generic form of a contraceptive described in Subsection |
| 67 | (2)(d)(i) or (ii). |
| 68 | (4) A sheriff shall follow the provisions of Section 64-13-46 if a prisoner is pregnant or in |
| 69 | postpartum recovery[, including the reporting requirements in Subsection 64-13-45(2)(c)]. |
| 70 | (5)(a) Except as provided in Section 17-22-10 and Subsection (5)(b), the expense |
| 71 | incurred in providing the services required by this section to prisoners shall be paid |
| 72 | from the county treasury. |
| 73 | (b) The expense incurred in providing the services described in Subsection (2)(d) to |
| 74 | prisoners shall be paid by the Department of Health and Human Services. |
| 75 | (6) A medication used for a medication assisted treatment plan under Subsection (2)(e): |
| 76 | (a) shall be administered to an inmate in accordance with the inmate's prescription under |
| 77 | the direction of the sheriff; |
| 78 | (b) may be paid for by a county; and |
| 79 | (c) may be left or stored at a jail at the discretion of the sheriff. |
| 80 | (7) If the county executive contracts with a private contractor to provide the services |
| 81 | required by this section, the sheriff shall provide only those services required of the |
| 82 | sheriff by the contract between the county and the private contractor. |
| 83 | Section 2. Section **26B-4-319** is amended to read: |
| 84 | **26B-4-319 . Testing of newborn infants.** |
| 85 | (1)(a) Except in the case where parents object on the grounds that they are members of a |
| 86 | specified, well-recognized religious organization whose teachings are contrary to the |
| 87 | tests required by this section, a newborn infant shall be tested for: |
| 88 | [(a)] (i) phenylketonuria (PKU); |
| 89 | [(b)] (ii) other heritable disorders which may result in an intellectual or physical |
| 90 | disability or death and for which: |
| 91 | [(i)] (A) a preventive measure or treatment is available; and |
| 92 | [(ii)] (B) there exists a reliable laboratory diagnostic test method; |
| 93 | [(c)(i) an infant born in a hospital with 100 or more live births annually, hearing |
| 94 | loss; and] |
| 95 | [(ii) an infant born in a setting other than a hospital with 100 or more live births |

| | |
|---|---|
|96|                    annually, hearing loss; and]|
|97|          (iii)  hearing loss; and|
|98|          [(d)] (iv)  critical congenital heart defects using pulse oximetry.|
|99|     (b)(i)  Prior to conducting newborn infant testing under this section, information shall|
|100|         be provided to the newborn infant's parent or guardian explaining relevant facts|
|101|         and information about newborn infant testing and sample storage under this|
|102|         section.|
|103|         (ii)  Prior to conducting a newborn infant heelstick screen under this section, a copy of|
|104|             the privacy consent form described in Subsection (5) shall be provided to the|
|105|             newborn infant's parent or guardian.|
|106|         (iii)  The department may retain, in accordance with the department's retention policy,|
|107|             a biological sample and any genetic data, as those terms are defined in Section|
|108|             13-60-102, collected under this section, only if a parent or guardian consents to|
|109|             the retention policy on the privacy consent form.|
|110|     (c)  A biological sample and any genetic data collected under this section shall be|
|111|         destroyed:|
|112|         (i)  according to the department's retention policy; or|
|113|         (ii)  if the newborn infant's parent or guardian does not consent to the department's|
|114|             retention policy, upon completion of the newborn infant's testing under this|
|115|             section.|
|116|     (2)  In accordance with Section 26B-1-209, the department may charge fees for:|
|117|         (a)  materials supplied by the department to conduct tests required under Subsection (1);|
|118|         (b)  tests required under Subsection (1) conducted by the department;|
|119|         (c)  laboratory analyses by the department of tests conducted under Subsection (1); and|
|120|         (d)  the administrative cost of follow-up contacts with the parents or guardians of tested|
|121|             infants.|
|122|     (3)  Tests for hearing loss described in Subsection (1) shall be based on one or more|
|123|         methods approved by the Newborn Hearing Screening Committee created in Section|
|124|         26B-1-432, including:|
|125|         (a)  auditory brainstem response;|
|126|         (b)  automated auditory brainstem response; and|
|127|         (c)  evoked otoacoustic emissions.|
|128|     (4)  Results of tests for hearing loss described in Subsection (1) shall be reported to:|
|129|         (a)  the department; and|

130          (b) when results of tests for hearing loss under Subsection (1) suggest that additional
131                diagnostic procedures or medical interventions are necessary:
132                (i) a parent or guardian of the infant;
133                (ii) an early intervention program administered by the department in accordance with
134                     Part C of the Individuals with Disabilities Education Act, 20 U.S.C. Sec. 1431 et
135                     seq.; and
136                (iii) the Utah Schools for the Deaf and the Blind, created in Section 53E-8-201.
137     (5) The department shall publish a privacy consent form containing:
138          (a) relevant facts and information about:
139                (i) the purposes for which the department retains biological samples or any genetic
140                     data obtained through newborn infant testing; and
141                (ii) the department's retention policy for biological samples or any genetic data
142                     obtained through newborn infant testing; and
143          (b) the option for a parent or guardian to indicate consent to the department's retention
144                policy.
145          Section 3. Section **63I-1-264** is amended to read:
146          **63I-1-264 . Repeal dates: Title 64.**
147     Section 64-13-46.1, Correctional Postnatal and Early Childhood Advisory Board, is
148     repealed July 1, [2025] 2027.
149          Section 4. Section **64-13-46** is amended to read:
150          **64-13-46 . Pregnant inmates.**
151     (1) As used in this section:
152          (a) "Postpartum recovery" means, as determined by the pregnant inmate's physician, the
153                period immediately following delivery, including the entire period the inmate is in
154                the hospital or health care facility after birth.
155          (b) "Restraints" means any physical restraint or mechanical device used to control the
156                movement of an inmate's body or limbs, including flex cuffs, soft restraints, shackles,
157                or a convex shield.
158          (c)(i) "Shackles" means metal restraints, including leg irons, belly chains, or a
159                security or tether chain.
160                (ii) "Shackles" does not include hard metal handcuffs.
161     (2) The department shall ensure that each female inmate younger than 50 years old is
162          offered, which the inmate may reject, a test for pregnancy upon admission, or within a
163          reasonable time after admission, to a correctional facility.

164    [(2)] (3)  Subject to Subsections [(3) and (4)] (4) and (5), if the staff of a correctional facility
165           knows or has reason to believe that an inmate is pregnant or is in postpartum recovery,
166           the staff shall, when restraining the inmate at any time or location, use the least
167           restrictive restraints necessary to ensure the safety and security of the inmate and others.
168    [(3)] (4)  A correctional staff member may not use restraints on an inmate during the third
169           trimester of pregnancy, labor, or childbirth unless a correctional staff member makes an
170           individualized determination that there are compelling grounds to believe that the inmate
171           presents:
172        (a)  an immediate and serious risk of harm to the inmate, the inmate's infant, medical
173              staff, correctional staff, or the public; or
174        (b)  a substantial risk of escape that cannot reasonably be reduced by the use of other
175              existing means.
176    [(4)] (5)  Notwithstanding Subsection [(3)] (4), under no circumstances may shackles, leg
177           restraints, or waist restraints be used on an inmate during the third trimester of
178           pregnancy, labor, childbirth, or postpartum recovery.
179    [(5)] (6)  Correctional staff present during labor or childbirth shall:
180        (a)  be stationed in a location that offers the maximum privacy to the inmate, while
181              taking into consideration safety and security concerns; and
182        (b)  be female, if practicable.
183    [(6)] (7)  If a correctional staff member authorizes restraints under Subsection [(2) or (3)] (3)
184           or (4), the correctional staff member shall make a written record of the authorization and
185           use of the restraints that includes:
186        (a)  an explanation of the grounds for the correctional staff member's authorization on the
187              use of restraints;
188        (b)  the type of restraints that were used; and
189        (c)  the length of time the restraints were used.
190    [(7)] (8)  The record described in Subsection [(6)] (7):
191        (a)  shall be retained by the correctional facility for five years;
192        (b)  shall be available for public inspection with individually identifying information
193              redacted; and
194        (c)  may not be considered a medical record under state or federal law.
195    [(8)] (9)  For a minimum of 48 hours after an inmate has given birth, a correctional facility
196           shall, if directed by the inmate's physician, allow the infant to remain with the inmate at
197           the health care facility.

198   [(9)] (10) A correctional facility shall provide:
199   (a) an inmate who is pregnant, or who has given birth within the past six weeks, access
200   to a social worker to help the inmate:
201   (i) arrange childcare;
202   (ii) establish a reunification plan; and
203   (iii) establish a substance abuse treatment plan, if needed; and
204   (b) an inmate in postpartum recovery access to postpartum care for up to 12 weeks as
205   determined by the inmate's physician.
206   [(10)] (11) The department may not create or operate a nursery in a correctional facility to
207   provide space for a female inmate and the inmate's child.
208   Section 5. Section **64-13-46.1** is amended to read:
209   **64-13-46.1 . Correctional Postnatal and Early Childhood Advisory Board --**
210   **Duties -- Rulemaking.**
211   (1) As used in this part:
212   (a) "Advisory board" means the Correctional Postnatal and Early Childhood Advisory
213   Board.
214   (b) "Correctional facility" means a facility operated by the department or a county
215   sheriff that houses inmates in a secure setting.
216   (c) "Incarcerated mother" means an inmate who:
217   (i) has recently given birth before entering a correctional facility;
218   (ii) is pregnant and incarcerated in a correctional facility; or
219   (iii) has given birth while incarcerated in a correctional facility.
220   (2) The advisory board shall consist of the following members:
221   (a) two individuals from the department, appointed by the executive director;
222   (b) one individual appointed by the Board of Pardons and Parole;
223   (c) one individual appointed by the president of the Utah Sheriffs' Association;
224   (d) one individual representing the Administrative Office of the Courts appointed by the
225   Judicial Council;
226   (e) one individual appointed by the Statewide Association of Public Attorneys and
227   Prosecutors;
228   (f) one individual appointed by the Utah Association of Criminal Defense Lawyers; and
229   [(d)] (g) four individuals appointed by the executive director of the Department of Health
230   and Human Services, including:
231   (i) [two] one pediatric healthcare [providers] provider;

232             (ii)  one individual with expertise in early childhood development;
233             (iii) one individual employed by the Division of Child and Family Services; and
234             [(iii)] (iv) one individual with experience advocating for incarcerated women.
235     (3)[(a) Except as provided in Subsection (3)(b), a member of the advisory board shall be
236             appointed for a four-year term.]
237         [(b) A member that is appointed to complete an unexpired term may complete the
238             unexpired term and serve a subsequent four-year term.]
239         [(c) Appointments and reappointments may be staggered so that one-fourth of the
240             advisory board changes each year.]
241         [(d)] The advisory board shall annually elect a chair and co-chair of the board from
242             among the members of the board[ to serve a two-year term].
243     (4) The advisory board shall meet at least bi-annually, or more frequently as determined by
244         the executive director, the chair, or three or more members of the advisory board.
245     (5) A majority of the board constitutes a quorum and a vote of the majority of the members
246         present constitutes an action of the advisory board.
247     (6) A member of the advisory board may not receive compensation or benefits for the
248         member's service, but may receive per diem and travel expenses as allowed in:
249         (a) Section 63A-3-106;
250         (b) Section 63A-3-107; and
251         (c) rules made by the Division of Finance in accordance with Sections 63A-3-106 and
252             63A-3-107.
253     (7) The advisory board shall:
254         (a) review research regarding childhood development and best practices for placing
255             infants and incarcerated mothers in a diversion program not located in a correctional
256             facility;
257         (b) study the costs of implementing a diversion program for infants and incarcerated
258             mothers removed from a correctional facility;
259         (c) create a provisional plan for implementing a diversion program for infants and
260             incarcerated mothers removed from a correctional facility; and
261         (d) advise and make recommendations to the department and county sheriffs regarding
262             rules and policies for placing an infant or incarcerated mother in a diversion program
263             not located in a correctional facility.
264     (8) On or before November 30[, 2024] of each year, the advisory board shall provide a
265         report of the advisory board's research and study under Subsections (7)(a) through (c),

266     including any proposed legislation, to:
267         (a)  the Law Enforcement and Criminal Justice Interim Committee; and
268         (b)  the [~~Executive Offices and~~ ]Criminal Justice Appropriations Subcommittee.
269         Section 6.  **Effective Date.**
270     This bill takes effect on May 7, 2025.

# EXHIBIT B

No. 23-1733

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 4, 2024
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| ADAM KANUSZEWSKI, et al., | ) |
| | ) |
|     Plaintiffs-Appellees, | ) |
| | ) |
| v. | )    O R D E R |
| | ) |
| MICHIGAN DEPARTMENT OF HEALTH AND | ) |
| HUMAN SERVICES, et al., | ) |
| | ) |
|     Defendants-Appellants. | ) |

Before: GILMAN, GIBBONS, and THAPAR, Circuit Judges.

Defendants—a Michigan state entity and several state employees sued in their official and individual capacities—appeal the district court's judgment for Plaintiffs—four Michigan parents and nine minor children—in this civil rights suit challenging the collection, testing, and storage of blood samples drawn from every newborn delivered in the state, as well as the resulting genetic data, as part of Michigan's Newborn Screening Program. Plaintiffs move to dismiss the appeal in part, arguing that Defendants' challenge to the district court's Fourteenth Amendment analysis was mooted by the return and destruction of the samples. Defendants oppose dismissal and, alternatively, move to vacate any district court decision that resulted in mootness.

"[I]f events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give meaningful relief, then the case is moot and must be dismissed." *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019) (alteration in original) (quoting *Ailor v. City of*

No. 23-1733
-2-

*Maynardville*, 368 F.3d 587, 596 (6th Cir. 2004)).  Plaintiffs concede that Defendants have a live case or controversy regarding the as-yet retained computer data.  Instead, they assert that we are no longer able to give meaningful relief regarding the retention or return of the physical blood samples, and that, as a result, any debate about the constitutionality of retaining those samples is now moot.

We disagree.  To be sure, Defendants can no longer obtain the return of the blood samples, but they can obtain a review of the constitutionality of their retention and use.  And "even the availability of a 'partial remedy'" is sufficient to avoid mootness.  *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).  Moreover, our judgment will have a concrete and meaningful effect on the ongoing operation of the Newborn Screening Program and the future invocation of qualified immunity by state employees involved in the program.  Thus, our merits order would not be an impermissible advisory opinion about an "abstract proposition[]." *Id.* (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).

Accordingly, the motion to dismiss is **DENIED** and the motion to vacate is **DENIED AS MOOT**.

ENTERED BY ORDER OF THE COURT

Kelly L. Stephens, Clerk