<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HANNAH LOVAGLIO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KAITLAN BASTON, *et al.*, <br><br> Defendants. | Civil Action No. 23-21803 (GC) (RLS) <br><br> <u>**OPINION**</u> |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court upon Defendants Kaitlan Baston and Nancy Scotto-Rosato's Motion to Dismiss Plaintiffs' First Amended Complaint (FAC). (ECF No. 45.) Plaintiffs opposed (ECF No. 47), and Defendants replied (ECF No. 46). The Newborn Screening Alliance filed a brief as *amicus curiae* in support of Defendants' Motion. (ECF No. 44.) The parties also filed supplemental letter briefs at the Court's direction. (ECF Nos. 52, 53, 57, 59.) After careful consideration of the parties' submissions and arguments, and for the reasons set forth below, and other good cause shown, Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

## I.    <u>BACKGROUND</u>[1]

Hannah Lovaglio and Erica and Jeremiah Jedynak (collectively, Parent Plaintiffs) and

---

[1]    On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted).

minor children, J.L., B.L., and C.J. (collectively, Minor Plaintiffs)[2] seek to challenge the New Jersey Department of Health's (NJDOH or the State) retention of infant residual dried blood spots in connection with its Newborn Screening Program. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983[3] against Kaitlan Baston, the Commissioner of NJDOH, and Nancy Scotto-Rosato, the Assistant Commissioner for NJDOH's Division of Family Health Services. (ECF No. 31 ¶¶ 9, 14-15.)[4]

### 1. New Jersey's Newborn Screening Program

The State, through its Newborn Screening Program, tests every baby born in the State for a "wide range of disorders." (*Id.* ¶ 16.) Healthcare providers at hospitals in the State administer a heel "prick" within 48 hours of the baby's birth, collecting the baby's blood spots on a paper card. (*Id.* ¶ 17.) According to Plaintiffs, the State does not seek parental consent before administering the heel prick. (*Id.* ¶ 20.) Parents receive a handout about the program in the packet of paperwork that every new parent receives at the hospital. (*Id.* ¶ 21.) Hospital staff are required to ensure that every parent is "informed of the purpose and need for newborn screening and given newborn screening educational materials." (*Id.* ¶ 25 (quoting N.J. Admin. Code §§ 8:18-1.2-1.4).) The State also provides a PowerPoint presentation online designed to give healthcare providers an overview of the program. (*Id.* ¶ 26.)

---

[2]    When this action was filed, Lovaglio's children J.L. and B.L. were five and one and a half years old, respectively. (ECF No. 31 ¶ 12.) The Jedynaks' child, C.J., turned two years old in December 2023. (*Id.* ¶ 13.)

[3]    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

[4]    Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

Testing is mandatory unless the baby's parent or guardian objects to testing on religious grounds. (*Id.* ¶ 27.) There is no requirement that parents are informed of their right to object on religious grounds. (*Id.* ¶ 28.) Parents may also choose to opt-in and purchase additional testing performed at a private lab. (*Id.* ¶¶ 29-30.)

The paper card with the newborn's blood is tested at NJDOH's laboratory "just outside of Trenton, New Jersey." (*Id.* ¶ 19.) Results are typically available within one to two weeks after the baby is born. (*Id.* ¶ 34.) The State sends the results to the hospital where the baby was born. (*Id.* ¶ 32.) If the results are abnormal, the State also sends the results directly to the baby's pediatrician. (*Id.* ¶ 35.) Parents are not able to access their baby's results directly. (*Id.* ¶ 36.) NJDOH's laboratory keeps the blood for 14 days before transferring the unused blood—the residual dried blood spots—to a storage area. (*Id.* ¶¶ 37-38.)

At the time this lawsuit was filed, NJDOH stored the residual dried blood spots for 23 years after testing. (*Id.* ¶¶ 39-40.) Plaintiffs allege that over 100,000 babies are born each year in New Jersey; thus, New Jersey is "stockpiling *millions* of blood spots from the [N]ewborn [S]creening [P]rogram." (*Id.* ¶ 141.) No statute requires New Jersey to destroy the blood or retain it. (*Id.* ¶¶ 41-42.) According to Plaintiffs, the State never informed parents that it would store their baby's blood after the newborn screening testing was completed. (*Id.* ¶ 44.) Nor does the State seek parental consent to store the blood after testing. (*Id.* ¶ 46.) Plaintiffs allege that the State not only keeps the unused blood for itself but also provides the blood to third parties. (*Id.* ¶ 48.) A lawsuit filed by the New Jersey Office of Public Defenders revealed that the State gave unused blood to law enforcement officers without a warrant on at least five occasions. (*Id.* ¶¶ 49-50.) Plaintiffs also allege that the State gives or sells blood from its "baby blood stockpile" to other third parties, such as researchers, companies, and other government agencies. (*Id.* ¶ 51.) Plaintiffs assert that

the State's "scheme[]" is similar to other states that have been "caught using babies' blood in alarming ways," such as Texas "turning over blood to the Pentagon to create a national (and someday international) registry." (*Id.* ¶ 66.)

### 2. NJDOH's New Policies Regarding Newborn Screening

Plaintiffs allege that in response to their lawsuit, NJDOH made a "surprise" public announcement on June 20, 2024, stating that it was changing its retention policy for newborn blood. (*Id.* ¶¶ 80-82.) The State now retains unused blood for two years (if the blood tests negative)[5] and ten years (if the blood tests positive). (*Id.* ¶ 83.) Under this new policy, the State still does not obtain parental consent before retaining the baby's blood. (*Id.* ¶ 85.) Starting on November 1, 2024, NJDOH began destroying all residual blood spots for children who are now older than two years old. (*Id.* ¶¶ 100, 102.)

On July 25, 2024, NJDOH revised the handout provided to every new parent in New Jersey. (*Id.* ¶ 87.) The new handout, which went into effect on November 1, 2024, states that an infant's blood will be "securely stored for 2 years to ensure the integrity of [the] baby's tests results (for example, to rule out false positive or false negative results)." (*Id.* ¶ 89.) The new handout explains that at a parent's request, the residual dried blood spots can be "[d]estroyed at any time after testing, including <u>before</u> [the] child is 2 years old"—an "opt-out" approach—or "[s]tored for additional time, up to 8 years beyond the initial 2-year retention period." (*Id.* (emphasis in original).) The destruction and extended-retention forms are available via a QR code provided on the handout. (*Id.*) According to the new handout, NJDOH will "destroy the sample after two years" if it does not hear otherwise from parents. (*Id.*) The handout also provides that NJDOH uses newborn blood spots "only for the following purposes: (1) newborn screening for [the] baby;

---

[5]     The test results for Minor Plaintiffs were all normal. (*Id.* ¶¶ 57, 70.) According to the First Amended Complaint, New Jersey retained the blood of Minor Plaintiffs. (*Id.* ¶¶ 58, 71.)

(2) routine quality assurance and quality control for DOH's lab; and (3) developing new tests for disorders." (*Id.*) Any blood used for the second or third purposes will be de-identified, *i.e.*, without reference to the child's name. (*Id.*) The handout further states that NJDOH will not release residual dried blood spots "in identified form to non-law enforcement third parties without [parental] consent," and that NJDOH will release residual dried blood spots to law enforcement "only with [parental] consent or consistent with the Attorney General's binding Law Enforcement Directive." (*Id.* (emphasis in original).) Finally, the handout provides that de-identified spots "will be released to third parties only as allowed by federal law." (*Id.*)

The Attorney General's Law Enforcement Directive, issued on June 20, 2024, states that law enforcement agencies may be able to obtain residual dried blood spots from newborn screening, but only "in genuinely exceptional circumstances." (*Id.* ¶¶ 115, 117.) The Directive provides that in order to access residual dried blood spots retained from the screening program, law enforcement agencies must "first seek approval [in writing] from the Director of the Division of Criminal Justice," explaining why the circumstance prompting the request are exceptional and why less intrusive means are insufficient. (*Id.* ¶¶ 118, 119.) The Directive also states that it "shall take effect immediately, and shall remain in force and effect unless and until it is repealed, amended, or superseded by Order of the Attorney General." (*Id.* ¶ 122.)

According to Plaintiffs, NJDOH's changes to the retention policy and handout are "voluntary" and "non-binding," meaning that the changes were not made in compliance with the Administrative Procedure Act and could be changed with the issuance of a new press release. (*Id.* ¶¶ 85-86.) Plaintiffs allege that nothing prevents Defendants or the Attorney General from "rescinding, amending, or changing" these new policies "at any time and for any reason whatsoever." (*Id.* ¶¶ 85-86.)

### 3. NJDOH's Interest in Retaining Residual Dried Blood Spots

Plaintiffs allege that NJDOH's interest in retaining newborn residual dried blood spots without informed consent is "minimal" or "nonexistent." (*Id.* ¶ 126.) They assert that the Centers for Disease Control and Prevention (CDC) provide newborn screening laboratories with quality assurance services. (*Id.* ¶ 127.) The CDC supplies laboratories with dried blood spots that mimic newborn specimens to ensure that their testing accurately detects disorders and minimizes false positives. (*Id.*) Plaintiffs allege that all newborn screening laboratories in the United States use the CDC's quality assurance services. (*Id.* ¶ 128.) Plaintiffs assert that while newborn blood does differ from the blood of older infants and adults, "'blood collected from any source, including cord blood,' can be modified to promote quality assurance in newborn screening laboratories." (*Id.* ¶ 129 (quoting W. Harry Hannon et al., *Newborn Screening Quality Assurance, in Genetics and Public Health in the 21st Century* 243, 245 (Muin Khoury et al., eds., Oxford University Press 2000).)

Plaintiffs allege that to the extent there is any remaining government interest in keeping blood spots beyond initial screening, the State can obtain voluntary, informed consent for the retention of those blood spots before birth—an "opt-in" approach. (*Id.* ¶ 130.) Plaintiffs assert that other states, like Virginia, employ "less restrictive" approaches to preserving newborn blood in the event that they need to rule out a false positive or a false negative test or result. (*Id.* ¶ 105.) Virginia's "Child ID Blood Spot" program gives parents the option when their child is born to have the hospital collect and give parents a sample of the newborn's blood. (*Id.* ¶ 106.) Virginia parents can then "properly safeguard the blood without risk of government or third-party abuse." (*Id.* ¶ 107.)

### 4. Class Allegations

Based on the foregoing allegations, Plaintiffs seek to represent two classes under Rule

23(b)(2) of the Federal Rules of Civil Procedure: the Children Class and the Parents Class. (*Id.* ¶¶

133, 135-137.) The Children Class, represented by Minor Plaintiffs, will be comprised of "[a]ll

persons born in New Jersey on or after November 2, 2000, whose blood has been or will be retained

by NJDOH's [N]ewborn [S]creening [P]rogram." (*Id.* ¶ 136.) The Parents Class, represented by

Parent Plaintiffs, will consist of "[a]ll parents or legal guardians of minors born in New Jersey on

or after November 3, 2005, whose blood has been or will be retained by New Jersey's [N]ewborn

[S]creening [P]rogram." (*Id.* ¶ 137.) Plaintiffs claim that the Children Class "has suffered and

will continue to suffer, constitutional violations under the Fourth Amendment . . . for the unlawful

retention of blood from the [N]ewborn [S]creening [P]rogram" and that the Parents Class "ha[s]

suffered, and will continue to suffer, constitutional violations under the Fourteenth Amendment .

. . for the unlawful retention of blood from the [N]ewborn [S]creening [P]rogram." (*Id.* ¶¶ 138-

139.)[6]

### 5. Procedural History

Plaintiffs filed the original Complaint on November 2, 2023. (ECF No. 1.) On July 19,

2024, the Court permitted Plaintiffs to file an amended complaint following settlement discussions

between the parties and the change to NJDOH's retention policy. (ECF No. 30.) In the FAC, filed

on August 2, 2024, Minor Plaintiffs bring a § 1983 claim for unlawful seizure under the Fourth

Amendment on behalf of themselves and other similarly situated individuals. (ECF No. 31 ¶¶ 156-

180.) Minor Plaintiffs assert that "once New Jersey completes testing on the baby blood, which

---

[6]     In addition to these class allegations, Plaintiffs include in the FAC legal arguments
regarding the class requirements of Rule 23. (*Id.* ¶¶ 140-155.) Class certification is not yet before
this Court, and Plaintiffs' arguments on that point have no bearing on Defendants' Motion to
Dismiss. Therefore, the Court will not recite those allegations here.

takes one to two weeks, the justification for initially collecting the baby blood" or the "initial seizure of the blood—*i.e.*, the health of the baby—has run its course." (ECF No. 31 ¶¶ 166-167.) Nevertheless, NJDOH retains the unused blood beyond the completed testing without "a new lawful justification." (*Id.* ¶¶ 168-172.) Minor Plaintiffs seek a declaration that NJDOH's retention of blood from the Newborn Screening Program "absent voluntary, informed consent" violates the Fourth Amendment. (*Id.* ¶ 175.) Minor Plaintiffs also seek an order permanently enjoining NJDOH from retaining any blood spots absent voluntary, informed consent, by requiring, within a year of judgment, that NJDOH either: (1) "[o]btain voluntary, informed consent to continue retaining each blood spot for specific disclosed purposes"; (2) "[r]eturn each blood spot to the person from whom that blood was drawn or to their parent or legal guardian, if that person is below the age of eighteen (18) years"; or (3) "[d]estroy the blood spot." (*Id.* ¶ 177.)[7]

Parent Plaintiffs bring a § 1983 claim for substantive due process violations under the Fourteenth Amendment on behalf of themselves and other similarly situated individuals. (*Id.* ¶¶ 181-199.) Parent Plaintiffs claim that they have a "fundamental due process right to raise their children without undue state interference" and to "direct the care, custody, and control of their children," including the right to make medical decisions for their children. (*Id.* ¶¶ 184-185, 187.) They allege that after newborn testing is completed, "Defendants make a choice *in lieu of* parents" when they decide to "automatically retain the blood of every child after the testing is complete."

---

[7]     Plaintiffs seek essentially the same injunctive relief prospectively: an order that, moving forward, NJDOH either (1) "[o]btain voluntary, informed consent from the parent or legal guardian, meaning that parents are informed of the specific uses that the blood can be used for, before New Jersey retains any blood spot after the newborn screening tests are completed, and the parents voluntarily opt-in to the retention of the blood"; (2) "[r]eturn all blood spots for which New Jersey does not first obtain voluntary, informed consent to retain the blood for specified uses once the newborn screening tests are completed"; or (3) "[d]estroy all blood spots for which New Jersey does not obtain voluntary, informed consent to retain the blood for specified uses once the newborn screening tests are completed." (*Id.* ¶ 179.)

(*Id.* ¶ 190.) Parent Plaintiffs assert that in doing so, "Defendants have unilaterally decided what *they think* is in the best interest of New Jersey children." (*Id.* ¶ 192 (emphasis in original).) They claim that these actions by the State, without the informed consent of parents, "strip" parents of their fundamental rights without a compelling reason to do so. (*Id.* ¶ 191.) They also allege that "stockpiling" blood from the Newborn Screening Program is not narrowly tailored to serve any government interest and that there is a "simple and less-restrictive alternative"—to obtain voluntary, informed consent to keep the newborn blood for specific disclosed purposes. (*Id.* ¶ 198.) Parent Plaintiffs seek a declaration that Defendants' retention of blood from the Newborn Screening Program without first obtaining voluntary, informed consent violates the Fourteenth Amendment. (*Id.* at 52.) Parent Plaintiffs seek the same injunctive relief as Minor Plaintiffs. (*Id.*)

Defendants' Motion to Dismiss the FAC is now before this Court. (ECF No. 45.) As part of its review of that Motion, the Court requested supplemental briefing from the parties regarding mootness. (ECF No. 48.) In their supplemental submission, Defendants provided the Court with a status update regarding the destruction of Minor Plaintiffs' residual blood spots under the new two-year retention policy. (ECF No. 52.) In their letter, Defendants explained that Minor Plaintiffs' blood spots have not been destroyed because Parent Plaintiffs previously declined their destruction. (*Id.* at 1, 2 n.1, 3.) Defendants attached several email communications for the Court's consideration on this point. (*Id.* at 8, 10.) In an email from Defendants' counsel dated December 14, 2023, Defendants provided to Plaintiffs NJDOH's form allowing parents to request destruction of their child's newborn blood spot. (*Id.* at 8.) Plaintiffs responded that they declined to use the form to request destruction. (*Id.*)

After NJDOH changed its retention policy to two years, Defendants' counsel contacted Plaintiffs on October 31, 2024, stating that NJDOH's destruction of newborn residual dried blood

spots older than two years would begin the next day. (*Id.* at 10.) Defendants stated that, based on Plaintiffs' "prior communications that plaintiffs want the samples associated with them/their children to be affirmatively retained for purposes of litigation," Defendants will not destroy the Minor Plaintiffs' residual dried blood spots "by default at the two-year mark." (*Id.*) Defendants requested that Plaintiffs "let [them] know if th[eir] understanding is inaccurate, so that [NJ]DOH can do whatever plaintiffs prefer" and provided that, in the meantime, NJDOH would continue to "operate on the understanding that plaintiffs want [NJ]DOH to continue retaining those specific samples." (*Id.*) Plaintiffs did not respond to this communication. Thus, Defendants have retained the Minor Plaintiffs' residual dried blood spots even though they are older than two years and subject to destruction under the new policy. (*Id.* at 2 n.1, 3.)

## II.    **LEGAL STANDARD**

### A.    **Rule 12(b)(1): Lack of Subject-Matter Jurisdiction**

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject-matter jurisdiction on either facial or factual grounds. *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents attached thereto, in the light most favorable to the plaintiff." *Gould Elec. Inc.*, 220 F.3d at 176. "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists." *Arosa Solar Energy Sys., Inc. v. Solar*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug*

*Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).  The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268.  Regardless of the type of challenge, the plaintiff bears the "burden of proving that the court has subject matter jurisdiction." *Cottrell v. Heritages Dairy Stores, Inc.*, Civ. No. 09-1743, 2010 WL 3908567, at *2 (D.N.J. Sep. 30, 2010) (citing *Mortensen*, 549 F.2d at 891).

### B. Rule 12(b)(6): Failure to State a Claim Upon Which Relief Can Be Granted

On a motion to dismiss for failure to state a claim, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).  When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Laboratories LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).  The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Practices &*

*Products Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

In deciding a Rule 12(b)(6) motion, the court can only consider "the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer*, 605 F.3d at 230. A court may also consider any document "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

## III.    DISCUSSION

Defendants raise several grounds for dismissing the FAC. *First*, they argue that Plaintiffs lack standing because their harm is self-inflicted and purely speculative. *Second*, they argue that Plaintiffs' claims are moot because Minor Plaintiffs' residual dried blood spots are older than two years and should have been destroyed by default under NJDOH's new retention policy. *Third*, Defendants contend that Plaintiffs cannot establish an unlawful seizure under the Fourth Amendment because they do not have a possessory interest in Minor Plaintiffs' residual dried blood spots. Nevertheless, they assert that the seizure in this case is reasonable under the "special needs" exception. *Fourth*, Defendants argue that Plaintiffs have failed to adequately allege that NJDOH's new two-year retention policy interferes with Parent Plaintiffs' rights to direct their children's upbringing, thus requiring the State to obtain express consent before retaining residual blood spots for two years after the initial heel prick and testing.

The Court will address each of these arguments in turn.

### A.  Standing

Defendants seek dismissal of the FAC for lack of standing, arguing that Plaintiffs cannot establish traceability because their harm is "self-inflicted." (ECF No. 45-1 at 25-28.) In addition,

Defendants argue that "to the extent that Plaintiffs rely on risks they fear *might* come to pass," Plaintiffs lack standing because their claims are "purely speculative." (*Id.* at 28-30.) A party who seeks to invoke the court's jurisdiction must demonstrate that she has standing. *A.S. v. Harrison Twp. Bd. of Educ.*, 66 F. Supp. 3d 539, 545 (D.N.J. 2014). To establish Article III standing, a plaintiff must satisfy three elements: the plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

In the context of a class action, only the named plaintiff must demonstrate standing. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 & n.3 (3d Cir. 2015) ("[U]nnamed, putative class members need not establish Article III standing. Instead, the 'cases or controversies' requirement is satisfied so long as a class representative has standing.") (citing 5 Jerold S. Solovy et al., Moore's Federal Practice, Civil § 23.63 (3d ed. 1997) ("The named plaintiff in a class action must meet all the jurisdictional requirements to bring an individual suit asserting the same claims, including standing.")). That is, as long as one named plaintiff has standing, the class action survives dismissal. *Id.* at 362. Once the court determines Article III standing "vis-a-vis the named parties . . . there remains no further separate class standing requirement in the constitutional sense." *Id.* at 361. However, "[i]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) (finding that "at least one of the four named Plaintiffs must have Article III standing in order to maintain this class action") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). The named plaintiff in a class action "must allege and show that they personally

have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.*

### 1. Injury in Fact

To satisfy the injury-in-fact requirement, a plaintiff must "demonstrate standing separately for each form of relief sought." *A.S.*, 66 F. Supp. 3d at 545 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 185 (2000)). When seeking prospective injunctive relief, "a plaintiff must show that he or she is likely to suffer future injury from the defendant's illegal conduct." *Id.* at 546; *see also McNair v. Synapse Grp., Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (finding that, "[i]n the class action context," when prospective relief is sought, the requirement that a plaintiff must show that he is likely to suffer future injury from a defendant's conduct "must be satisfied by at least one named plaintiff"). "Allegations of possible future injury are not sufficient to satisfy Article III" standing. *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (internal quotation marks omitted). The threat of future injury may not be "merely imaginary or wholly speculative." *N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 855 (3d Cir. 2022); *City of Los Angeles v. Lyons*, 461 U.S. 95, 95 (1983) (reasoning that "the injury or threat of injury" cannot be "conjectural" or "hypothetical"). It must be "real or immediate." *A.S.*, 66 F. Supp. 3d at 546. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 95-96 (internal quotation marks omitted).

Indeed, a plaintiff's "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury" required for purposes of Article III standing. *Lujan*, 504 U.S. at 564 & n.2 ("[W]e are at a loss to see how, as a factual matter, the standard can be met by respondents' mere profession of an intent, some day, to return. Although 'imminence' is concededly a somewhat

elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending. It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. In such circumstances we have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." (cleaned up)).

"Obtaining standing for declaratory relief has the same requirements as obtaining standing for injunctive relief." *Kanuszewski v. Mich. Dep't of Health and Hum. Servs.* (*Kanuszewski I*), 927 F.3d 396, 406 (6th Cir. 2019); *see also Giterman v. Pocono Med. Ctr.*, 361 F. Supp. 3d 392, 408 (M.D. Pa. 2019) ("Standing will not exist for injunctive relief and declaratory relief if adjudication . . . rests upon contingent future events that may not occur as anticipated or indeed may not occur at all." (internal quotation marks omitted) (citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 561 (3d Cir. 2002))).

To determine whether Plaintiffs have met the injury-in-fact requirement, the Court must first identify the date by which to assess standing. Standing is generally evaluated "at the time the action commences—that is, at the time the plaintiff brought the lawsuit." *Road-Con, Inc. v. City of Phila.*, 120 F.4th 346, 354 (3d Cir. 2024) (internal quotation marks omitted); *Freedom from Religion Found. Inc v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 475 (3d Cir. 2016). "[O]nce the plaintiff shows standing at the outset, she need not keep doing so throughout the lawsuit." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). "The filing of an amended complaint . . . does not restart the date for assessing standing" but rather provides a court with "additional information that can be used to evaluate standing as of the date that the lawsuit

was filed." *Lutter v. JNESO*, 86 F.4th 111, 125 (3d Cir. 2023). "That is so because an amended complaint revises the prior pleading only to reflect a more accurate understanding of the state of things when the action was filed—not to update the pleading with later occurring facts." *Id.* On the other hand, if a court permits "a supplemental complaint, then for the claims and requested relief substantively affected by the alleged post-suit developments, a plaintiff's Article III standing is evaluated as of the date of the supplemental pleading." *Id.*; *see also Greenberg v. Lehocky*, 81 F.4th 376, 384 n.4 (3d Cir. 2023) (evaluating a plaintiff's standing, not mootness, based on a later-filed complaint that challenged a revision to a rule that occurred after the original complaint). Here, Plaintiffs filed the FAC on August 2, 2024. (ECF No. 31.) That complaint sought to include post-suit information regarding NJDOH's new retention policy, which became effective on June 20, 2024, and upon which the Court now assesses Plaintiffs' constitutional claims. (*Id.* ¶¶ 77-125.) The Court, thus, construes the FAC as a supplemental pleading and evaluates standing as of the date of the FAC—August 2, 2024. *See Lutter*, 86 F.4th at 125.

According to Plaintiffs, their harm arises from Defendants' retention of blood spots "after newborn testing is complete without obtaining informed consent to do so." (ECF No. 47 at 31 (citing ECF No. 31 ¶¶ 164, 171, 174, 193-195).) The parties do not dispute that, at the time the FAC was filed, NJDOH had retained the Minor Plaintiffs' blood spots and Parent Plaintiffs had not given their affirmative consent to that retention. As redress for this alleged harm, Plaintiffs seek the following injunctive relief: (1) an order enjoining NJDOH from "retaining any blood spots absent voluntary, informed consent" by requiring NJDOH, within a year of judgment, to either (a) "[o]btain voluntary, informed consent to continue retaining each blood spot for specific disclosed purposes," (b) [r]eturn each blood spot to the person from whom that blood was drawn or to their parent or legal guardian, if that person is below the age of eighteen (18) years, or (c) destroy the

blood spot (ECF No. 31 ¶ 177); and (2) an order enjoining NJDOH from "retaining blood from the [N]ewborn [S]creening [P]rogram after testing is completed absent voluntary, informed consent" by requiring NJDOH, "moving forward," to (a) "[o]btain voluntary, informed consent from the parent or legal guardian . . . before New Jersey retains any blood spot after the newborn screening tests are completed," (b) "[r]eturn all blood spots for which New Jersey does not first obtain voluntary, informed consent to retain blood for specified uses once the newborn screen tests are completed," or (c) "[d]estroy all blood spots for which New Jersey does not obtain voluntary, informed consent to retain the blood for specified uses once the newborn screening tests are completed" (*id.* at ¶¶ 178-179). Plaintiffs also seek declaratory relief. (*Id.* at 52.) That is, they seek a judgment declaring that NJDOH's retention of newborn blood without first obtaining voluntary, informed consent violates the Fourth and Fourteenth Amendments. (*Id.*)

All Plaintiffs have failed to demonstrate standing to pursue Plaintiffs' requested relief that "moving forward" and "before" the State retains any newborn blood spot NJDOH must obtain voluntary, informed consent from the parent or legal guardian. (*Id.* ¶ 179). Minor Plaintiffs' will not be subject to the Newborn Screening Program again and their blood is already being retained by NJDOH without the consent of Parent Plaintiffs. Therefore, the harm has already occurred and there is no risk of any future injury that would warrant such prospective injunctive relief as to Minor Plaintiffs.

As for Parent Plaintiffs, standing would depend on Parent Plaintiffs' having additional children subject to the Newborn Screening Program. The alleged facts offered by Plaintiffs to support their standing to pursue such prospective relief is limited. They allege that Lovaglio and her husband are "considering whether to have more children in New Jersey" and "still have several frozen embryos stored in New Jersey." (*Id.* ¶ 55.) Plaintiffs also allege that the Jedynaks are

"considering whether to have more children in New Jersey." (*Id.* ¶ 68.) Plaintiffs assert that "[i]f and when" Parent Plaintiffs have their next child, it will be subject to NJDOH's two-year blood retention policy. (*Id.* ¶¶ 56, 69.) These allegations are precisely the kind of "some day intentions" that the Supreme Court of the United States has rejected. *See Lujan*, at 563-64, 564 & n.2; *de Ramirez v. Barr*, Civ. No. 18-1516, 2019 WL 4750373, at *1 (D.D.C. Sept. 30, 2019) (finding that the plaintiff lacked standing to challenge the Government's Zero-Tolerance Policy based on her fear that her children would be separated from her if she one day brought them to the United States from El Salvador); *see also Berry v. Hennepin Cnty.*, Civ. No. 20-2189, 2024 WL 3495797, at *5 (D. Minn. July 22, 2024) (concluding that the plaintiffs lacked standing to pursue their claim that the City of Minneapolis violated their constitutional rights by destroying their personal property when disbanding homeless encampments based on the allegation that they may one day become homeless again). Indeed, Parent Plaintiffs do not allege that they intend or are likely to have more children, only that they are "considering whether" to do so. Accordingly, Plaintiffs have failed to establish Article III's "actual or imminent" injury requirement to obtain the following injunctive relief: an order requiring NJDOH to "[o]btain voluntary, informed consent from the parent or legal guardian . . . before New Jersey retains any blood spot after the newborn screening tests are completed," (ECF No. 31 ¶ 179 (subpart a)). The Court dismisses Plaintiffs' claim for this requested relief.

Regarding the remaining relief requested by Plaintiffs, both injunctive and declaratory, the Court finds that Plaintiffs have alleged actual, ongoing harm. The United States Court of Appeals for the Sixth Circuit's decision in *Kanuszewski I* is instructive. In that case, the plaintiffs sought declaratory and injunctive relief and damages in connection with Michigan's storage of newborn residual dried blood spots. 927 F.3d at 409. The Sixth Circuit held that the injury-in-fact

requirement had been met because storage of the minor plaintiffs' residual dried blood spots is "the sort of actual, ongoing harm that affords a plaintiff standing to sue for damages, as well as injunctive and declaratory relief," assuming Michigan's retention of their blood confers on them Fourth Amendment rights. *Id.* at 409.

The court also found that Michigan's "ongoing storage of the blood samples without parental consent" met the injury-in-fact requirement as to the parent plaintiffs in connection with their Fourteenth Amendment claim. *Id.* at 411-412. The court determined that the parents' alleged harm—that "they are being denied their right to direct the medical care of their children by the defendants' ongoing storage of the blood samples without parental consent and will be further denied this right if the state conducts research using the samples or transfers the samples to third parties"—demonstrated actual, ongoing harm that afforded them standing to seek injunctive and declaratory relief, as well as damages. *Id.*; *see also Beleno v. Lakey*, 306 F. Supp. 3d 930, 942 (W.D. Tex. 2009) (reasoning that "the storage of the infants' blood samples is an injury which has occurred and continues to occur, and there is reasonable fear of the potential for misuse because of the continued storage" constituting injury-in-fact and conferring standing on the parent plaintiffs).

Like *Kanuszewski I*, Minor Plaintiffs allege that their Fourth Amendment rights are being violated by NJDOH's continued retention of their residual dried blood spots. Assuming for purposes of standing only that Minor Plaintiffs possess Fourth Amendment rights in this context, the Court finds that they are experiencing actual, ongoing harm from the continued retention of their blood and have, therefore, met Article III's injury-in-fact requirement. Similarly, Parent Plaintiffs allege that their Fourteenth Amendment rights are being violated by NJDOH's continued retention of Minor Plaintiffs' residual dried blood spots. Assuming Parent Plaintiffs have rights

under the Fourteenth Amendment in this circumstance, they too have established, at the time the FAC was filed, actual, ongoing harm from the retention of their children's residual dried blood spots and have also satisfied Article III's injury-in-fact requirement.

Defendants argue that "to the extent that [Plaintiffs] ground their claims" in the "harms they fear *may* befall them from hypothetical uses of [residual dried blood spots]," Plaintiffs cannot establish injury in fact because their harm is speculative. (ECF No. 45-1 at 28.) At this stage, the Court accepts Plaintiffs' allegations as true, specifically, that their "constitutional injury arises not from what New Jersey may or may not do with the blood spots," including distribution to third parties or law enforcement, "but from the fact that Defendants are retaining the blood spots after the newborn testing is complete without obtaining informed consent to do so." (ECF No. 47 at 31.) The Court bases its standing assessment on this allegation of harm.

Because Defendants had, in fact, retained Minor Plaintiffs' blood at the time the FAC was filed, the Court finds that Plaintiffs have adequately demonstrated an injury in fact.

### 2. Traceability

Regarding traceability, "[t]he plaintiff must establish that the defendant's challenged actions, and not the actions of some third party, caused the plaintiff's injury." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009). The United States Court of Appeals for the Third Circuit has "yet to articulate a single standard for establishing this causal relationship." *N.J. Bankers Ass'n*, 49 F.4th at 855 n.1 (internal quotation marks omitted). It has held, however, that "but-for causation" and "concurrent causation" are "sufficient to satisfy traceability." *Id.* (citing *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014)); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013)). Indeed, the Third Circuit has explained that the "causal connection need not be as close as the proximate causation needed to succeed on the merits of a tort claim," but rather "an indirect causal relationship will suffice, so long as there is a

fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant." *Toll Bros., Inc.*, 555 F.3d at 142 (cleaned up).

Defendants argue that Plaintiffs cannot demonstrate traceability because, by not requesting destruction of the Minor Plaintiffs' residual dried blood spots, Plaintiffs, not Defendants, are inflicting harm upon themselves. The Court disagrees. In *Federal Election Commission v. Cruz*, the Supreme Court addressed the concept of self-inflicted harm in the context of Article III's traceability requirement. 596 U.S. 289, 296 (2022). In that case, United States Senator Ted Cruz and his campaign committee (collectively the appellees), brought a First Amendment claim seeking to challenge a limit on the use of post-election contributions to repay candidates' personal loans to their campaign committees. *Id.* at 294-295. The Government argued that the appellees lacked standing because his campaign committee had a "legally available alternative," which was to repay Senator Cruz's loans in full with pre-election funds, within 20 days of the election. *Id.* at 298. According to the Government, the appellees "knowingly triggered the application of the loan-repayment limitation," resulting in injury "traceable to *them*, not the Government." *Id.* at 296 (emphasis in original).

The Supreme Court rejected this argument. *Id.* at 298. The Court reasoned that "[a]t bottom," the Government was asking the Court to "recognize an exception to traceability for injuries that a party purposely incurs." *Id.* at 296. Yet, the Court stated that it had "never recognized a rule of this kind under Article III." *Id.* at 297. To the contrary, the Court explained that it has "made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Id.* (citing *Evers v. Dwyer*, 358 U.S. 202, 204 (1958) (*per curiam*); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982)). The Court

distinguished the appellees' case from its prior precedent, reasoning that although the appellees "chose to subject themselves to those provisions, [it] does not change the fact that they are subject to them[] and will face genuine legal penalties if they do not comply." *Id.* (distinguishing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) and *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (*per curiam*)). The Court explained that the Government's reliance on the appellees' refusal to choose the "legally available" alternative option "largely misse[d] the point." *Id.* at 298. The Court found that "[d]emanding that the Committee comply with the Government's 'alternative' would . . . require it to forgo the exercise of a First Amendment right we assume [for purposes of standing] it has—to repay its campaign debts in full at any time" and would "subject itself to the very framework it says unconstitutionally burdens its speech." *Id.* As the Court concluded, "[s]uch a principle finds no support in our standing jurisprudence." *Id.*

Plaintiffs' claims present this Court with a similar circumstance. The alleged Fourth and Fourteenth Amendment rights at issue hinge on a parents' right to affirmatively decide whether their newborn's residual dried blood spots are retained by the State beyond the completion of newborn testing. Like the Court in *Cruz*, this Court accepts for purposes of standing that this is a right that Minor Plaintiffs have under the Fourth Amendment and that Parent Plaintiffs have under the Fourteenth Amendment. Defendants contend, like the Government in *Cruz*, that Plaintiffs' failure to opt-out of retention and request destruction of the blood spot resulted in an injury traceable to them, not Defendants. Similar to the Supreme Court in *Cruz*, this Court finds Defendants' argument unpersuasive. Plaintiffs claim that this opt-out framework is unconstitutional and that the policy should instead allow parents to opt in to the Newborn Screening Program by providing informed consent prior to NJDOH's retention of residual dried blood spots. Plaintiffs' injuries are directly inflicted by Defendants' retention of the Minor

Plaintiffs' residual dried blood spots without informed consent. The fact that Plaintiffs chose not to opt out and request destruction does not change the fact that they are, by default, subject to this allegedly unconstitutional retention. That is, the opt-out option does not change the fact that Plaintiffs have been harmed and will continue to be harmed by Defendants so long as Defendants retain the Minor Plaintiffs' residual dried blood spots. *See Kanuszewski I*, 927 F.3d at 410 n.5 (rejecting the defendants' argument that the plaintiffs were not cognizably harmed "because a parent or guardian may request that a blood sample not be used for research . . . or request that a sample be destroyed"). Indeed, stripping Plaintiffs of standing to challenge an allegedly unconstitutional framework by demanding that they cure their own injury by requesting destruction requires them to acquiesce to such a framework and to forego their alleged right to informed consent. Like the Court in *Cruz*, this Court declines to recognize a self-inflicted exception to Article III traceability on these facts.

The cases cited by Defendants do not alter this conclusion. In *Clapper v. Amnesty Int'l USA*, which the *Cruz* Court also distinguished, the plaintiffs failed to show that they had been or were likely to be subject to a government surveillance policy that they sought to challenge as unconstitutional. 568 U.S. at 416. The plaintiffs argued that they had standing because they incurred costs to protect the confidentiality of their communications "as a reasonable reaction to a risk of harm," but the Court held that they could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* Plaintiffs here, unlike in *Clapper*, are subject to the challenged conduct—

Defendants have retained the Minor Plaintiffs' residual dried blood spots without informed consent.[8]

Defendants' reliance on *Cordoba v. DIRECTV, LLC* is also misplaced. The court in *Cordoba*, which involved unsolicited telemarketing calls, found that certain class members could not establish that their injury was "fairly traceable to the challenged conduct." 942 F.3d 1259, 1272 (11th Cir. 2019). The harm alleged in that case was the defendants' failure to maintain an internal do-not-call list in violation of the Telephone Consumer Protection Act. *Id.* at 1271. Some plaintiffs, however, did not ask to be placed on the defendants' internal do-not-call list. *Id.* at 1271-1272. The court determined that these plaintiffs lacked Article III standing to sue because, by not asking to be placed on the do-not-call list in the first instance, it would not "make any difference [to these plaintiffs] that [the defendant] hadn't maintained an internal do-not-call list." *Id.* Here, in contrast, there is no dispute that Plaintiffs participated in the Newborn Screening Program and that they are seeking redress for harm resulting from that participation. In other words, it *would* make a difference to Plaintiffs that NJDOH retained residual dried blood spots without parental consent because Defendants have, in fact, retained Minor Plaintiffs' residual dried blood spots without Parent Plaintiffs' informed consent.

Similarly unavailing are the two newborn blood spot cases cited by Defendants—*Higgins v. Texas Department of Health Services*, 801 F. Supp. 541 (W.D. Tex. 2011), and *Doe v. Adams*, 53 N.E.3d 483 (Ind. Ct. App. 2016). In *Higgins*, the plaintiffs complained of the "possibility" that their children's residual dried blood spots, "which were taken in 2007 and 2008," had been

---

[8]    *Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018), is similarly distinguishable. In that case, the plaintiff sought to challenge a statute limiting the acceptance of campaign contributions outside of Austin, Texas. *Zimmerman*, 881 F.3d at 389. The court found that the plaintiff lacked standing because he did not actually exceed the campaign contribution limit set by the statute. *Id.*

"distributed to third parties without their knowledge or consent," and that "the blood and information contained therein, such as DNA, may be misused." 801 F. Supp. at 546. As part of a settlement in another newborn screening case, the Texas Department of Health Services "agreed to destroy all blood specimens that were taken as part of the newborn screening program and received by the Department before May 27, 2009." *Id.* at 546-547. In finding that the plaintiffs lacked standing, the court determined that the plaintiffs' "alleged ongoing harm is the *possible* expropriation of their children's previously taken blood by its release to third parties and those third parties' retention and use of the blood specimens." *Id.* at 553 (emphasis in original). The court reasoned that the plaintiffs' request that the court order the destruction of their children's residual dried blood spots was "relevant only if . . . [the] [p]laintiffs' children's blood ha[d] in fact been released." *Id.* As the court explained, the plaintiffs failed to allege that they had ever requested information "about the fate of their children's blood specimens" or requested that their children's blood be destroyed and been informed that it was "not possible" to destroy it "due to their release to third parties." *Id.* The court found that because the plaintiffs "simply did not know at the time they filed their complaint whether their children's blood had been distributed or destroyed," their alleged "ongoing" injury was speculative. *Id.*

The alleged harm here, unlike in *Higgins*, is not speculative. Despite including such allegations in the FAC, Plaintiffs do not assert that they were harmed by NJDOH providing residual dried blood spots to third parties or to law enforcement. The harm alleged by Plaintiffs is limited solely to the continued retention of Minor Plaintiffs' blood spots without consent. (ECF No. 47 at 31.) Whereas, in *Higgins*, the ongoing harm was the possible distribution of blood spots to third parties and the third parties' retention and use of the blood specimens. While the *Higgins* court mentioned the plaintiffs' failure to request destruction of residual dried blood spots, it was

only in reference to one of the ways in which the plaintiffs could have learned that Texas had distributed their children's residual dried blood spots to third parties before initiating their case. Here, Plaintiffs knew when this matter was filed that Defendants had retained the Minor Plaintiffs' residual dried blood spots without their informed consent. (ECF No. 1 ¶¶ 6, 8; *see also* ECF No. 31 ¶¶ 58, 71.)

*Doe v. Adams* is distinguishable for similar reasons. In that case, the court articulated the plaintiff's direct injury from the blood spot storage as the "reasonable fear that blood samples, including hers, might be misused." 53 N.E.3d at 497. As the Indiana Court of Appeals explained, the defendant presented evidence to the trial court that the plaintiff's blood was "not used for medical research, nor will it be without parental authorization." *Id.* at 498. Accordingly, the court held that the plaintiff's fear of potential misuse of her blood spot was speculative and she lacked standing. *Id.* Again, Plaintiffs' alleged injuries arise from the residual dried blood spots retention without informed consent, not the subsequent use or distribution of the blood spots to third parties or law enforcement. There is no dispute that the spots at issue here were retained.

For these reasons, the Court concludes that Plaintiffs have standing to pursue their remaining claims for relief, and Defendants' Motion is denied on this ground.[9]

## B. Mootness

Under Article III, federal courts have jurisdiction over "Cases" and "Controversies." *Hartnett*, 963 F.3d at 305 (citing U.S. Const. art. III, § 2, cl. 1). "Thus, federal courts can entertain actions only if they present live disputes, ones in which both sides have a personal stake." *Id.* While a plaintiff bears the burden of demonstrating standing at the start of litigation, "[t]he heavy burden of persua[ding] the court that there is no longer a live controversy" shifts to the party

---

[9]    Defendants do not challenge Plaintiffs' standing based on Article III's third requirement (redressability).

claiming that some development during the litigation has mooted the case. *Id.* at 306 (internal quotation omitted). In other words, "mootness is not just the doctrine of standing set in a time frame." *Id.* (internal quotations omitted). "So sometimes a suit filed on Monday will be able to proceed even if, because of a development on Tuesday, the suit would have been dismissed for lack of standing if it had been filed on Wednesday. The Tuesday development does not necessarily moot the suit." *Id.*

Where a defendant claims that a later action that it took has mooted a case, a practice known as voluntary cessation, the defendant bears the heavy burden of persuading the court that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Fields v. Speaker of Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 170 (2000)). Generally, courts are "reluctant to declare a case moot . . . when the defendant argues mootness because of some action it took unilaterally after the litigation began." *Hartnett*, 963 F.3d at 306. In assessing whether the wrongful behavior is reasonably expected to recur, courts look at the defendant's reason for changing its behavior and whether it is likely to change its behavior again. *Id.* Courts are often skeptical when a defendant claims mootness by voluntary cessation and "maintains that its conduct was lawful all along." *Id.*

In their initial moving papers, Defendants state that they "never claimed that this case is moot," but they also argue that their alleged unconstitutional behavior is not likely to recur, stating that "while [NJ]DOH has never claimed that its new policy is formally unalterable, there is no reasonable likelihood of reversion." (ECF No. 46 at 10.) Defendants point to the fact that NJDOH is "now voluntarily (and irreversibly) destroying two decades of samples, despite knowing

Plaintiffs will continue to press their claims." (*Id.*)  In their supplemental briefing,[10] Defendants

argue that Plaintiffs' case is now moot because (1) NJDOH, under its new policy, is destroying all

bloodspots older than two years unless parents provide express permission to retain the blood and

(2) Minor Plaintiffs' blood spots are now older than two years and subject to destruction by default.

(ECF No. 52 at 2-3.)  According to Defendants, NJDOH has "destroyed 1014 of 1600 boxes

(63.38%) of previously retained bloodspots that are older than two years[]" and that "[d]estruction

of the remainder is ongoing." (*Id.* at 2, n.1.)  Defendants also highlight the "considerable sunk

costs[,]" which consists of NJDOH's time and money spent on "reprinting the kits to explain the

new retention policy, putting information on the website, and educating hospitals about the

change." (*Id.* at 4.)  NJDOH also received approval from the State Records Committee to "de-

couple" the new retention policy from the broader records retention policy that required a longer

retention period. (*Id.*)  Defendants argue that Plaintiffs cannot save their case from mootness by

refusing to permit the destruction of Minor Plaintiffs' residual dried blood spots under the new

policy as each Minor Plaintiff is now older than two years of age. (*Id.*)

Plaintiffs argue that their case is not moot because to "actually moot Plaintiffs' case,

Defendants would need to end the nonconsensual retention at the heart of Plaintiffs' complaint[;]

[t]hat would require Defendants to begin obtaining voluntary, informed consent from parents

before retaining blood spots for *any* amount of time post testing, and to return or otherwise destroy

blood spots of those from whom it could not obtain that consent." (ECF No. 53 at 2 (emphasis in

original).)  Plaintiffs contend that they have asked the Court for a declaratory judgment on a class-

wide basis and injunctive relief to prevent the nonconsensual retention of residual dried blood

---

[10]    Because the Court is obligated to resolve issues of mootness as a threshold matter of jurisdiction, the Court requested supplemental briefing regarding the status of Minor Plaintiffs' blood spots under NJDOH's new two-year retention policy.

spots post-testing. (*Id.*) They argue that because Defendants still retain residual dried blood spots without parental consent, the Court can still grant declaratory and injunctive relief. (*Id.*)

The Court agrees that NJDOH's new two-year-retention policy does not render Plaintiffs' case moot. As Plaintiffs point out, NJDOH's new policy does not provide Plaintiffs complete relief in this case. Plaintiffs seek a declaratory judgment that *any* retention of newborn blood spots without voluntary, informed consent is unconstitutional. The new two-year policy does not provide for this "voluntary, informed consent" framework. Therefore, retention of residual dried blood spots without voluntary, informed consent is still a live controversy in this case, and such claims are not moot. *See Kanuszewski v. Michigan Dep't of Health & Hum. Servs.* (*Kanuszewski II*), 141 F.4th 796, 802 (6th Cir. June 25, 2025) (permitting the appeal to proceed as not moot because, although the plaintiffs could no longer obtain meaningful relief in the form of returning the physical residual dried blood spots, the plaintiffs could still obtain review of the district court's decision regarding the constitutionality of the retention policy as a whole and the use of those residual dried blood spots).

Moreover, Defendants have not met their heavy burden to show that voluntary cessation applies to moot Plaintiffs' claims for declaratory or injunctive relief. The Court is unpersuaded based on the record currently before it[11] that it is absolutely clear that NJDOH could not reasonably be expected to revert to its 23-year retention policy or some other policy imposing a longer than

---

[11]    Indeed, to meet their voluntary cessation burden, Defendants offer only argument in their supplemental briefing regarding the likelihood that they would not revert to the 23-year retention policy. (ECF No. 52 at 4.) They do not present a declaration or other sworn statement from NJDOH personnel to support their assertions. The Court finds that such argument is insufficient to support their heavy burden to establish mootness under the voluntary cessation doctrine. *See Travelodge Hotels, Inc. v. Mangat Houston Race Track, LLC*, Civ. No. 06-3543, 2007 WL 2156367, at *4 n.3 (D.N.J. July 25, 2007) ("Of course, factual allegations made in the [d]efendants' brief cannot be an appropriate basis for any factual arguments this [c]ourt may take into account in deciding the motions unless they are also presented in an affidavit, certification, or the like.").

two-year retention period without informed consent. *See Beleno v. Lakey*, 306 F. Supp. 3d 930, 949-50 (W.D. Tx. 2009) (declining to find the plaintiffs' claims moot on motion to dismiss where the defendant's conduct is voluntary, as opposed to mandated by statute) (citing *Buchanan v. Consolidated Stores Corp.*, 217 F.R.D. 178, 189 n.14 (D. Md. 2003) (finding that the defendants' commitment to its new policy is "questionable, having instituted it just several months after the filing of this lawsuit") and *Mack v. Suffolk Cnty.*, 191 F.R.D. 16, 21 (D. Mass 2000) (declining to find that plaintiffs' claims were moot in absence of statutory imperative imposed upon defendants)); *cf.* ECF No. 52 at 2 (citing *New York State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 337-40 (2020) (determining that the city's amended rule rendered claims moot following the State of New York amending its firearm licensing statute) and *Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (finding claims moot based on the university substantially amending its regulations and that the regulation at issue was no longer in force).

The Court recognizes, however, that whether NJDOH's new two-year policy moots Plaintiffs' claims for injunctive relief in particular is a closer call. Defendants argue that Plaintiffs cannot save their case from mootness by refusing to permit the destruction of Minor Plaintiffs' residual dried blood spots as each Minor Plaintiff is now over two years old. (ECF No. 52 at 3.) Destruction of blood spots is one of the injunctive relief options alleged by Plaintiffs,[12] and, if Minor Plaintiffs spots are destroyed, it follows that Plaintiffs will have received complete injunctive relief. And, if destroyed, the harm to Plaintiffs regarding retention of Minor Plaintiffs'

---

[12]    Plaintiff's request an order, as to the blood spots currently retained by NJDOH, that NJDOH "*either*" (a) "[o]btain voluntary, informed consent to continue retaining each blood spot for specific disclosed purposes"; (b) "[r]eturn each blood spot to the person from whom that blood was drawn or to their parent or legal guardian, if that person is below the age of eighteen (18) years; *or*" (c) "[d]estroy the blood spot." (ECF No. 31 ¶ 177 (emphasis added).) In other words, Plaintiffs' request for injunctive relief would be satisfied if the Court ordered any of these three options, including destruction of Minor Plaintiffs' blood spots.

blood spots will not recur. However, Minor Plaintiffs' blood spots have not yet been destroyed. Defendants contend that Plaintiffs are the reason that destruction has not occurred because they refused to respond to Defendants' October 31, 2024, email communication seeking clarification on the destruction of Minor Plaintiffs' blood spots. (ECF No. 52 at 3, 10.) Yet, Plaintiffs' silence, while not to be rewarded, may not be the sole reason why Minor Plaintiffs' blood spots have not been destroyed. Defendants themselves acknowledge that almost 40% of blood spots older than two years have yet to be destroyed by NJDOH. (*Id.* at 2 n.1.) Therefore, even if NJDOH did not change its two-year policy, Defendants have provided this Court with no evidence that Minor Plaintiffs' blood spots would have even been destroyed at this point. Without more, Defendants have failed, at this stage, to meet the heavy burden of mootness.[13]

---

[13]    Plaintiffs' case is also distinguishable from *F.V. v. Cherry Hill Twp. Bd. of Educ.*, Civ. No. 21-18096, 2023 WL 2662697 (D.N.J. Mar. 28, 2023), and *Jarrett v. United States*, 79 F.4th 675 (6th Cir. 2023), both cited by Defendants. *F.V.* arose in a different context, under the Individuals with Disabilities Education Act. 2023 WL 2662697, at *1. In that case, the district court affirmed a New Jersey Administrative Law Judge (ALJ)'s finding that the plaintiffs' claims were moot when the defendant had provided all services and accommodations demanded by plaintiffs and the plaintiffs refused it. *Id.* at *11. Unlike *F.V.*, as stated above, the new two-year retention policy does not provide Plaintiffs here with all of the relief that they have requested, *i.e.*, a finding that any retention of blood spots without voluntary, informed consent is unconstitutional. Indeed, regardless of Plaintiffs' failure to respond to Defendants' email communication, there is no guarantee that the new two-year policy would have yet provided Plaintiffs with the destruction that they seek as NJDOH has not yet destroyed all blood spots older than two years. *Jarrett* is similarly distinguishable from this case as it involved damages, not injunctive relief. 79 F.4th at 676. In that case, the plaintiff sued the Internal Revenue Service (IRS) for a refund; the IRS responded by issuing a full refund check that the plaintiff refused to cash. *Id.* Again, unlike here, the IRS offered the plaintiff complete relief in the form of his full refund. The court also noted that "[a] defendant's check . . . may not moot a case if the evidence shows that the defendant will not be good for the money." *Id.* at 680. This case presents an analogous circumstance. Here, as the Court has held, Defendants have failed to sufficiently show on this record that NJDOH would not reasonably change its policy, and, with 40% of blood spots older than two years left to destroy, this Court is not inclined to moot Plaintiffs' case at this stage without such evidence.

Since the Court has determined that Plaintiffs' claims for declaratory and injunctive relief are not moot,[14] it will turn now to the plausibility of Plaintiffs' Fourth and Fourteenth Amendment claims.

## C. Fourteenth Amendment

Defendants argue that the Court should dismiss Parent Plaintiffs' substantive due process claim because the FAC "reveals no basis to conclude that [parents'] rights [to direct the upbringing of their children] extend as far as forcing the State to obtain express consent before retaining residual blood spots for two years." (ECF No. 45-1 at 49.) The Fourteenth Amendment forbids states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause enumerates both substantive and procedural rights. *See Steele v. Cicchi*, 855 F.3d 494, 501 (3d Cir. 2017). Parent Plaintiffs assert only substantive due process violations. (ECF No. 31 ¶¶ 181-199.) To show a violation, a plaintiff must "demonstrate that he has 'been deprived of a particular interest that is protected by . . . substantive due process.'" *Holland v. Rosen*, 895 F.3d 272, 292 (3d Cir. 2017) (quoting *Steele*, 855 F.3d at 501). The substantive component of the Due Process Clause protects both those rights guaranteed by the first eight amendments, and fundamental rights that are not mentioned in the Constitution but are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks and citations omitted).

The Supreme Court is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."

---

[14]    Because the Court finds that Plaintiffs' claims are not moot, the Court need not address the two mootness exceptions raised by Plaintiffs—the "capable of repetition, yet evading review" exception and the "inherently transitory" exception.

*Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 447 (3d Cir. 2020) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). "Because a court's expansion of the concept of due process 'place[s] the matter outside the arena of public debate and legislative action,' the 'doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field.'" *Doe v. Delaware Valley Reg'l High Sch. Bd. of Educ.*, Civ. No. 24-00107, 2024 WL 5006711, at *11 (D.N.J. Nov. 27, 2024) (quoting *Glucksberg*, 521 U.S. at 721; *Reno v. Flores*, 507 U.S. 292, 302 (1993)) ("A court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." (quoting *Holland v. Rosen*, 895 F.3d 272, 273 (3d Cir. 2018))). Thus, the assertion of an interest protected by substantive due process "requires a careful description of the asserted fundamental liberty interest . . . ; vague generalities . . . will not suffice." *Holland*, 895 F.3d at 292 (internal quotation marks omitted). And it is a plaintiff's burden to do so. *Kanuszewski II*, 141 F.4th at 805 (citing *Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008)).

Parent Plaintiffs characterize the right at issue as the right to "make decisions about their children," including the right to "make medical decisions." (ECF No. 47 at 47-48; *see also* ECF No. 31 ¶ 187.) Defendants do not dispute that the Fourteenth Amendment grants such a right. (ECF No. 45-1 at 49.) "The interest of parents in the care, custody, and control of their children— is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). That right includes parents' "primary responsibility to consent to [their] children's medical treatment." *Doe v. Div. of Youth & Fam. Servs.*, 148 F. Supp. 2d 462, 492 (D.N.J. 2001); *see also Delaware Valley Reg'l High Sch. Bd. of Educ.*, 2024 WL 5006711, at *11. Government actions that "burden a fundamental right" like this one are "subject to strict

scrutiny and will pass constitutional muster only if it is narrowly tailored to serve a compelling state interest." *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998).

Courts have held, in certain contexts, that state conduct implicates a liberty interest because it constitutes medical care. *See, e.g.*, *Kanuszewski II*, 141 F.4th at 806 (collecting cases that found state conduct to implicate medical treatment, including a state's refusal of a parent's request to take a vegetative child off of life support, a state's involuntary psychiatric treatment of a prisoner, a state's mandating vaccination, a state's banning sex-organ surgeries and puberty blockers for minors with gender dysphoria, a state's performance of physical examinations and blood tests on children, and a state law permitting parents to institutionalize children in mental health facilities); *Guertin v. Michigan*, 912 F.3d 907, 920-921, 920 n.4 (6th Cir. 2019) (collecting "numerous cases involving government experiments on unknowing and unwilling patients" wherein the government "[i]nvoluntarily subject[ed] nonconsenting individuals to foreign substances with no known therapeutic value" and finding that government action in these contexts intruded upon a person's right to bodily integrity under the Fourteenth Amendment).

Here, Parent Plaintiffs allege that, after newborn testing is completed, "Defendants make a choice *in lieu of* parents" when they decide to "automatically retain the blood of every child after the testing is complete" without informed parental consent. (ECF No. 31 ¶ 190.) Parent Plaintiffs assert that, in making this "medical choice," "Defendants have unilaterally decided what *they think* is in the best interest of New Jersey children." (ECF No. 47 at 47; *id.* ¶ 192.) They claim that these actions by the State, without the informed consent of parents, "strip" parents of their fundamental rights without a compelling reason to do so. (ECF No. 31 ¶ 191.) They also allege that stockpiling blood from the Newborn Screening Program is not narrowly tailored to serve any

government interest and that there is a "simple and less-restrictive alternative"—to obtain

voluntary, informed consent to keep the baby blood for specific disclosed purposes. (*Id.* ¶ 198.)

The Court disagrees with Plaintiffs' representation in their initial opposition brief that

NJDOH's retention of Minor Plaintiffs' residual blood spots without parental consent is a "medical

choice," (ECF No. 47 at 47). Plaintiffs rely heavily on the Sixth Circuit's opinion in *Kanuszewski*

*I* to support that NJDOH's retention implicates such a choice. However, as the Sixth Circuit

recently stated in *Kanuszewski II*, *Kanuszewski I* held that the plaintiffs' Fourteenth Amendment

claim—that "defendants' indefinite storage and potential uses of the blood spots violated the

parents' Fourteenth Amendment substantive due process right to direct the medical care of their

children"—was adequately pled in the complaint to survive a motion to dismiss. *Kanuszewski II*,

141 F.4th at 803. The Sixth Circuit explained that it had assumed at the motion to dismiss stage

that "the complaint's allegations regarding medical treatment . . . were true" but "neither

considered nor consciously resolved whether each of defendants' discrete actions following the

taking of the plaintiff-children's blood actually constituted medical care under the Fourteenth

Amendment." *Id.* (internal quotation marks omitted). In other words, the Sixth Circuit held that

"the conclusory legal statements from *Kanuszewski I* d[id] not establish binding law of the case,"

and, thus, the court considered *de novo* whether the defendants' retention of blood violated the

Fourteenth Amendment. *Id.* at 804.

In *Kanuszewski II*, the Sixth Circuit determined that the plaintiffs failed to show that "the

retention and use of the dried blood spots and data . . . implicates the parents' right to direct the

control of their children's medical care." *Id.* at 807. The court held that

> [u]nder no reading of the caselaw can one argue that the literal act
> of storing involves medical treatment, diagnosis, or advice, or that
> this act intrudes on bodily integrity. Nor do the other uses—quality
> assurance, test improvement, test development, research, and victim

> identification—constitute medical care for the child who provided the blood spots. . . . [P]laintiff-parents do not have a fundamental right to direct the medical care of other children. . . . Although plaintiff-parents strongly oppose defendants' storage and research of their children's blood spots and data, we cannot elevate every concern to a "fundamental right."

*Id.* Again, Plaintiffs here only challenge the retention of Minor Plaintiffs' residual dried blood spots, not the potential distribution of those blood spots to third parties or law enforcement. Based on this alleged harm and for the same reasons relied on by the Sixth Circuit in *Kanuszewski II*, the Court finds, as a matter of law, that NJDOH's retention alone of Minor Plaintiffs' residual dried blood spots does not implicate Parent Plaintiffs' fundamental right to direct the medical care of their children under the Fourteenth Amendment.

Plaintiffs do not appear to dispute that *Kanuszewski II*'s holding requires such a finding. Instead, Plaintiffs pivot in a supplemental filing, seeking to distinguish *Kanuszewksi II* by arguing that they rely not on the "lesser right to direct medical care" but "on the greater right to the care, custody, and control of their children, which includes the seizure, retention, and use of their blood and genetic information without informed consent." (ECF No. 59 at 1.) The Court will accept Plaintiffs' argument, although, in their initial briefing on Defendants' Motion to Dismiss and in the FAC, Plaintiffs appear to focus their allegations on the medical nature of NJDOH's conduct. In support of their current theory, Plaintiffs cite to the Third Circuit's decision in *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000). In that case, a high school swim coach allegedly pressured a member of his team into taking a pregnancy test, resulting in a lawsuit brought under 42 U.S.C. § 1983 and state tort law by the student and her mother. *Gruenke*, 225 F.3d at 295. Plaintiffs cannot rely on *Gruenke*'s reasoning as to the student's Fourteenth Amendment right to "be free from the disclosure of personal matters" and her personal medical information as Minor Plaintiffs in this case do not pursue a Fourteenth Amendment claim. *Id.* at 302-303. *Gruenke* does recognize that

the circumstances before it implicated the mother's Fourteenth Amendment right to raise her child without undue state interference because the coach had failed to notify the student's parents about his suspicions regarding her pregnancy, instead involving other members of the team and their mothers to pressure the student to take a pregnancy test. *Id.* at 303-307. But, unlike *Gruenke*, in which the circumstances of the student's pregnancy test were withheld from her parents, Parent Plaintiffs do not dispute that they knew of and consented to Minor Plaintiffs' blood being taken and tested pursuant to the Newborn Screening Program. Even if this Court were to agree that *Kanuszewski II* was distinguishable, *Gruenke* and the familial privacy line of cases on which *Gruenke* relies, which all arise in a different context than this one, do not persuade this Court to extend parental rights under the Fourteenth Amendment to the mere retention of residual dried blood spots, especially in light of the Supreme Court's reluctance to expand the concept of substantive due process, *see Porter*, 974 F.3d at 447 (explaining that the Supreme Court is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

Plaintiffs' reliance on New Jersey statute § 10.5-44 is similarly misplaced. This statue provides that "[g]enetic information is personal information that should not be collected, retained or disclosed without the individual's authorization." N.J. Stat. Ann. § 10.5-44(2)(b); *see also* N.J. Stat. Ann. § 10.5-45(6) ("No person shall obtain genetic information from an individual, or from an individual's DNA sample, without first obtaining informed consent from the individual or the individual's representative."). However, the requirements of this statute explicitly do not apply to genetic information obtained "[b]y a State, county, municipal or federal law enforcement agency for the purposes of establishing the identity of a person in the course of a criminal investigation or prosecution"; "[f]or anonymous research where the identity of the subject will not be released";

"[p]ursuant to newborn screening requirements established by State or federal law"; or "[a]s authorized by federal law for the identification of persons." N.J. Stat. Ann. § 10.5-45(6)(a)(1), (5)-(7). Plaintiffs do not pursue a claim based on a violation of this statute. But, even if they did, by the plain language of the statute, Defendants would not be in violation of it. Plaintiffs point to no authority to suggest otherwise. And, despite the allegations in the FAC, Plaintiffs make clear that they do not challenge the potential misuse of the blood samples once the testing is complete. Plaintiffs also fail to cite to any case in which a court has determined that this state statutory provision creates a parental right under the Fourteenth Amendment of the United States Constitution. Indeed, the fact that there is legislation regarding the retention of genetic information in the State of New Jersey in relation to the Newborn Screening Program persuades this Court, even more so, that such issues are better suited for public debate and legislative action and that judicial restraint is proper. *Glucksberg*, 521 U.S. at 721. Thus, the Court finds that Parent Plaintiffs have failed to plausibly plead a violation of the Fourteenth Amendment. The Court dismisses their claim without prejudice.

### D. Fourth Amendment

Finally, the Court addresses the sufficiency of Minor Plaintiffs' Fourth Amendment claim. Defendants argue that Plaintiffs do not have a possessory interest in Minor Plaintiffs' residual dried blood spots and, therefore, cannot establish a seizure under the Fourth Amendment. (ECF No. 45-1 at 31-36.) In the alternative, Defendants assert that the seizure of Minor Plaintiffs' residual dried blood spots is reasonable under the Fourth Amendment's "special needs" exception. (*Id.* at 36-48.)

The Fourth Amendment of the United States Constitution grants individuals the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A Fourth Amendment "seizure" of personal property occurs when "there

is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A Fourth Amendment seizure remains lawful "only 'so long as [unrelated] inquiries do not measurably extend [its] duration.'" *Coles v. Carlini*, 162 F. Supp. 3d 380, 391 (D.N.J. 2015) (quoting *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)); *see also United States v. Place*, 462 U.S. 696, 707-09 (1983) ("[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is [constitutional]."). When assessing the constitutionality of a seizure's duration, a court must consider the seizure's purpose and the time "reasonably needed to effectuate" that purpose. *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

In *Kanuszewski II*, the Sixth Circuit determined that "[p]ossessory interests are created and defined by state law." *Kanuszewski II*, 141 F.4th at 810. The court relied on prior Sixth Circuit precedent for this reasoning. *Id.* (citing *Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir. 2010) (explaining that the state defines property interests and federal law decides whether the property interest "rises to the level of a constitutionally protected property interest" (internal quotation marks omitted)); and *Smith v. City of Detroit*, 751 F. App'x 691, 694 (6th Cir. 2018) (looking to Michigan law to determine a property interest in connection with a Fourth Amendment seizure claim). The Third Circuit has held that, "[f]or a property interest to be protected, a plaintiff must show 'a legitimate claim of entitlement to it'" and "[t]hough state law creates that entitlement, whether it counts as a protected property interest depends on federal constitutional law." *Coon v. Cnty. of Lebanon*, 111 F.4th 273, 275 (3d Cir. 2024) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Thus, this Court will look to both New Jersey and federal law for guidance on whether Minor Plaintiffs have a possessory interest in their residual dried blood spots.

Plaintiffs cite various cases, mostly United States Supreme Court precedent, which they argue establish that "bodily fluids, including blood, effects a seizure within the meaning of the Fourth Amendment by violating a person's right to exclude the government from their persons." (ECF No. 59 at 2.)  Not so.  None of the cases cited by Plaintiffs hold that individuals have a possessory interest in their blood for purposes of seizure.  Indeed, most of the cases that Plaintiffs rely on concern blood tests in the context of drunk driving and analyze those tests as searches, not seizures, under the Fourth Amendment, which implicate privacy expectations against the unlawful intrusion of one's person, not possessory interests in property.  *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) (reasoning that the "compelled intrusio[n] into the body for blood to be analyzed for alcohol content" has "long [been] recognized" as a Fourth Amendment search: "it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable");[15] *Mitchell v. Wisconsin*, 588 U.S. 840, 847 (2019) ("BAC tests are 'searches.'"); *Schmerber v. California*, 384 U.S. 757, 769-70 (1966) (analyzing law enforcement's requirement to submit to a blood test when driving under the influence as a "search[] involving intrusions beyond the body's surface": "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained"); *Birchfield v. North Dakota*, 579 U.S. 438, 476 (2016) ("[W]e conclude that a breath test, but not a blood test, may be

---

[15]    In *Skinner*, in dicta, the Court noted that "[t]aking a blood or urine sample *might* also be characterized as a Fourth Amendment seizure, since it *may* be viewed as a meaningful interference with the [individual]'s possessory interest in his bodily fluids." 489 U.S. at 618 n.4 (emphasis added).  However, the Court declined to extend its holding because the protected "privacy expectations" are "adequately taken into account by [the] conclusion that such intrusions are searches." *Id.*  Again, Plaintiffs do not challenge the constitutionality of the initial "intrusion" in this case, *i.e.*, the heel prick.  Rather, Plaintiffs' alleged harm solely relates to the retention of the residual dried blood spots.  Therefore, any reliance on *Skinner* in this context is unavailing.

administered as a search incident to a lawful arrest for drunk driving. As in all cases involving reasonable searches incident to arrest, a warrant is not needed in this situation."); *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) ("We first considered the Fourth Amendment restrictions on such searches in *Schmerber*, where, as in this case, a blood sample was drawn from a defendant suspected of driving while under the influence of alcohol."). And, as Plaintiffs themselves acknowledge, search-based decisions like these are "inapposite" because the "Amended Complaint contains no search claim." (ECF No. 59 at 2.)

Plaintiffs also rely on a New Jersey Supreme Court case, *Gardner v. New Jersey Pinelands Commission*, 593 A.2d 251 (N.J. 1991), but that case is also distinguishable as it addressed the rights of owners of real property. The owner of a farm challenged the State's attempt to restrict most of his property to agricultural use, arguing that these restrictions resulted in an "unlawful taking" of his property. *Gardner*, 593 A.2d at 253. Here, there is no indication in the cases cited by Plaintiffs that the interests in residual dried blood spots should be treated the same as real property.

Plaintiffs again rely on New Jersey statute sections § 10.5-44 and § 10.5-45. However, as already discussed, although these provisions characterize genetic information as "personal information," genetic information (1) obtained pursuant to newborn screening requirements, (2) for anonymous research where the identity of the subject is not released, and (3) when law enforcement seeks to establish the identify of a person in the course of a criminal investigation or prosecution is not subject to the consent requirements of this statute. N.J. Stat. Ann. § 10.5-45(6)(a). Plaintiffs have not adequately established a legitimate claim of entitlement to Minor

Plaintiffs' residual dried blood spots when by statute the Newborn Screening Program is specifically excluded from protections afforded to genetic information.[16]

In sum, based on Plaintiffs' failure to point to any New Jersey or federal law recognizing that an individual has a possessory interest in residual dried blood spots for purposes of a seizure under the Fourth Amendment, the Court declines to extend Fourth Amendment seizure protections to the facts of this case as pled. *See Kanuszewski II*, 141 F.4th at 811 ("Neither we nor the district court on remand need to resolve this important state-law question concerning possessory rights because plaintiffs failed to prove their claim. At no point, in their complaint, in briefs before the district court, or on appeal, did plaintiffs support that they have a property interest in the dried blood spots and data, let alone satisfy their burden of proof.") Accordingly, Plaintiffs have failed to plausibly plead a Fourth Amendment violation, and the Court grants Defendants' Motion to Dismiss Minor Plaintiffs' Fourth Amendment claim.[17]

---

[16]    Plaintiffs also rely on the Sixth Circuit's decision in *Kanuszewski I* and the Western District of Texas's decision in *Beleno v. Lakey* to support their possessory interest argument. However, the holding in *Kanuszewksi I* is of no moment. As the Court in *Kanuszewski II* stated, the *Kanuszewski I* opinion "assumed without deciding that plaintiffs had a possessory interest sufficient to establish a Fourth Amendment seizure claim." *Kanuszewski II*, 141 F.4th at 811. The court's abbreviated Fourth Amendment analysis in *Beleno v. Lakey*, another newborn screening case, also does not include an assessment of a possessory interest in this context. 306 F. Supp. 3d at 943. Indeed, in that decision, the court makes no mention of the possessory interest requirement under the Fourth Amendment. *Id.* And it construes the plaintiffs' Fourth Amendment claim as one arising from both an unlawful search and seizure. *Id.*

[17]    The Court need not address Defendants' arguments regarding the "special needs" exception under the Fourth Amendment as it has dismissed Plaintiffs' Fourth Amendment claim on other grounds.

## IV.    __CONCLUSION__

For the reasons set forth above, and other good cause shown, Defendants' Motion to Dismiss (ECF No. 45) is **GRANTED in part** and **DENIED in part**.  Plaintiffs shall have thirty (30) days to file a Second Amended Complaint in accordance with Local Rule 15.1(b), to the extent Plaintiffs can cure the deficiencies cited herein.  Failure to file an amended complaint within that time will render the dismissal final.  *See Mann v. A.O. Smith Corp.*, Civ. No. 21-2361, 2023 WL 2344225, at *2 (3d Cir. Mar. 3, 2023) ("A district court's dismissal without prejudice for failure to state a claim is converted into a dismissal with prejudice if plaintiff 'declar[es] his intention to stand on his complaint' by failing to timely amend it. . . ."); *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 279 (3d Cir. 2016) ("When that 30-day period expired, the District Court's decision became final.").

An appropriate Order follows.


Dated: August    8   , 2025

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE