EXHIBIT 1

**INSTITUTE FOR JUSTICE**
Robert Frommer*
~~Brian A. Morris*~~
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
rfrommer@ij.org
~~bmorris@ij.org~~

Christen Mason Hebert*
Daniel Woislaw**
816 Congress Ave., Suite 970
Austin, Texas 78701
(703) 682-9320
chebert@ij.org
dwoislaw@ij.org

*Counsel for Plaintiffs*
*admitted *Pro Hac Vice*
** *Pro Hac Vice* motion forthcoming

**PASHMAN STEIN WALDER HAYDEN, P.C.**
CJ Griffin (NJ Bar No. 031422009)
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201) 270-4930
cgriffin@pashmanstein.com

*Local Counsel*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### (Trenton Vicinage)

| | |
|---|---|
| **HANNAH LOVAGLIO**, <br><br> **J.L.** and **B.L.**, by next friend, Hannah Lovaglio, <br><br> **ERICA JEDYNAK,** <br><br> **JEREMIAH JEDYNAK**, <br><br> **C.J.**, by next friends, Erica and Jeremiah Jedynak, | Civil Action No.: 3:23-cv-21803-CG-RLS <br><br><br> ~~First~~Second **Amended Class Action Complaint** |

*Plaintiffs,*

v.

**KAITLAN BASTON**,
Commissioner of the New Jersey
Department of Health, sued in
her official capacity,

**NANCY SCOTTO-ROSATO**,
Assistant Commissioner for the
Division of Family Health
Services, sued in her official
capacity,

*Defendants.*

1.     Plaintiff Hannah Lovaglio and Plaintiffs J.L. and B.L., by next friend Hannah Lovaglio, who ~~reside at 46 S. Main Street,~~previously resided in Cranbury, New Jersey ~~08523~~, along with Plaintiffs Erica Jedynak and Jeremiah Jedynak, and Plaintiff C.J., by next friends Erica and Jeremiah Jedynak, who reside ~~at 203 Deerlea Lane,~~in Boonton, New Jersey ~~07005~~ (collectively, "Plaintiffs" or "Named Plaintiffs"), seek declaratory, injunctive, and class action relief against Defendant Commissioner Kaitlan Baton~~, located at 55 North Willow Street, Trenton, New Jersey 08608,~~ and Defendant Assistant Commissioner Nancy Scotto-Rosato~~, located at 50 East State Street, Trenton, New~~

2

Jersey 08608 (collectively referred to as "Defendants" or "New Jersey"),")

for the deprivation of Plaintiffs' rights, and the rights of those similarly

situated, under the Fourth and Fourteenth Amendments to the United

States Constitution.

## INTRODUCTION

2. Every This case concerns the government's policy of piercing

newborns' skin to seize their blood, analyze the information contained

within it, and keep that blood and information for potential later use and

sharing with third parties, all without parents' consent or a warrant.

3. The Fourth Amendment generally prohibits government

intrusion into the human body without consent or a warrant.

Nevertheless, without consent or a warrant, New Jersey extracts blood

from the body of every baby born in the state, analyzes that seized blood,

and then keeps the rest of each baby's blood—which undisputedly

contains DNA and other genetic material that can be "used with near

certainty to identify a person."[1]

_____

[1] *Maryland v. King*, 569 U.S. 435, 442 (2013). In *King*, the Supreme
Court summarized the "current standard for forensic DNA testing" as of

4. A New Jersey ~~is~~statute requires that all infants born in the state be screened for ~~diseases. Shortly after birth, the~~ a list of disorders. That statute and its attendant regulations mandate that hospital officials submit a sample of blood from each baby for testing. To do so, those officials puncture every newborn baby's heel ~~is pricked, blood is collected~~and physically manipulate it to retrieve several drops of blood from the wound, which they then place on a card~~, and the card is sent~~ they send to the New Jersey Department of Health's Newborn Screening Laboratory~~, where~~. There, the state tests the blood for ~~62~~ disorders. ~~This testing is not particularly controversial — every state does~~, usually obtaining results within two weeks.

~~2.~~5.    Despite getting test results within two weeks, New Jersey kept the remaining portion of each baby's blood for 23 years—or at least it~~.~~ did until Plaintiffs ~~are not challenging this heel prick or the~~

_____

2013. *Id.* at 442–43. In the twelve years since the *King* decision, DNA analysis and the information obtainable from DNA has continued to improve. Most recently, artificial intelligence has begun transforming the interpretation of genetic data, and there is a particularly heightened need to maintain privacy and control over blood and the genetic information contain within.

~~test itself, which gives parents results in one to two weeks.~~sued. Before Plaintiffs sued, New Jersey did not ask parents if the state could seize or analyze their newborn's blood, nor did New Jersey inform parents that it would keep any remaining blood after initial testing, let alone that it would keep that blood for 23 years.

~~3.    Plaintiffs are, however, challenging what happens after the testing is complete. When Plaintiffs filed their original complaint (Doc. 1), Defendants were secretly keeping the blood of every child born in the state for 23 years. And Defendants had no oversight or limits on how they could use that blood—or to whom they could give the blood.~~

4.~~6.~~    ~~Plaintiffs were appalled to learn about Defendants' retention policy, so they filed~~ So, in 2023, Plaintiffs filed this class action lawsuit on behalf of all children and parents in New Jersey ~~to~~. Their goal was, and remains, simple: stop Defendants from violating their ~~collective~~ rights under the Fourth and Fourteenth Amendments to the United States Constitution.

5.~~7.~~    Plaintiffs ~~also~~ provided Defendants with an easy and straightforward fix to violating peoples' rights: Just ask parents for

5

consent. ~~That's all this lawsuit is about voluntary, informed consent.~~ Plaintiffs even gave Defendants a template form asking parents for consent. If the state obtains voluntary~~, informed~~ consent from parents to retain their children's blood, Defendants will comply with the Constitution. It really is that ~~simple.~~ easy.

~~6.~~8.    In response to Plaintiffs' original complaint, Defendants, along with the New Jersey Attorney General Matthew Platkin, made voluntary and non-binding changes to the newborn testing program and retention policy. Among other things, Defendants shortened their retention period and ~~now promise~~promised to disclose ~~some~~more information to parents.

~~7.~~9.    These changes, however, are missing the one thing that matters: ~~Consent~~consent. Defendants ~~are~~ *still* ~~refusing~~refuse to obtain parental consent ~~before retaining~~ at any stage of the ~~blood. As a result, nothing has changed constitutionally about this case.~~ process. Defendants ~~are~~ still ~~retaining~~puncture the ~~blood~~skin of every child born in New Jersey ~~after the~~ to seize blood for testing ~~is complete.~~ without parental consent. Nor are Defendants ~~are still refusing~~willing to ask parents for

consent to retain ~~the blood. And thus,~~ their children's remaining blood for secondary uses. Such nonconsensual retention and use means Defendants are still violating the Fourth and Fourteenth Amendments to the United States Constitution.

~~8.~~10.    In the end, it remains perplexing why Defendants still refuse to do the one thing that will fix their policy: Just ask parents for consent. Perhaps Defendants are worried some parents will say "no." But Defendants cannot sidestep the Constitution just because they think some parents will make, as Defendants see it, the "wrong" choice. Parents, on behalf of their children—not New Jersey—control whether and how the state may intrude into their children's bodies for medical testing, including how the state may retain and use the blood and data obtained from that intrusion.

## JURISDICTION AND VENUE

~~9.~~11.    This is a civil rights case brought under 42 U.S.C. § 1983, as well as the Fourth and Fourteenth Amendments to the United States Constitution.

~~10.~~12.    This Court has jurisdiction under 28 U.S.C. ~~§§~~ § 1331~~, 2201, and 2202~~ because the claims arise under the United States Constitution.

~~11.~~13.    Venue is proper in this Court under 28 U.S.C. § 1391 because all ~~defendants~~Defendants reside in New Jersey and all or a substantial part of the events or omissions giving rise to the claims occurred in New Jersey.

## THE PARTIES

~~12.~~14.    Plaintiff Parent Hannah Lovaglio is a mother who ~~lives~~previously resided in ~~Cranbury,~~ New Jersey. Hannah has two boys, Plaintiffs J.L. and B.L. (ages 5 and 1.5, when the lawsuit was filed), both of whom were born in New Jersey. Hannah brings this suit on her own behalf, as well as parent-guardian and next friend to her minor children, Plaintiffs J.L. and B.L.

~~13.~~15.    Plaintiff Parents Erica and Jeremiah Jedynak are a married couple who live in Boonton, New Jersey. The Jedynaks have one son, Plaintiff C.J., who was born in New Jersey and turned two in December 2023, after the lawsuit was filed. The Jedynaks bring this suit

on their own behalf, as well as parent-guardians and next friends to their minor child, Plaintiff C.J.

14.16.    Defendant Kaitlan Baston is the commissioner of the New Jersey Department of Health—the agency in charge of New Jersey's newborn screening program. She is sued in her official capacity under *Ex parte Young*, 209 U.S. 123 (1908).

15.17.    Defendant Nancy Scotto-Rosato is the assistant commissioner for the Division of Family Health Services, which oversees the newborn testing program in New Jersey. She is also sued in her official capacity under *Ex parte Young*, 209 U.S. 123 (1908).

## STATEMENT OF FACTS

### *The Newborn Screening Program.*

16.18.    Since the 1970s, New Jersey has required every baby born in the state to be tested for a wide range of disorders, including cystic fibrosis, hormonal deficiencies, and other immunity and congenital disorders. N.J. Stat. § 26:2-111; N.J. Dep't of Health, *Disorders Screened*, https://tinyurl.com/NJ-Disorders. N.J. Stat. § 26:2-111.

9

19.     ~~Within 48 hours of birth,~~ Regulations promulgated by the Department of Health dictate precisely how hospitals ~~prick the heel of each newborn~~, physicians, birth attendants, and home health agencies are to collect specimens for such testing. *See generally* N.J. Admin. Code § 8:18-1.4(a).

20.     Those regulations require "that specimens are taken utilizing correct specimen collection techniques as described on the back of the specimen collection form;" *id.* at (a)6); that "the specimen collection forms "be filled in completely, accurately and promptly;" *id.* at (a)(7); and that all "specimens are taken before the infant is 48 hours old." *Id.* at (a)(9).

21.     Pursuant to New Jersey law and regulations, medical officials and institutions must "assure that a satisfactory specimen is submitted to the testing laboratory for each infant born in the hospital." N.J. Admin Code § 8:18-1.4(a)(3).

~~17.~~22.     Following the state-mandated techniques, officials and institutions perform "capillary blood ~~on~~collection" upon a newborn within 48 hours of birth. This requires officials to puncture the newborn's heel

with a lancet, and then physically manipulate the newborn's heel to draw blood out from their body. The blood that results from those efforts is then collected onto a paper card—creating "blood spots."[2]



18.23.    This paper card is then sent to the Newborn Screening Laboratory, (Laboratory), which is run by the New Jersey Department of Health at the New Jersey Public Health and Environmental Laboratories.

19.24.    The labLaboratory is located just outside Trenton, New Jersey, and processes more than 100,000 newborn tests each year.

---

[2] The following image comes from a video that New Jersey publishes on its website. N.J. Dep't of Health, *Newborn Screening & Genetic Services*, https://www.nj.gov/health/fhs/nbs/blood-spot/handout/https://www.nj.gov/health/fhs/nbs/bloodspot/handout/ ["NJDH Video"] (link at the bottom of the page to register and watch at https://attendee.gotowebinar.com/record-ing/4933247376685884930).https://attendee.gotowebinar.com/record-ing/4933247376685884930).

25.     On information and belief, New Jersey ~~does not require~~retains data associated with each individual blood spot that the Laboratory processes, data which is personally identifiable.

~~20.~~26.   New Jersey neither seeks nor obtains parental consent ~~before it takes blood from newborns~~at any stage of the blood collection or testing process. Nor does New Jersey obtain any kind of warrant to collect or test newborn blood.

~~21.   Rather, parents simply receive a handout about the program in the packet of paperwork every new parent receives at the hospital.~~

22.   When Plaintiffs filed this lawsuit, this was the entire handout:

**Parent Overview**

All babies born in New Jersey are required by law to receive a newborn blood screen 24-48 hours after their birth. One part of newborn screening is a simple and safe blood test that provides important information about your baby's health.

The blood sample is used to screen for many rare conditions which, if left untreated, may result in serious health problems. A newborn baby can look healthy, but have a serious disease that cannot be seen right after birth. Newborn Screening helps to detect these unseen illnesses. Early diagnosis and treatment may help prevent problems and complications related to these conditions.

The New Jersey Newborn Screening Program currently tests for **60** different disorders and identifies about 150 babies a year who have one of these rare and serious illnesses.

KNOW YOUR RESULTS!  Please check with your baby's doctor to find out your baby's Newborn Screening test results. Results are often available as early as your baby's one-week checkup.  If a repeat test is recommended for any reason, please arrange for it to be completed as soon as possible.

Websites below are written for parents and have lots of good information about Newborn Screening:



http://www.state.nj.us/health/fhs/nbs/
www.BabysFirstTest.org
www.NewbornScreening.info
www.SaveBabies.org



KNOW YOUR RESULTS!

23.   Parents may also find out about the screening from nurses.

24.   The handout provides links to four websites as referral sources. Three of these websites are from third parties—not New Jersey. The lone link back to the New Jersey Health Department does not provide any information about the retention of the blood.

25.   Under New Jersey law, however, the hospital's informational obligations are limited to ensuring that "the infant's parent is informed

13

~~of the purpose and need for newborn screening and given newborn screening educational materials" provided by New Jersey's Newborn Screening and Genetic Services. N.J. Admin. Code §§ 8:18-1.2–1.4.~~

~~26.    New Jersey also has a PowerPoint presentation on its website, which is designed to give an overview of the program to healthcare providers. *See* NJDH Video.~~

27.    The blood draw and testing are mandatory unless a "parent or guardian objects to the testing on the grounds that testing would conflict with his or her religious tenets or practices." N.J. Admin. Code § 8:18-1.12(a).

<u>28.</u>    ~~There is no requirement that~~ <u>Under New Jersey statute, a parent who wants to opt out must send "written notice to the hospital or birthing facility where the newborn infant was delivered, in a manner designated by the commissioner, that they object to the screening on the grounds that it would conflict with their religious tenets or practices." N.J. Stat.§ 26:2-111.</u>

~~28.~~<u>29.</u>    New Jersey law does not require <u>anyone</u> ~~to~~ <u>inform</u> parents about their right to object on religious grounds.

14

30. ~~New Jersey also gives parents a second notice about the availability of supplemental testing that~~ <u>Instead, New Jersey law tells hospitals they need only ensure that "the infant's parent is informed of the purpose and need for newborn screening and given newborn screening educational materials" provided by New Jersey's Newborn Screening and Genetic Services. N.J. Admin. Code §§ 8:18-1.2 to -1.4.</u>

~~29.~~ <u>Accordingly, parents simply receive a handout about the program in the packet of paperwork every new parent receives at the hospital. There is no requirement that</u> parents ~~can choose to opt-in and purchase.~~

~~30.    The supplemental notice references the "Mandated Newborn Screening" and explains that "New Jersey does not test for every possible birth defect." Any extra testing is performed by a private lab.~~

15

31.   This is the supplemental notice:

**State of New Jersey**
**Department of Health**

**NOTICE OF AVAILABILITY OF SUPPLEMENTAL NEWBORN SCREENING**

**Mandated Newborn Screening**
New Jersey law mandates that every baby born in New Jersey receive:
- Newborn Biochemical (Bloodspot) screening
- Hearing screening
- Critical Congenital Heart Defect (pulse oximetry) screening

For more information about the NJ Newborn Screening Program see https://www.nj.gov/health/fhs/nbs/

**Supplemental (additional, optional) screening**
The purpose of this notice is to inform expectant parents that New Jersey does not test for every possible birth defect and that additional, supplemental, testing is available for defects for which the State does not screen, should you choose to pursue further screening.
- **Supplemental** screening is performed by private laboratories and may not be covered by your insurance plan.

The results of any supplemental screening tests are sent to the ordering health professional and NOT to the NJ Newborn Screening Program.

32.   After the screening tests are completed, New Jersey sends the results to the hospital where the baby was born.

33.31.   As the handout explained, *supra* ¶ 22, "Results are often available as early as your baby's one-week checkup." even be informed of the blood draw's purpose before it occurs.

34.32.   Generally, the screening tests are completed within one to two weeks after the baby is born. New Jersey sends the results to the hospital where the baby was born.

35.   If the screening results are abnormal, New Jersey also sends the results directly to the baby's primary care provider.

16

36.   Regardless of whether the results areWhether normal or abnormal, parents cannot directly access the results of their child's newborn screening results.

37.33.   Under Defendants' policy, the Laboratory only keeps the blood for fourteen days before placing all blood spots into storage boxes and transferring the boxes to a storage areatests.

### New Jersey Unlawfully Keeps the Unused Blood.

38.34.   After New Jersey completes the newborn screening tests, there is some unusedof the blood lefttaken from the child's body remains on the paper card—called a "residual dried blood spot."

39.35.   New Jersey does not destroy the unusedthat remaining blood; instead, it holds onto it.

40.36.   In fact, as reported by several news outlets and as noted on a prominent newborn screening website to which the New Jersey Department of Health refers parents, at the time this lawsuit was filed, New Jersey had a policy of storing all unusedchildren's remaining blood

in a temperature-controlled room for 23 years after testing.³ until after Plaintiffs filed this lawsuit.⁴

41.37.   No New Jersey statute requires unusedNew Jersey officials to destroy the children's remaining blood to be destroyed.

42.38.   No statute authorizes New Jersey to retain the blood either.

43.39.   Instead, the New Jersey Department of Health has unilaterally determined that it candecided to keep and store the

_____

³ See, e.g., Nikita Biryukov, *Newborn Screening Program Used to Aid Criminal Investigation, Public Defender Says*, N.J. MONITOR (July 13, 2022, 7:44 AM), https://tinyurl.com/NJ-Monitor-BabyBlood; Matt Delaney, *New Jersey Health Officials Gave Police Access to Baby DNA for Criminal Probes, Lawsuit Says*, WASH. TIMES (Aug. 10, 2022), https://tinyurl.com/Wash-Times-BabyBlood; Baby's First Test, *New Jersey*, https://www.babysfirsttest.org/newborn-screening/states/new-jersey (last visited Oct. 17, 2023).

⁴ See, e.g., Nikita Biryukov, *Newborn Screening Program Used to Aid Criminal Investigation, Public Defender Says*, N.J. MONITOR (July 13, 2022, 7:44 AM), https://tinyurl.com/NJ-Monitor-BabyBlood; Matt Delaney, *New Jersey Health Officials Gave Police Access to Baby DNA for Criminal Probes, Lawsuit Says*, WASH. TIMES (Aug. 10, 2022), https://tinyurl.com/Wash-Times-BabyBlood; Baby's First Test, *New Jersey*, https://www.babysfirsttest.org/newborn-screening/states/new-jersey (last visited Oct. 17, 2023).

~~unused~~children's remaining blood ~~from every baby born in New Jersey~~for its own purposes.

40.    ~~When Plaintiffs filed this lawsuit,~~New Jersey never ~~told~~obtains a warrant to keep children's remaining blood.

~~44.~~41.  New Jersey neither seeks nor obtains consent from parents ~~that it would store~~before retaining their ~~baby's blood after the newborn screening testing is completed.~~ child's remaining blood.

~~45.   Instead, Defendants secretly kept the blood for however long it wanted.~~

~~46.   New Jersey does not and never has asked parents for consent to keep their baby's blood after the newborn screening testing is completed.~~

42.    New Jersey never obtains a warrant to ~~retain unused~~use children's remaining blood for research or other purposes.

~~47.~~43.  New Jersey neither seeks nor obtains consent from parents before using their child's remaining blood~~.~~ for research and other purposes.

### *New Jersey Gives Blood to Third Parties.*

~~48.~~44.   New Jersey does not just keep ~~the unused~~children's remaining blood for itself. Rather, it has been caught giving ~~baby~~that blood to third parties.

~~49.~~45.   Following a lawsuit filed by the New Jersey Office of the Public Defender, it was revealed that New Jersey gave ~~unused~~ blood from its baby blood stockpile to law enforcement officers on at least five occasions.

~~50.~~46.   The officers ~~did not have a~~had no warrant to take the blood.

~~51.~~47.   On information and belief, New Jersey also gives or sells blood from its baby blood stockpile to other third parties. ~~This could include~~, including, but ~~is~~not limited to, researchers, companies, ~~or~~and other government agencies.

~~52.~~48.   When Plaintiffs filed this lawsuit, New Jersey did not tell parents ~~anything about when   or to whom~~ that it gives ~~away or sells~~their children's blood. to others, who those other entities are, or what they were using the children's blood for.

20

49.     New Jersey does not secure parental consent before giving their children's blood to third parties.

**Plaintiffs Were Appalled to Learn** ~~that New Jersey Is Secretly Keeping Their Children's~~ of New Jersey's Nonconsensual **Blood** Practices.

50.     Plaintiff Parent Reverend Hannah Lovaglio ~~is~~ lived in Cranbury, New Jersey from 2015 to August 2025. Hannah was the pastor of a church in New Jersey~~.~~ for ten years and recently received a call to lead a different church in Hamilton, Ontario. The Lovaglio family is currently in the process of moving.

~~53.~~ Hannah has been married for ~~eight years. Hannah and her husband love New Jersey and have enjoyed raising their family here. To Hannah, it's the perfect place: Far enough from New York City that it feels like a small-town community, but close enough to still experience all of NYC's restaurants, museums, and culture.~~

~~54.~~51.   ~~ten years.~~ Starting a family was not easy for Hannah and her husband. But, with the help of in vitro fertilization, Hannah now has two boys. Both of Hannah's boys were born in New Jersey. When this lawsuit was filed, her oldest son, J.L., was five years old; her younger son,

B.L., was a year-and-a-half. Hannah and her husband still have several frozen embryos stored in New Jersey.

~~55.   Hannah and her husband are considering whether to have more children in New Jersey. Hannah still has several frozen embryos that are stored in New Jersey.~~

~~56.   If and when Hannah and her husband have their next child, their child will be subject to New Jersey's unconstitutional blood-retention policy.~~

52.   At birth, New Jersey ~~took blood from~~ punctured the skin of both of Hannah's boys ~~through the~~ and physically manipulated their heels to collect their blood for the state's newborn screening program. ~~The newborn testing for both~~

~~57.~~53.   Before the filing of this lawsuit, no person involved with the collection and testing of the blood of Hannah's boys ~~came back as normal~~ever sought or obtained Hannah's consent before collection and testing.

58.54.  New Jersey has retained the unused blood from Hannah's boys after the newborn screening tests were completed—and still has the boys' remaining blood.

59.55.   Before the filing of this lawsuit, New Jersey never asked Hannah whether it could sought or obtained Hannah's consent to keep her children's unused remaining blood after the testing was completed.

60.56.   Nor did New Jersey ask Hannah whether it could seek or obtain Hannah's consent for it to use her children's blood for other purposes, such as giving or selling the blood to third parties.

61.  When Hannah learned about New Jersey's secret retention of her children's blood, she was appalled. As Hannah sees it, when your baby is born and you're in the hospital, the only concern is for the baby's health and the mother's health—that's it.

62.   So while Hannah would have consented to the initial drawing of her children's blood to test for the 62 diseases in the newborn screening program, she would not have agreed to allow New Jersey to keep her children's blood for any length of time following that testing.

23

63.57.   nonconsensual baby blood practices, she was appalled. Like any mom, Hannah recognizes that her top priority is protecting her children. That includes protecting and keeping track of her children, their health and medical needs, and everything else about them— including their blood, which contains their DNA and other genetic information.

64.58.   But now Hannah worries about howthat New Jersey may beis abusing its nonconsensual, continued possession of her children's remaining blood.

65.59.   Hannah's concerns are not hypothetical. New Jersey has already given some blood to law enforcement officers without a warrant.

66.60.   And otherOther states, with similar schemes, have been caught using babies' remaining blood in alarming ways. In Texas, for example, a lawsuit revealed that the state was turning over blood to the Pentagon to create a national (and someday, international) registry.

67.61.   Plaintiff Parents Erica and Jeremiah Jedynak are married and live in Boonton, New Jersey. The Jedynaks love New Jersey and have enjoyed raising their family here. They have a son, C.J., who

24

was born in New Jersey and, after this lawsuit was filed, turned two in December 2023.

68.    Erica and Jeremiah are also considering whether to have more children in New Jersey.

69.    If and when Erica and Jeremiah have their next child, their child will be subject to New Jersey's unconstitutional blood-retention policy.

62.    At birth, New Jersey tookpunctured C.J.'s heel and physically manipulated it to collect his blood from the Jedynaks' son throughfor the state's newborn screening program. The newborn

70.63.    Before this lawsuit, no person involved with the collection and testing for the of C.J.'s blood ever sought or obtained the Jedynaks' son came back as normalconsent before collection and testing.

64.    New Jersey has retained the unusedC.J.'s remaining blood from.

71.65.    Before this lawsuit, New Jersey never sought or obtained the Jedynaks' son after the newborn screening tests were completed—and still has theconsent to keep C.J.'s remaining blood.

72.   New Jersey never asked the Jedynaks whether it could keep their child's unused blood after the testing was completed.

73.66.   Nor did New Jersey askever seek or obtain the Jedynaks whetherJedynaks' consent for it couldto use their child'sC.J.'s remaining blood for other purposes, such as giving or selling histhe blood to third parties.

67.    Erica and Jeremiah intend, plan, and resolve to have more children in New Jersey. Erica and Jeremiah purchased a 4-bedroom home so that they would have room to grow their family. Moreover, Erica and Jeremiah have retained and diligently stored C.J.'s crib, stroller, toys and baby clothes for his sibling to be. They want and are trying for another child.

68.    When Erica and Jeremiah have their next child, that child will be subject to New Jersey's nonconsensual and warrantless blood collection, screening, and retention practices.

74.69.   Erica was horrified and disgusted when she learned thatabout New Jersey wasJersey's practices, including its keeping of her

son's blood in a state facility for what she ~~describes~~views as "a creepy database."

75.70.    To Erica, keeping the blood of an innocent newborn, who has done nothing wrong, is immoral.

76.71.    Indeed, while the families were still in the hospital during the initial 24 to 48 hours after birth—a time that most parents feel is sacred and special as they meet and begin to care for their new baby—New Jersey ~~took part~~seized the blood of ~~the Jedynaks' son and~~ Hannah's children ~~with the intent~~and the Jedynaks' son, all without parents' consent, to test it, use it for a variety of purposes including potentially giving it to third parties, and keep it ~~and possibly~~for possible use ~~it~~ against the children decades later.

### *In Response to this Lawsuit, Defendants Made Voluntary and Non-Binding Changes to the Newborn Screening Program and Retention Policy.*

77.72.    On November 2, 2023, Plaintiffs filed their original complaint against Defendants. (Doc. 1.)

78.    In response, Defendants reached out to Plaintiffs to try and resolve the case without litigation.

79.73.   The parties then worked together for almost six months trying to reach an agreement. But once it became clear to Plaintiffs that Defendants wanted to keep retaining blood from the newborn screening program withoutrefused to seek or obtain parental consent, Plaintiffs informed Defendants that further negotiations would not be productive.

80.74.   The parties then informed the Court that negotiations failed, and the case could continue. (Doc. 23.) Defendants were scheduled to finally respond to the original complaint on June 25, 2024. (Doc. 24.)

81.75.   On June 20, 2024, however, Defendants made a surprise announcement.: The newborn screening program was changing its blood retention policy. (Doc. 25.)

82.   The Department of Health made a public statement that announced changes to its retention policy of blood from the newborn screening program.

83.76.   Among other changes, Defendants voluntarily shortened the blood retention policyperiod from 23 years to either 2 years or 10 years. If a test ischild's blood tests negative for all disorders, Defendants now claim they will retain the negativethat child's blood

28

spots for only two years post testing. ~~If~~And if a test is positive for any disorder, Defendants now claim they will ~~now~~ retain ~~a positive~~that child's blood spot for ten years post testing.

84.77.   In ~~either~~neither situation~~,~~ do Defendants *still* ~~do not~~ ask parents for consent ~~before retaining the~~to collect, test, or retain their children's blood.

~~85.~~   On July 25, 2024, Defendants made another voluntary and non-binding policy change.

~~86.   These changes are simple policy changes that could be changed in the next hour. These changes were not, for example, made in compliance with the Administrative Procedures Act, with a public comment period, etcetera. Rather, these policy changes could change again if Defendants simply issued a new press release.~~

~~87.~~78.   This time, Defendants revised the handout about the newborn screening program in the packet of paperwork every new parent receives at the hospital. *~~See supra ¶ 22 (showing the version of this card that was given~~*The content of the handout is entirely subject to Defendants' discretion, absent complying with the statutory requirement

29

to "inform[] [parents ~~when this lawsuit was filed~~] of the purpose and ~~until Defendants voluntarily changed the card in response to the lawsuit~~need for newborn screening and [provide] newborn screening educational materials[.]" N.J. Admin. Code § 8:18-1.4(a)(4).

~~88.~~79.    This is the front of the new card that Defendants created in response to this lawsuit:

Effective November 1, 2024



89.80.    This is the back of the new card that Defendants created

in response to this lawsuit:

Effective November 1, 2024



In accordance with Department of Health (DOH) policy, the sample taken from your baby will be securely stored for 2 years to ensure the integrity of your baby's tests results (for example, to rule out false positive or false negative results). If we do not hear otherwise from you, we will destroy the sample after 2 years.

At your request, the blood sample from your baby's Newborn Screening can be:

1. Destroyed at any time after initial testing, including before your child is 2 years old.
2. Stored for additional time, up to 8 years beyond the initial 2-year retention period.

DOH uses blood samples from the Newborn Screening program only for the following purposes: (1) newborn screening for your baby; (2) routine quality assurance and quality control for DOH's lab; and (3) developing new tests for disorders. Any blood samples used for the second or third purposes will be de-identified—that is, unlinked from your baby's identifying information.

The sample taken from your baby will not be released in identified form (that is, with identifying information about your baby) to non-law enforcement third parties without your consent. DOH will release your baby's identified blood samples to law enforcement (for example, if your child went missing) only with your consent or consistent with the Attorney General's binding Law Enforcement Directive (available at www.nj.gov/oag/dcj/agguide/directives/). De-identified samples will be released to third parties only as allowed by federal law.

Scan the QR code below to access the full Newborn Screening bloodspot retention policy, or to fill out and submit either a destruction form or an extended-retention form. These forms are also available at: www.nj.gov/health/phel/documents/destruction-form.pdf and www.nj.gov/health/phel/documents/extended-retention-form.pdf.

90.81.    On this card, Defendants include a "QR Code" that links

to a Newborn Screening Bloodspots Destruction Request Form.

91.82.    If parents fill out this form, Defendants say they will

destroy theirthe child's bloodspot that Defendants are retaining.

92.83.    ThisThe card is given to parents in the hospital, along

with other paperwork, within the first 24 to 48 hours that the child is

born.after the child is born. The card does not ask for parental consent

and there is no requirement that hospital staff provide the card before New Jersey punctures a baby's skin.

93.    Other lawsuits, including a nearly identical challenge to Michigan's retention policy, have explained why this "opt-out" option is not the same as voluntary, informed consent under the Fourth Amendment, such as an "opt-in" option. *See, e.g.*, *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 684 F. Supp. 3d 637, 647 (E.D. Mich. 2023), *appeal docketed*, No. 23-1733 (6th Cir. Aug. 16, 2023).

94.    For instance, as the District Court in Michigan put it, there's a variety of reasons why a new parent may not ask the state to stop violating their rights, such as "the product of the opacity of the system, the infants' nascent existence in the world, or the result of the overwhelmed state of their new parents." *Id.*

84.    In addition to revising the informational card provided to parents in the hospital, Defendants also revised a page on the Department of Health's website: https://www.nj.gov/health/phel/public-health-lab-testing/newborn-screening-lab/parents.shtml. That website has a short section about "Newborn Screening Specimen Retention," with

three links. The website does not directly tell parents that they can request the destruction of blood spots retained by Defendants. Rather, a parent would have to click one of the three links to documents that reference and provide another link to the destruction form.

85.    Defendants' after-the-blood-draw "opt-out" option for parents is not equivalent to consent under the Fourth Amendment, which requires that consent be "freely and voluntarily given" by parents and not merely "acquiesce to a claim of lawful authority." *See Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).

86.    Defendants have identified no meaningful obstacle to obtaining parental consent for the blood draw, the testing, and any subsequent retention and use of that blood for any length of time.

~~95.~~87.    Defendants' revised policy proves that point. For blood with negative test results, Defendants say they will obtain parental consent to continue retaining the blood ~~after two years.~~beyond two years. If parents give that consent, Defendants will retain the blood for ten years. In other words, Defendants concede that they *can* obtain parental consent but refuse to seek that consent before taking blood from

33

newborns, testing it, or keeping that blood for at least two years. Defendants are only willing—at least right now—to obtain parental consent to continue keeping blood with negative results after the initial two-year period, for years three through ten.

96.     ~~If parents give consent, Defendants will retain the blood for ten years. In other words, Defendants~~ *will* To obtain consent to ~~continue the retention of~~keep that negative-result blood~~, post testing,~~ for ~~years three through ten.~~

97.88.     Defendants     have     an     ~~Extended     Retention Form~~additional seven years, Defendants created a form that allows parents to opt- in to retention for years three to ten.

89.     If parents do not ~~give~~ consent ~~through~~to the ~~Extended Retention Form~~extended retention, Defendants say they will destroy the negative-result blood after two years.

98.90.     By contrast, for blood that had a positive result, Defendants don't ask for parental consent to keep that blood longer than two years. Defendants have unilaterally decided that they can and will

keep that blood for ten years. No consent to retain required, according to Defendants.

99.91.  After ten years, Defendants claim they will destroy all blood samples, no matter the original test results.

100.92. According to Defendants, they will destroy all current blood spots they have begun destroying the negative-results blood spots they have for children thatwho are now older than two years old. and all blood spots older than ten years.

101.93. However, Defendants will continue the retention ofkeeping all blood spots they have for children younger than two years old. Defendants do not and will not ask parents for consent to continue this retention.

102.    Defendants say this mass destruction will take place starting November 1, 2024.

103.    According to the newThe revised informational card, some of the policy changes will also become effective on November 1, 2024.

104.94.   ~~The new card~~ provided at the hospital also gives ~~a primary reason~~one creason for the retention: "the sample taken from your baby will be securely stored for 2 years to ensure the integrity of your baby's tests results (for example, to rule out false positive or false negative results)."

~~105.    Other states, including Virginia, have a less restrictive way of preserving newborn blood in~~In addition, the ~~event someone needs to rule out a false positive or a false negative result  or in~~revised informational card notes that, during the ~~tragic situation that blood is needed to identify a child.~~

~~106.    Through the Virginia Child ID Blood Spot program, parents have the option, at the time of the child's birth, to have the hospital collect and give parents a sample of the newborn's blood.~~

~~107.    Parents can then properly safeguard the blood without the risk of government or third-party abuse.~~

~~108.    On July 25, 2024, Defendants also updated a page on the Department of Health's website: https://www.nj.gov/health/phel/public-health-lab-testing/newborn-screening-lab/parents.shtml.~~

36

~~109.    Defendants now have a short section about "Newborn Screening Specimen Retention," with three links:~~

**Newborn Screening Specimen Retention**

Currently, all NBS specimens are retained for 23 years. Effective November 1, 2024, this is changing and NBS specimens will be saved for two years. At that time, all specimens older than two years will be destroyed.

Notice of Change to Newborn Screening Program's Retention Policy

Parent Information about NBS Specimen Retention

Newborn Screening Retention Policy, Effective November 1, 2024

~~110.    The website does not directly tell parents that they can request the destruction of blood spots retained by Defendants.~~

~~111.    Rather, a parent would have to click one of the three links and find the explanation and reference to the Destruction Request Form in one of those three documents.~~

~~112.~~95. Defendants also announced that they ~~"~~two-year retention period, New Jersey will use ~~retained bloodspots only for the following purposes: (1) newborn screening for a child; (2)~~ the baby blood to conduct "routine ~~laboratory~~ quality assurance and quality control~~;~~" for

the Laboratory and ~~(3) the development of~~to "develop[] new tests for disorders."

~~113.~~96. The card also confirms that Defendants~~, however, confirm that they~~ will still release blood spots to third parties in various situations—sometimes without parental consent.

97.    ~~Defendants~~ In providing baby blood to third parties, Defendants make the distinction between blood spots with a baby's identifying information and deidentified blood spots.

98.    Defendants assert that baby blood with identifying information will ~~still~~ only be released to non-law enforcement parties with parental consent but provide no details on how that consent would be obtained.

99.    Defendants announce that they will release deidentified blood samples to third parties "as allowed by federal law."

100.    Defendants provide no information on how they will ensure that deidentified blood spots are truly deidentified. Each blood spot contains the unique DNA of that child. Regardless of whether a child's name or other information is linked to a particular blood spot, the

child's DNA within that blood spot is still unique and can be used to identify them.

114.    Defendants state that they will still release identified blood spots to state and local law enforcement agencies "as , but indicate that release will be consistent with the Attorney General's Directive."

101.    Also on June 20, 2024, thea directive from New Jersey Attorney General, Matthew Platkin, issued.

115.    The relevant Attorney General Law Enforcement Directivedirective, No. 2024-03.

116.102.    The Attorney General, confirmed that Defendants have released blood retained from the newborn screening program to law enforcement agencies.

117.103.    Moving forward, the Attorney General claimsdirective states that law enforcement agencies will only be able to obtain blood from the newborn screening program "in genuinely exceptional circumstances."

118.104.    While calling these circumstances "rare," the Attorney General directive goes on to explain that law enforcement

39

agencies will *still* be able to access blood retained from the newborn screening program, but that such agencies "shall first seek approval from the Director of the Division of Criminal Justice."

119.105.    These requests, the Attorney General says, must "be made in writing and must explain why this is an exceptional circumstance that necessitates seeking information from the Program and why less intrusive means will not suffice."

120.106.    The Attorney General then goes on to detaildetails the three different processes through which law enforcement officers can access the blood retained by Defendants.

121.107.    Unlike some other states, the Attorney General did *not* categorically bar law enforcement officers from obtaining blood retained by Defendants from the newborn screening program.

122.108.    The Attorney General admits that his voluntary and non-binding policy change is, in fact, voluntary and non-binding: "This directive shall take effect immediately, and shall remain in force and effect unless and until it is repealed, amended, or superseded by Order of the Attorney General."

40

123.109.    Attorney General Platkin has rescinded and amended directives that previous attorneys general have issued.

124.110.    Nothing prevents Defendants, or the Attorney General, from rescinding, amending, or changing their policy changes tomorrow, in a year, or in five years.

125.    Nothing prevents the next administration, the next Commissioner of the New Jersey Department of Health, the next Assistant Commissioner for the Division of Family Health Services, or the next Attorney General from rescinding, amending, or changing any of these the policy changes at any time and for any reason whatsoever.

***States Can Achieve Quality Control By Using Samples From Other Sources*** The changes to the state program mandating the seizure, testing, and ***By Obtaining Consent Before Birth.***

126.    Any government interest retention of every newborn's blood were not, for example, made in compliance with the Administrative Procedures Act, with a public comment period, or with other indicia of formality and process. Accordingly, New Jersey's practices and policies on taking, retaining the blood spots without voluntary, informed consent before birth is minimal or nonexistent.

41

127. ~~The Centers for Disease Control and Prevention's Newborn Screening Quality Assurance Program (NSQAP) provides~~, and sharing newborn ~~screening laboratories with quality assurance services. Newborn Screening Quality Assurance Program, U.S. Centers for Disease Control and Prevention, https://tinyurl.com/NSQAP-Guidance. As part of those services, NSQAP supplies laboratories with dried~~ blood ~~spot materials~~, including how long the State keeps that ~~mimic newborn specimens. These reference materials help laboratories assess their ability to produce accurate results by, among other things, ensuring that testing accurately detects disorders and minimizes false positive reports.~~

128. ~~As stated on NSQAP's website, all newborn screening laboratories in the United States — which surely includes New Jersey's laboratory — use the NSQAP's quality assurance services. Even~~blood, to whom it can give the blood and the associated genetic information and when, and what it tells parents could change again if Defendants ~~are not getting samples from NSQAP, the number of laboratories using NSQAP's materials means the materials meet most, if not all, quality assurance standards.~~

129.    ~~Any claim that the unique properties of newborn blood necessitates the use of newborn blood to calibrate testing and improve diagnostic capabilities falls flat. While newborn blood does differ from the blood of older infants and adults, "blood collected from any source, including cord blood," can be modified to promote quality assurance in newborn screening laboratories. W. Harry Hannon et al., *Newborn Screening Quality Assurance,* in Genetics and Public Health in the 21st Century 243, 245 (Muin Khoury et al., eds., Oxford University Press 2000).~~

130.    ~~To the extent that there is any remaining government interest in keeping blood spots beyond the initial screening, nothing prevents Defendants from obtaining voluntary, informed consent for the retention of blood spots before birth.~~

~~131.~~111.    When medical providers give parents up-front ~~information about newborn screening, parents have greater trust in and understanding of both the initial testing and any subsequent storage and research.~~ simply issue a new press release.

43

## CLASS ACTION ALLEGATIONS

~~132.~~112.     Named Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–~~131~~111 as if fully stated here.

~~133.~~113.     Named Plaintiffs seek to maintain this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(b)(2).

~~134.~~114.     New Jersey's conduct towards Named Plaintiffs is part of a broader policy and practice, in which the state ~~retains~~seizes and ~~uses~~searches the blood of every child born in New Jersey—without ~~notice~~a warrant or ~~informed~~parental consent.

~~135.~~115.     Named Plaintiffs represent two putative classes.

~~136.~~116.     Plaintiff Children J.L. and B.L., by next friend, Hannah Lovaglio, and Plaintiff C.J., by next friends Erica and Jeremiah Jedynak, represent the first putative class (the "Children's Class") with the following proposed class definition:

> All persons born in New Jersey on or after November 2, 2000, whose blood has been or will be retained by New Jersey's newborn screening program absent parental consent.

~~137.~~117.    Plaintiff Parents Hannah Lovaglio and Erica and Jeremiah Jedynak represent the second putative class (the "Parents' Class") with the following proposed class definition:

> All parents or legal guardians of minors born in New Jersey on or after November 3, 2005, whose blood has been or will be retained by New Jersey's newborn screening program absent parental consent.

~~138.~~118.    Plaintiff Children J.L. and B.L., by next friend, Hannah Lovaglio, and Plaintiff C.J., by next friends Erica and Jeremiah Jedynak, and the members of the Children's Class have suffered, and will continue to suffer, constitutional violations under the Fourth Amendment to the United States Constitution for ~~the unlawful~~New Jersey's continued retention, use, and sharing of their remaining blood ~~from the newborn screening program~~without a warrant or consent.

~~139.~~119.    Plaintiff Parents Hannah Lovaglio and Erica and Jeremiah Jedynak, and the members of the Parents' Class have suffered, and will continue to suffer, constitutional violations under the Fourteenth Amendment to the United States Constitution for ~~the unlawful~~New Jersey's continued retention, use, and sharing of their

45

children's blood ~~from the newborn screening program~~without a warrant or their consent.

~~140.~~120.        Both classes satisfy all requirements under Rule 23(b)(2), ~~including~~as well as the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a)(1)–(4).

~~141.~~121.        Both classes satisfy the numerosity requirement of Rule 23(a)(1). In New Jersey, there are over 100,000 babies born each year. ~~That means New Jersey is stockpiling~~New Jersey law mandates the nonconsensual, warrantless, and exceptionless searches and seizure of those babies' blood. In total, New Jersey has stockpiled *millions* of blood spots from the newborn screening program.

~~142.~~122.        Both classes satisfy the commonality requirement of Rule 23(a)(2). Common questions of law and fact will predominate over any individual issues.

~~143.~~123.        Common questions of fact for both the Children's Class and the Parents' Class include, but are not limited to:

a. ~~Why does~~Does New Jersey ~~not~~ obtain ~~parental~~parents' consent to puncture their newborn's skin and massage their heels in order to collect their blood?

b. Does New Jersey obtain parents' consent to perform genetic testing on the specimen obtained from the blood-collection process?

~~a.~~c.    Does New Jersey obtain parents' consent to retain any of the ~~residual~~ blood obtained from the blood-collection process for use in the newborn screening program?

~~b.~~d.    How is New Jersey using the ~~residual~~children's remaining blood ~~from~~in the newborn screening program?

~~c.~~e.    ~~What~~To what third parties has New Jersey given ~~residual~~children's remaining blood from the newborn screening program ~~to~~?

~~d.~~f.    ~~Does New Jersey make a profit from selling residual blood from~~Who has access to the blood that the

47

newborn screening program has retained without parental consent?

e. Where does New Jersey store the residual newborn blood?

f. Who is allowed access to the blood retained from the newborn screening program?

g. How is New Jersey storing the children's remaining blood?

h. Why did New Jersey keep the children's remaining blood for 23 years?

i. Why does New Jersey keep thechildren's remaining blood for any length of time post-testing?

j. What justification, if any, does New Jersey have to stockpile store and use remaining blood obtained from the residual blood from the newborn screening programblood-collection process without parental consent?

48

k.  ~~Why does New Jersey not use~~ Are there less restrictive means~~, many of which other states~~ that New Jersey could use~~,~~ to achieve ~~the~~those same ~~goals or~~ justifications ~~for retention~~?

~~k.~~l.   Does New Jersey keep any genetic or other information about children after it ceases to retain those children's blood spots?

~~144.~~124.   Common questions of law for the Children's Class include, but are not limited to:

a.  Whether the ~~retention~~puncturing of a child's skin to collect blood from ~~the newborn screening program~~that child's body is a "search" that implicates the Fourth Amendment;

b.  Whether puncturing a child's body so that, acting pursuant to state law, medical officials can squeeze blood out of the resulting wound for collection is a "seizure" that implicates the Fourth Amendment;

49

a.c.     Whether New Jersey's retention of blood collected from the child's body, after the that child's initial genetic testing is completed, constitutes complete, is a "continued continuing seizure" that requires a new justification for New Jersey to keep the blood. must independently justify under the Fourth Amendment; and

b.d.     Whether the New Jersey's retention and use of the remaining blood from of New Jersey children for the newborn screening program, without informed a warrant or parental consent, a warrant, or a valid warrant exception violates the Fourth Amendment.

c. Whether notice and the ability to request Defendants to end the continued seizure of the blood—i.e., to "opt-out" constitutes voluntary consent under the Fourth Amendment.

d. Whether voluntary consent under the Fourth Amendment requires Defendants to ask parents to "opt-

in" to the continued seizure of the blood before
Defendants retain the blood for any length of time after
the newborn screening testing is complete.

c. At what time—e.g., in the hospital, during a prenatal
visit, or at some other time—do Defendants need to
obtain consent from parents for that consent to be
considered informed and voluntary.

145.125.    Common questions of law for the Parents' Class in-
clude, but are not limited to:

a. Whether parents have the fundamental right to raise
their children without undue state interference.;

b. Whether parents have the fundamental right to direct
the care, custody, and control of their children.;

c. Whether parents have the fundamental right to direct
the medical care of their children.;

d. Whether the puncturing of their child's body so that,
acting pursuant to state law, medical officials can
squeeze blood out of the resulting wound for collection

51

and genetic testing, constitutes "medical care" that implicates parents' substantive due process rights under the Fourteenth Amendment; and

~~d.~~e.    Whether New Jersey's post-testing retention and use of ~~the~~ blood that was extracted from ~~the newborn~~their child for genetic screening ~~program~~, without ~~obtaining~~parental consent ~~from the parents or legal guardians to do so~~, violates the substantive due process rights of parents under the Fourteenth Amendment.

~~146.~~126.    Under Rule 23(a)(3), the attributes of Named Plaintiffs are typical of the claims of the respective class members in both the Children's Class and Parents' Class. In fact, the claims, facts, and injuries are identical. New Jersey, under the same policy or practice: (a) ~~unlawfully~~ punctured the bodies of Plaintiffs J.L., B.L., and C.J. and every person in the Children's Class to squeeze blood out of the resulting wound for testing without first securing a warrant or parents' consent; (b) tested the blood of Plaintiffs J.L., B.L., and C.J. and every person in

52

the Children's Class without first securing a warrant or parents' consent; (c) retained the remaining blood collected from Plaintiffs J.L., B.L., and C.J. and every person in the Children's Class, and (b) for purposes other than genetic testing without first securing a warrant or parents' consent; and (d) violated the same fundamental rights of Plaintiffs Hannah, Erica, and Jeremiah and every parent or legal guardian in the Parents' Class by holding onto blood it collected from their children's bodies for genetic testing and using it for purposes other than genetic testing without first securing their consent.

147.127.    Named Plaintiffs, like all class members, have an interest in obtaining declaratory and injunctive relief so that will require New Jersey to will (a) either (a) obtain voluntary, informedparental consent to keep theretain their children's blood spotsfor purposes other than testing, or (b) return or destroy the blood spots and all associated data, including genetic information. There is nothing materially different about the relief Named Plaintiffs seek on their own behalf and the relief they seek for members of the Children's Class and Parents' Class.

148.128.    Named Plaintiffs will fairly and adequately represent both the Children's Class and Parents' Class, satisfying Rule 23(a)(4). Named Plaintiffs are represented by Robert Frommer, ~~Brian Morris, and~~ Christen Hebert, and Daniel Woislaw at the Institute for Justice and by CJ Griffin of Pashman Stein Walder Hayden, P.C.

149.129.    The Institute for Justice is a nonprofit, public-interest law firm that, since its founding in 1991, has successfully litigated constitutional issues nationwide. The Institute for Justice also has extensive experience litigating civil rights class actions raising claims under the Fourth and Fourteenth Amendments around the country, including in Philadelphia, Pennsylvania; ~~Seattle, Washington;~~ Pagedale, Missouri; Brookside, Alabama; New York, New York; and Los Angeles, California~~; and Chicago, Illinois~~.

150.130.    ~~The classes will also be represented by~~ CJ Griffin of Pashman Stein Walder Hayden, P.C.~~, who~~. has decades of experience litigating in state and federal courts in New Jersey. CJ is the director of Pashman Stein's Public Interest Center and even has experience

litigating the unauthorized use of residual baby blood against New Jersey.

151.131.     As a result, both classes satisfy Rule 23(a)(1) ()—(4).

152.132.     Both classes also meet the requirement of, and are brought in accordance with, Rule 23(b)(2) of the Federal Rules of Civil Procedure. By keepingretaining children's remaining blood from, which it took for genetic testing, and using it in the newborn screening program for purposes unrelated to that testing absent a warrant or parental consent, New Jersey has acted, or refused to act, on grounds generally applicable to members of both the Children's Class and the Parents' Class.

153.133.     Also, insofar as a Rule 23(b)(2) class must be ascertainable, this action satisfies that requirement for both the Children's Class and the Parents' Class. For instance, records within New Jersey's custody or control would identify members of both classes in a manageable process requiring little, if any, individual factual inquiry.

154.134.        Lastly, to the extent that the Court reads a cohesiveness requirement into Rule 23(b)(2), both classes satisfy that element. Here, there are no individual factual issues that prevent these claims from proceeding on a class-wide basis.

155.135.        The classes are entitled to the requested declaratory and injunctive relief. Thus, a class action is an appropriate method for adjudication of this case under Rule 23(b)(2).

## INJURIES

136.        J.L., B.L., C.J., and similarly situated children in New Jersey suffered injuries to their bodily autonomy, bodily integrity, and right to be secure against unreasonable searches and seizures of their persons under the U.S. Constitution's Fourth Amendment by:

a. New Jersey's physical extraction of blood from their persons without a warrant or parental consent;

b. New Jersey's testing of their blood without a warrant or parental consent;

c. New Jersey's post-testing, physical retention of their blood without a warrant or parental consent;

56

d. New Jersey's post-testing use of their blood by generating and storing electronic data derived from it without a warrant or parental consent;

e. New Jersey's potential sharing of their blood and/or associated data with law enforcement personnel without a warrant or parental consent; and

f. New Jersey's potential sharing of their blood and/or associated data with other third parties without a warrant or parental consent.

137.    Hannah Lovaglio, Erica Jedynak, Jeremiah Jedynak, and similarly situated parents have suffered harm to their rights under the U.S. Constitution's Fourteenth Amendment to direct the care, custody, and control of their children when New Jersey took, tested, retained, and shared their children's blood and genetic information without their prior, informed, parental consent, which interfered and continues to interfere with their right to direct the possession, use, medical testing, and control of their children's blood and genetic information.

## CONSTITUTIONAL VIOLATIONS

### Count I
### 42 U.S.C. § 1983—Fourth Amendment
### (Unlawful Search and Seizure Claim of Plaintiffs J.L. and B.L., by next friend Hannah Lovaglio, and Plaintiff C.J., by next friends Erica and Jeremiah Jedynak, for themselves and those similarly situated)

156.138. Plaintiff Children reallege and incorporate by reference the allegations in paragraphs 1–155137 as if fully stated here.

157.139. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

140. All persons, including children, have a property and privacy interest in their persons, which includes the blood in their veins and the DNA and other genetic material within that blood.

158.141. The right of the people to be secure in their persons includes (1) the right to be free from intrusion into, and removal of material from, the human body; and (2) property and privacy interests in the exclusive possession of their blood and genetic information.

58

159.142.     The Fourth Amendment is incorporated against the states through the Fourteenth Amendment to the United States Constitution.

160.     Warrantless searches and seizures are per se unreasonable unless one of the narrow exceptions to the warrant requirement applies.

161.     The initial drawing and collection of baby blood through the New Jersey's newborn screening program iseffects a seizuresearch under the Fourth Amendment.

162.     New Jersey's purpose for the initial drawing and collection of baby blood, and thus, the initial seizure, is by requiring officials to puncture a child's skin and manipulate their heels to test for 62 diseases.

143.     extract their blood so that New Jersey has no propertycan learn information by testing that blood.

144.     By requiring nurses and other medical personnel to puncture a newborn's skin and manipulate their heel to extract blood from the resulting wound, New Jersey law effects a seizure within the

59

meaning of the Fourth Amendment, as it meaningfully interferes with the newborn's possessory interest in ~~the blood collected for the newborn screening program. Instead,~~ their person and their own blood.

145.    Moreover, people's property and privacy interests in their blood and associated genetic material do not dissipate when that blood is taken physically from inside their bodies by state action.

~~163.~~146.    Plaintiff Children, via their parents, never voluntarily gave their blood to the state, and New Jersey never sought nor received their consent. Absent such a voluntary transfer of ownership, Plaintiff Children maintain their property and privacy interests in the blood.

147.    ~~The~~New Jersey does not have a property interest in the blood within children's veins.

148.    Nor does New Jersey gain a property interest in children's blood upon physically seizing that blood from children following their birth without parental consent.

60

164.149.    Defendants' retention of the babyeach newborn's blood following testing istherefore works a continuing seizure within the meaning of the Fourth Amendment.

165.150.    If a person or property has been seized, and the initial justification for that seizure has endedceased, the government must either:

a. End the seizure and return the property, or

b. Secure a newProve that there is an independent justification to continue the seizure.

151.    The initial seizure of blood from children by New Jersey for genetic testing, on the one hand, and New Jersey's subsequent use and retention of children's blood on the other, are independent Fourth Amendment events that require independent justification.

166.152.    Once New Jersey completes thegenetic testing on the baby blood it has seized, which takes one to two weeks, theany justification it may have had for initially collecting and testing the baby blood has ended.

167.    More specifically,But once New Jersey completes the newborn screening tests, the justification for the initial seizure of the blood—i.e., the health of the baby—has run its course.

168.    that testing is complete, New Jersey does not end its seizure of the babynewborn baby's blood once the testing is complete.

169.153.    New Jersey. It does not return or destroy the baby blood once the testing is complete.

170.154.    Nor does New Jersey does not secure a newor assert an independent justification to continue its seizure of newborn babies' blood once the testing for the continued seizure of the baby blood once the testingthose babies is complete.

171.155.    New Jersey has no lawful justification for its continuing seizure of blood from the newborn screening programpost-testing.

172.156.    Without a new lawful justification to keep and stockpile the baby blood, New Jersey's continuing seizure violates the Fourth Amendment.New Jersey does not obtain warrants to keep blood spots after the initial testing is complete.

62

173.157.    No exception to the Fourth Amendment's warrant requirement applies to New Jersey's retention of blood spots after the newborn screening testing is completed..

158.    Indeed, with the limited exception of asking for parental consent to retain blood negative for a disorder beyond two years discussed above, New Jersey refuses to obtain parental consent for any retention whatsoever.

174.159.    As a result, New Jersey's retention of baby blood for 2 years, 10 years, 23 years, or any amount of time post-testing, violates the Fourth Amendment to the United States Constitution.

175.160.    Plaintiffs J.L. and B.L., by next friend Hannah Lovaglio, Plaintiff C.J., by next friends Erica and Jeremiah Jedynak, and the Children's Class are entitled toseek declaratory relief stating that retainingDefendants' retention of their remaining blood from the newborn screening program, absent voluntary, informed parental consent, violates the Fourth Amendment.

176.161.    Plaintiffs J.L. and B.L., by next friend Hannah Lovaglio, Plaintiff C.J., by next friends Erica and Jeremiah Jedynak, and

63

the Children's Class ~~are also entitled to injunctive relief.~~ask the Court to enjoin New Jersey from retaining any blood spots post-testing absent parental consent.

177.162.        ~~The Court should permanently enjoin New Jersey from retaining any blood spots absent voluntary, informed consent.~~ To that end~~, for~~ the ~~Court should~~ existing blood spots—Plaintiffs ask that the Court require ~~that~~New Jersey, within a year of judgment, ~~New Jersey must~~to either:

a. Obtain ~~voluntary, informed~~parents' consent to continue retaining each blood spot for specific disclosed purposes;

b. Return each blood spot and associated, individualized data, including genetic information to the person from whom that blood was drawn or to their parent or legal guardian, if that person is below the age of eighteen (18) years; or

c. Destroy the blood spot and associated, individualized data, including genetic information, generated there-from.

~~178.    The Court should also permanently enjoin Defendants from retaining blood from the newborn screening program after testing is completed absent voluntary, informed consent.~~

~~179.~~163.    To that end~~, moving forward, this Court should order~~—for any blood spots that New Jersey obtains in the future—Plaintiffs ask that the Court require New Jersey to ~~either~~:

a. Obtain voluntary~~, informed~~ consent from the parent or legal guardian~~, meaning that parents are informed of the specific uses that the blood can be used for,~~ before New Jersey retains any blood spot after the newborn screening tests are completed, such that parents are informed of and ~~the parents voluntarily opt-in~~ consent to the ~~retention of~~specific uses that the blood can be used for;

b. Return all blood spots and associated, individualized data, including genetic information for which New Jersey ~~does~~has not ~~first obtain voluntary, informed~~obtained parental consent to retain the blood

65

for specified uses once the newborn screening tests are completed; or

c.  Destroy all blood spots and associated, individualized data, including genetic information for which New Jersey does not obtain ~~voluntary, informed~~parental consent to retain the blood for specified uses once the newborn screening tests are completed.

~~180.~~164.    Unless Plaintiffs J.L. and B.L., by next friend Hannah Lovaglio, Plaintiff C.J., by next friends Erica and Jeremiah Jedynak, and the Children's Class obtain the declaratory and injunctive relief requested, they will suffer continuing and irreparable harm.

## Count II
## 42 U.S.C. § 1983—Fourteenth Amendment
## (Substantive Due Process Claim of Plaintiffs Hannah Lovaglio, Erica Jedynak, and Jeremiah Jedynak, for themselves and those similarly situated)

~~181.~~165.    Plaintiff Parents reallege and incorporate by reference the allegations in paragraphs 1–~~155~~137 as if fully stated here.

~~182.~~166.    The due process guarantee of the Fourteenth Amendment to the United States Constitution provides that no state

66

shall "deprive any person of life, liberty, or property, without due process of law[.]"

183.167.    The Due Process Clause protects against state infringement of, among other things, those fundamental rights and liberties that are deeply rooted in our Nation's history and traditions or are implicit in the concept of ordered liberty. State action that infringes on fundamental rights is reviewed under strict judicial scrutiny.

184.168.    Plaintiff Parents have a fundamental due process right to raise their children without undue state interference.

185.169.    As part of that right, parents have the fundamental due process right to direct the care, custody, and control of their children.

186.170.    In *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.), the Supreme Court noted that parents' A parent's right to direct "the care, custody, and control of their children" is fundamental. Indeed, the Court recognized that means the right to make decisions about raising one's children "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court" and is "clearly

established beyond all reasonable debate as an enduring American tradition." *Id.* at 65 66.

171.     What's more, the parental right over the "care, custody, and control of their children" includes the right to make medical decisions for their children. The Third Circuit has explicitly said, including decisions regarding medical testing and further use of any biospecimens taken for that testing.

172.     New Jersey's puncturing of a newborn's skin and massaging of their heel to extract their blood for testing, absent a warrant or parental consent, implicates Plaintiff Parents' fundamental right to raise their children without undue state interference.

173.     New Jersey's puncturing of a newborn's skin and massage of their heel to extract their blood for testing, absent a warrant or parental consent, implicates Plaintiff Parents' fundamental rights to make decisions about the care, custody, and control of their children.

174.     New Jersey's puncturing of a newborn's skin and massage of their heel to extract their blood for testing, absent a warrant

or parental consent, implicates Plaintiff Parents' fundamental right to make medical decisions for their children.

187.    One fundamental aspect of consent in the medical field is the right for patients (or their representatives) to consent as to how any biospecimens (such as much. *See Gruenke v. Seip*, 225 F.3d 290, 306-07 (3d Cir. 2000) (recognizing that a public school violated substantive due process when it pressured a student into taking a pregnancy test absent her mother's knowledge or consent).

175.    Here, after theany remaining newborn testing is completed, there is a choice about whetherblood) may be retained and used for secondary research.

188.    Defendants' newborn screening program violates Plaintiff Parents' fundamental rights regarding the storage, maintenance, and secondary use of their children's remaining blood. Once newborn testing is complete, Defendants do not seek or obtain parents' consent to retain atheir child's blood for any amount of time post-testing.

~~189.     Defendants, however, have taken that choice away from every parent in New Jersey.~~

~~190.~~176.     Instead, Defendants are making that choice *in lieu of* parents ~~when Defendants~~by automatically ~~retain~~retaining the blood of every child after the testing is complete without parental consent.

~~191.     In doing so, Defendants strip parents of their fundamental rights without a compelling reason to do so.~~

~~192.     And Defendants have unilaterally decided what *they think* is in the best interest of New Jersey children.~~

~~193.~~177.     New Jersey's ~~stockpiling of~~continued retention of children's seized blood ~~from the newborn screening program~~for storage, maintenance, and secondary research, absent parents' voluntary~~,~~ ~~informed~~ consent, violates Plaintiff Parents' fundamental right to raise their children without undue state interference.

~~194.~~178.     New Jersey's ~~stockpiling~~continued retention of children's seized blood ~~from the newborn screening program~~for storage, maintenance, and secondary research, absent voluntary~~, informed~~

70

consent, violates Plaintiff Parents' fundamental rights to make decisions about the care, custody, and control of their children.

195.179.     New Jersey's stockpilingcontinued retention of children's seized blood from the newborn screening programfor storage, maintenance, and secondary research, absent parents' voluntary, informed consent, violates Plaintiff Parents' fundamental right to make medical decisions for their children.

180.     Defendants' retaining of children's seized blood, post-testing, for storage, maintenance, and secondary research, without parental consent, strip parents of their fundamental rights without a compelling reason to do so.

196.181.     There is no compelling reason to allow New Jersey to stockpile blood from the newborn screening programretain children's seized blood for storage, maintenance, and secondary research without obtaining parents' voluntary, informed consent.

197.182.     Not only does New Jersey's stockpiling of blood from the newborn screening programcontinued retention of children's seized blood for storage, maintenance, and secondary research absent

71

parental consent lack a compelling interest, it is not narrowly tailored to serve any government interest.

198.183.    For instance, aA simple and less-restrictive alternative exists: Simply obtain voluntary, informed consent from parents to keep the babytheir baby's remaining blood for specific disclosed purposes prior to its storage, use, and potential sharing with third parties.

184.    Plaintiff Parents Hannah Lovaglio, Erica Jedynak and Jeremiah Jedynak seek declaratory relief stating that retaining their children's remaining blood for storage, maintenance, and secondary research, absent parents' voluntary consent, violates Plaintiff Parents' fundamental rights under the Fourteenth Amendment.

185.    Plaintiff Parents Hannah Lovaglio, Erica Jedynak and Jeremiah Jedynak seek injunctive relief preventing New Jersey from retaining or using any remaining blood post-testing absent parental consent.

199.186.    Unless Plaintiff Parents Hannah Lovaglio, Erica Jedynak and Jeremiah Jedynak, along with the Parents' Class, obtain

the declaratory and injunctive relief requested, they will suffer continuing and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

~~A.    An entry of judgment holding Defendants liable for their unconstitutional conduct;~~

~~B.~~A.   Certification of both classes under Rule 23(b)(2);

~~C.~~B.   Appointment of Named Plaintiffs as representatives of their respective classes; and

~~D.~~C.   Appointment of the Institute for Justice as class counsel, and appointment of CJ Griffin as local class counsel.

~~E.~~D.   A judgment declaring, on a class-wide basis, that Defendants' continued retention of children's seized blood ~~from the newborn screening program~~and associated data post-testing for storage, maintenance, and secondary research, without first obtaining voluntary~~, informed~~ consent, violates the Fourth Amendment;

~~F.~~E.   A judgment declaring, on a class-wide basis, that Defendants' continued retention of children's seized blood ~~from the newborn screening~~

~~program~~and associated data post-testing for storage, maintenance, and secondary research, without first obtaining ~~voluntary, informed~~parental consent violates the Fourteenth Amendment;

~~G.~~F.   An injunction, as described in ~~paragraph 177~~paragraphs 162–63, that permanently enjoins Defendants from ~~keeping any~~the continued retention of children's seized blood ~~spots~~for storage, maintenance, and secondary research, absent voluntary~~, informed~~ parental consent;

~~H.   An injunction, as described in paragraph 179, that permanently enjoins Defendants from retaining and stockpiling blood spots from the newborn screening program after the testing is completed absent voluntary, informed consent.~~

~~I.~~G.   An award of reasonable attorneys' fees and costs; and

~~J.~~H.   Such other relief as this Court deems appropriate.

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Plaintiffs, by their undersigned counsel, certify that to the best of their knowledge and belief, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration or administrative proceeding in this District.

74

Dated: ~~August 2, 2024~~October 6, 2025.        Respectfully submitted,

/s/ CJ Griffin

**CJ Griffin (NJ Bar No. 031422009)**
PASHMAN STEIN WALDER HAYDEN, P.C.
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201) 270-4930
cgriffin@pashmanstein.com

**Robert Frommer***
~~**Brian A. Morris***~~
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
rfrommer@ij.org
~~bmorris@ij.org~~

**Christen Mason Hebert***
**Daniel Woislaw****
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, Texas 78701
(703) 682-9320
chebert@ij.org
dwoislaw@ij.org

*admitted *Pro Hac Vice*
***Pro Hac Vice* motion forthcoming

*Counsel for Plaintiffs Hannah
Lovaglio, J.L. and B.L., by next
friend, Hannah Lovaglio, Erica
Jedynak, Jeremiah Jedynak, and*

75

*C.J., by next friends, Erica and Jeremiah Jedynak*

76