# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### (Trenton Vicinage)

| | |
|---|---|
| **HANNAH LOVAGLIO**, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>**KAITLAN BASTON**, et al.<br><br>*Defendants* | Hon. Georgette Castner, U.S.D.J.<br><br>Hon. Rukhsanah L. Singh, U.S.M.J.<br><br>**Civil Action No.: 3:23-cv-21803** |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

**INSTITUTE FOR JUSTICE**
Robert Frommer*
901 N. Glebe Rd., Ste. 900
Arlington, Virginia 22203
(703) 682-9320
rfrommer@ij.org

Christen Mason Hebert*
Daniel Woislaw*
816 Congress Ave., Ste. 970
Austin, Texas 78701
(703) 682-9320
chebert@ij.org
dwoislaw@ij.org

*Counsel for Plaintiffs*
***admitted Pro Hac Vice*

**PASHMAN STEIN WALDER HAYDEN, P.C**
CJ Griffin (NJ Bar No. 031422009)
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201) 270-4930
cgriffin@pashmanstein.com

*Local Counsel for Plaintiffs*
**Pro Hac Vice Counsel*

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................1

Background ......................................................................................3

Standard of Review .......................................................................7

Summary of Argument ..................................................................8

Argument ......................................................................................10

I.  Plaintiffs State a Claim for Relief Under the Fourth Amendment. ...................................................................................10

  A.  Plaintiffs Assert Searches and Seizures of Their Persons ...11

    1.  Defendants Both Search and Seize Plaintiffs' Blood. ......11

    2.  Plaintiffs Retain Fourth Amendment Interests in Their Blood. ...................................................................15

  B.  Defendants' Searches and Seizures of Children's Blood are Unreasonable. .............................................................18

II.  Plaintiffs State a Claim for Relief Under the Fourteenth Amendment. ..............................................................................22

III.  The Parents' Fourteenth Amendment Claim Is Justiciable. ........26

  A.  The Parents Have Standing .................................................27

  B.  The Parents' Claims Are Not Moot .....................................32

  C.  Mootness Exceptions Independently Preserve Jurisdiction. ....................................................................................34

IV.    The Children's Fourth Amendment Claim Is Justiciable. ............36

Conclusion ...................................................................................37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADAPT of Phila. v. Phila. Hous. Auth.*,
  417 F.3d 390 (3d Cir. 2005) ........................................................ 14, 32

*Asinor v. District of Columbia*,
  111 F.4th 1249 (D.C. Cir. 2024)........................................................20

*Bd. of Educ. v. Earls*,
  536 U.S. 822 (2002)........................................................................19

*Bearder v. State*,
  806 N.W.2d 766 (Minn. 2011)........................................................24

*Birchfield v. North Dakota*,
  579 U.S. 438 (2016).............................................................. 12, 13, 17

*Brewster v. Beck*,
  859 F.3d 1194 (9th Cir. 2017)........................................................20

*Chandler v. Miller*,
  520 U.S. 305 (1997)........................................................................19

*Church of Scientology of Ca. v. United States*,
  506 U.S. 9 (1992)...................................................................... 14, 32

*Const. Party of Pa. v. Aichele*,
  757 F.3d 347 (3d Cir. 2014) ............................................................7

*County of Riverside v. McLaughlin*,
  500 U.S. 44 (1991)..........................................................................35

*Del Monte Fresh Produce Co. v. United States*,
  570 F.3d 316 (D.C. Cir. 2009) ..........................................................9

*Dittimus–Bey v. Taylor,*
   244 F.R.D. 284 (D.N.J.2007)............................................................35

*Doe ex rel. Doe v. Governor of N.J.,*
   783 F.3d 150 (3d Cir. 2015) ...........................................................23

*Ellison v. Am. Bd. of Orthopaedic Surgery,*
   11 F.4th 200 (3d Cir. 2021)............................................................29

*Ferguson v. City of Charleston,*
   532 U.S. 67 (2001)............................................................. 16, 19, 21

*Fields v. Speaker of Pa. House of Representatives,*
   936 F.3d 142 (3d Cir. 2019) ...........................................................33

*Gayle v. Warden Monmouth Cnty. Corr. Inst.,*
   838 F.3d 297 (3d Cir. 2016) ...........................................................37

*Gruenke v. Seip,*
   225 F.3d 290 (3d Cir. 2000) ...........................................................25

*Honda Lease Tr. v. Malanga's Auto.,*
   152 F.4th 477 (3d Cir. 2025)...................................................... 14, 20

*Lutter v. JNESO,*
   86 F.4th 111 (3d Cir. 2023)............................................................28

*Mann v. County of San Diego,*
   907 F.3d 1154 (9th Cir. 2018).........................................................23

*Maryland v. King,*
   569 U.S. 435 (2013).......................................................................12

*Meyer v. Nebraska,*
   262 U.S. 390 (1923).......................................................................23

*Mich. Dep't of State Police v. Sitz,*
   496 U.S. 444 (1990).......................................................................19

v

*Moore v. Regents of Univ. of Cal.*,
 793 P.2d 479 (Cal. 1990) ...................................................................24

*Neumeyer v. Beard*,
 421 F.3d210 (2005) ...........................................................................19

*Parham v. J.R.*,
 442 U.S. 584 (1979) ...........................................................................23

*Phillips v. County of Allegheny*,
 515 F.3d 224 (3d Cir. 2008) ................................................................8

*Praxis Props., Inc. v. Colonial Sav. Bank, S.L.A.*,
 947 F.2d 49 (3d Cir. 1991) ................................................................34

*Rd.-Con, Inc. v. City of Philadelphia*,
 120 F.4th 346 (3d Cir. 2024) .............................................................34

*Reedy v. Evanson*,
 615 F.3d 197 (3d Cir. 2010) ...................................................2, 13, 17

*Reno v. Flores*,
 507 U.S. 292 (1993) ...........................................................................22

*Schmerber v. California*,
 384 U.S. 757 (1966) ...........................................................................12

*Skinner v. Ry. Lab. Execs.' Ass'n*,
 489 U.S. 602 (1989) .....................................................................12, 13

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) ...........................................................................27

*T Mobile Ne. LLC v. City of Wilmington*,
 913 F.3d 311 (3d Cir. 2019) ..............................................................28

*Troxel v. Granville*,
 530 U.S. 57 (2000) .............................................................................23

*United States v. Bey,*
   911 F.3d 139 (3d Cir. 2018) ................................................................. 18

*United States v. Jacobsen,*
   466 U.S. 109 (1984) ........................................................................... 20

*United States v. Jones,*
   565 U.S. 400 (2012) ........................................................................... 15

*United States v. Matlock,*
   415 U.S. 164 (1974) ........................................................................... 19

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) ..................................................................... 22, 26

## Constitutional Provisions

U.S. Const. Amend. XIV ......................................................................... 22

## Codes & Statutes

Del. Code Ann. tit. 16, § 805C(a)(1) ........................................................ 4

45 C.F.R. § 46.116(a)(1) ........................................................................ 24

45 C.F.R. § 46.116(d) ........................................................................... 24

Fla. Stat. § 383.14(4) ............................................................................. 4

S.D. §Admin. R. 44:19:03:03 .................................................................. 4

## Other Authorities

https://www-doh.nj.gov/doh-shad/indicator/view/BirthRate.Year.html
   (last visited Jan 29, 2026)................................................................. 35

## INTRODUCTION

Defendants' Motion to Dismiss squarely identifies this case's core legal dispute: "whether the Constitution compels this Court to choose Plaintiffs' default rule—destruction unless a parent affirmatively opts into retention—over the State's—retention for a time unless a parent affirmatively requests earlier destruction." MTD SAC at 35. The Plaintiffs say "yes," while Defendants insist "[t]he answer is no." Plaintiffs' complaint alleges that retaining and using children's blood post-testing, *for any period*, without consent or a warrant violates the Fourth and Fourteenth Amendments. By contrast, the State argues that an opt-out system is good enough for government work. But close only counts in horseshoes.

Following Plaintiffs' initial complaint—after being caught with their hands in the cookie jar—Defendants shortened the program's automatic retention period from 23 to 2 years. Defendants claim this unilateral change moots the case, but a review shows it does not materially alter the live controversy before this Court. Defendants' policies still require parents to allow the state to take, test, retain, use, and share their children's blood without a warrant or consent.

1

Although Defendants argue an opt-out scheme is fine, binding caselaw makes clear that warrantless searches and seizures are reasonable *only* if they are *opt-in*, i.e., feature voluntary consent from the person being searched and seized (or their parent/guardian). Under this caselaw, this is presumptively unreasonable. *See, e.g.*, *Reedy v. Evanson*, 615 F.3d 197 (3d Cir. 2010). And while Defendants claim their nonconsensual post-testing retention is reasonable under the "special needs" exception, they cannot prove that with evidence at the pleading stage.

The same is true for Parent-Plaintiffs' Fourteenth Amendment claim. Parents have a fundamental right over the care, custody, and control of their children. This includes the right to make medical decisions for them and the subsidiary right to decide how any biospecimens or information arising from testing and treatment may be used. Keeping and using children's blood without parental consent violates that right.

Plaintiffs have alleged that Defendants' policy violates both their rights and the rights of thousands of New Jersey families. That policy is not moot, Plaintiffs have standing to challenge it, and the case is ripe for this Court's adjudication. Accordingly, Plaintiffs ask that the Court deny Defendants' Motion to Dismiss.

2

## BACKGROUND

### *The Plaintiffs*

Plaintiff Hannah Lovaglio is the mother of two young boys, J.L. and B.L., who were five and one and a half years old, respectively, when this lawsuit was filed. SAC ¶ 14. Both children were born in New Jersey where Hannah was a church pastor. SAC ¶ 50. Shortly after their births, Defendants seized and searched both of Hannah's children's blood by pricking their heels, collecting their blood and testing it for diseases. It now retains the boys' residual blood—and associated data—for later use. SAC ¶¶ 52–56. Defendants never sought consent either for the initial extraction and testing, or to retain and use the residual blood and data associated therewith. SAC ¶ 55. Hannah and her husband still have several frozen embryos stored in New Jersey. SAC ¶ 51.

Plaintiffs Erica and Jeremiah Jedynak are the parents of C.J., who was under two years old when this lawsuit was filed. SAC ¶¶ 61, 72. The growing Jedynak family resides in Rockaway Township, NJ. SAC ¶ 61. When C.J. was born, Defendants took his blood, just as with J.L. and B.L., tested it for diseases, and retained the residual blood—and associated data—for future use. SAC ¶¶ 61–66. As with Hannah's children,

3

Defendants never asked for or got consent either for the initial extraction and testing, or to retain or use the residual blood or data associated therewith. SAC ¶ 65; Declaration of Jeremiah Jedynak ("J.Jedynak Decl.") ¶¶ 4, 6; Declaration of Erica Jedynak ("E.Jedynak Decl.") ¶¶ 4,6.

### The Newborn Screening Program.

Defendants' screening program requires that newborn babies' blood be seized, tested for diseases, and retained for later use by Defendants, including disclosure to law enforcement, without parental consent. SAC ¶¶ 8–10. Within forty-eight hours of birth, hospitals prick the heel of each newborn and collect their blood on a paper card—creating "blood spots." SAC ¶ 22. The blood spots are sent to the New Jersey Department of Health's Newborn Screening Laboratory. SAC ¶ 23. New Jersey does not obtain parental consent at any stage of collection, testing, or retention of their children's blood.[1] SAC ¶ 26.

---

[1] New Jersey parents can object to the testing only on religious grounds. SAC ¶¶ 27–28. Many states allow parents to opt out of the newborn screening tests for any reason. *See, e.g.*, Fla. Stat. § 383.14(4); Del. Code Ann. tit. 16, § 805C(a)(1). And some states automatically destroy the blood after testing is complete, see, e.g., S.D. §Admin. R. 44:19:03:03, unless parents "opt-in" to retention.

New Jersey uses a portion of each child's blood spot to test for diseases within a week or two after birth. SAC ¶ 32. After testing, some unused ("residual") blood remains on the card. SAC ¶ 34. That blood contains DNA and other highly sensitive genetic material. SAC ¶ 3. Rather than destroy the blood, New Jersey stores and uses it as it sees fit, SAC ¶¶ 35, 94–97, including sharing it with others. SAC ¶¶ 45, 101–07.

### Defendants' Retention Policy.

Before Plaintiffs sued, New Jersey never told parents it kept their babies' blood post-testing. FAC ¶ 44. No statute let Defendants retain the blood, but no statute said to destroy it. SAC ¶¶ 37–38. So Defendants kept the blood spots however long they wanted—which was 23 years when this lawsuit was filed. FAC ¶ 45; SAC ¶ 36.

Just before Defendants' initial response to this lawsuit was due, DOH announced it had shortened its retention period from 23 years to either two or 10 years.[2] SAC ¶¶ 75–78. As part of those changes, Defendants stated they had begun to destroy old blood spots and had adopted a

---

[2] Under Defendants' new policy, they keep blood spots with positive test results for up to ten years without parental consent, and negative test results without parental consent for two years. SAC ¶¶ 76–77.

form through which parents could "opt out" by requesting destruction of their children's blood spots. DOH can change its retention period and other aspects of its program whenever it wants. SAC ¶ 111. And in any event, Defendants' changes still allow them to retain children's blood to use, share, and generate data from without parental consent. SAC ¶¶ 8–10, 25, 78–84. Defendants still do not ask—and have never asked—parents for consent to keep and use their babies' blood after the newborn screening is complete. SAC ¶ 26; FAC ¶ 46. Nor do they obtain a warrant to retain, query, or share the blood. SAC ¶ 40. Instead, Defendants claim the power to keep the blood of every child born in New Jersey and use it however they want, all without parental consent. SAC ¶¶ 34–43.

### *Defendants Give Blood Spots to Third Parties.*

New Jersey has been caught giving retained blood spots to third parties. SAC ¶¶ 44–49. For instance, New Jersey has handed over blood spots to law enforcement without a warrant at least five times. SAC ¶¶ 36 & n.3, 45–46, and continues to give them access to residual blood. SAC ¶¶ 101–07. Defendants downplay such disclosures as "rare occurrences" or having an "extremely low" or "minimal" risk of happening. MTD FAC at 10, 35–37. But that is a fact question to be answered in

6

discovery. *See infra* Part I–B. At this stage, what matters is that Defendants have released blood spots to third parties, including law enforcement—and continue to assert the prerogative to do so. SAC ¶¶ 94–107. This claimed authority only underscores the injury Defendants' policy inflicts upon both Plaintiffs and the broader putative class.

## STANDARD OF REVIEW

Defendants' Motion to Dismiss arises under Rules 12(b)(1) and 12(b)(6). Defendants claim their challenge to Plaintiffs' standing is factual, one that "contest[s] the factual allegations of the complaint." *Const. Party of Pa. v. Aichele,* 757 F.3d 347, 358 (3d Cir. 2014). In such an attack, defendants would argue "that there is no subject matter jurisdiction because the facts of the case—and here the District Court may look beyond the pleadings to ascertain the facts—do not support the asserted jurisdiction." *Id.* But here, a review of Defendants' declarations shows that none of them contest the truth of any of Plaintiffs' well-pleaded allegations. Accordingly, the Court should "consider the allegations of the complaint as true" to decide whether subject-matter jurisdiction exists as to Rule 12(b)(1). *Id.* at 358–59.

Similarly, for Defendants' Rule 12(b)(6) motion, this Court must "accept all factual allegations as true, construe the complaint in the light most favorable for the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff[s] may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

## SUMMARY OF ARGUMENT

The State's motion to dismiss must be denied. Plaintiffs have stated claims that Defendants' retention of their newborn blood without consent violates their constitutional rights. Plaintiffs have standing to bring those claims, which are live and ripe for judicial resolution.

First, Plaintiffs state a Fourth Amendment claim because the State's newborn screening regime requires officials to conduct both a search and a seizure, one that does not end after the initial testing. The State extracts and tests newborn blood—which constitutes both a search and seizure—and then keeps and uses the remaining blood and information derived from it. Although both children and their parents have privacy and possessory interests in that blood and data, Defendants never ask for consent to keep and use it. The State's nonconsensual

8

retention policy works an unreasonable search and seizure that violates the Fourth Amendment.

Second, Plaintiffs state a claim for relief under the Fourteenth Amendment. Defendants' failure to ask parents for consent at any stage of the process, including to keep and use their children's blood post-testing, interferes with parents' fundamental right to the care and protection of their children. Specifically, it interferes with parents' right to direct their children's medical care, including directing what medical officials can do with any biospecimens or data arising from that care. To justify that interference, Defendants must show why keeping and using children's blood without consent is narrowly tailored to serve a compelling interest. Defendants cannot make that showing on a motion to dismiss.

Third, Plaintiffs' claims are not moot. Defendants *still* keep and use newborn blood post-testing without consent. While Defendants changed their retention practices around the margins, they categorically refuse to get consent to keep the blood. Because the challenged conduct is ongoing, this case presents a live controversy, and mootness does not apply. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 323 (D.C. Cir.

9

2009) (holding that "the wrong at issue for mootness purposes is defined by the plaintiffs' theory set forth in the complaint").

Fourth, Plaintiffs have standing to pursue relief under the Fourth and Fourteenth Amendment. They allege that Defendants' unconsented retention and use of their blood post-testing violated the Fourth and Fourteenth Amendments, and they seek an equitable remedy in the form of the destruction of their residual blood and corresponding data. Plaintiffs, whose blood is still in Defendants' possession, can press their constitutional claims on their own behalf. Moreover, Plaintiffs also have the right to press their Fourth and Fourteenth Amendment claims on behalf of the putative classes, since Defendants' change to a two-year retention period means that plaintiffs' claims are both inherently transitory and capable of repetition yet evading review.

Fifth, Plaintiffs' claims are ripe. Plaintiffs' claims turn on the fact that Defendants keep and use infants' blood without consent. Nothing about those claims, or the relief Plaintiffs seek, depends on whether Defendants have in fact shared Plaintiffs' residual blood with third parties.

## ARGUMENT

**I.    Plaintiffs State a Claim for Relief Under the Fourth Amendment.**

10

Plaintiffs claim that Defendants take, test, keep, and share infant blood without consent or a warrant. Defendants do not dispute those allegations. Rather, Defendants argue that drawing blood from newborns and testing that blood is not a search and that, once Defendants take the blood, Plaintiffs lose entitlement *to their own blood*.

But Fourth Amendment caselaw makes clear that people have a right to the exclusive possession of their "persons," which extends to their blood. This right continues even after extraction: Neither operation of law nor magic converts a person's blood into the government's property upon its exit from the body. Accordingly, Plaintiffs have stated a claim that the State's post-testing retention and use of their blood constitutes an unreasonable search and seizure.

### A.   Plaintiffs Assert Searches and Seizures of Their Persons.

Defendants' actions trigger Fourth Amendment scrutiny because (1) Defendants conduct both a search and seizure of the person by pricking a newborn's heel, extracting blood, and testing it, and (2) infants retain Fourth Amendment interests in their blood *after* it has been tested.

#### 1. Defendants Both Search and Seize Plaintiffs' Blood.

11

The State's newborn blood program starts with both a search and a seizure. Defendants' policy requires officials to pierce a child's skin to take a blood sample so they can learn information. As the Supreme Court has held, "the taking of a blood sample … is a search." *Birchfield v. North Dakota*, 579 U.S. 438, 455 (2016). Testing that blood "plainly constitute[s] *searches* of 'persons,' and depend[s] antecedently upon *seizures* of 'persons,' within the meaning of th[e Fourth] Amendment." *Schmerber v. California*, 384 U.S. 757, 767 (1966) (emphasis added); *see also Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 616 (1989) (holding that "collection *and subsequent analysis* of the requisite biological samples must be deemed Fourth Amendment searches" (emphasis added)).

Defendants' actions would still be a search and seizure even if the blood contained little to no revealing genetic information. In *Maryland v. King*, 569 U.S. 435 (2013), the Court held that a "far more gentle" buccal swab was "a search within the body." *Id.* at 446. That was so even though the case dealt with "junk" DNA, useful only for identification purposes. *Id. at* 442–43. Yet the Court proceeded to deciding whether Maryland's searches were reasonable. *Id.* at 446.

12

Plaintiffs' complaint alleges that, pursuant to policy, Defendants took, tested, and kept their children's blood, squarely triggering Fourth Amendment scrutiny. *See* SAC ¶¶ 136–37. But Defendants do not address these well-pleaded allegations; instead, they assert there was no search or seizure. MTD SAC at 26. Their arguments presupposes that the infants' blood magically appeared in the lab one day—already tested. *See id.* at 26–27 (ignoring Plaintiffs' allegations that Defendants retain their blood and data *as a result of* extraction and testing). They act as if the residual blood, the rDBS, is wholly "decoupled" from the initial blood draw and screening. *Id.* at 15.

But Defendants cannot dodge constitutional scrutiny so easily. Defendants' policy implicates the Fourth Amendment from start to finish. Pricking infants' heels, collecting their blood, testing it, retaining it, and using it for "routine quality assurance and quality control," to "develop[] new tests for disorders," and to share it with third parties—these are all searches and seizures within the meaning of *Schmerber* and its progeny. SAC ¶¶ 18–33, 95–98; *see also Birchfield*, 579 U.S. 474; *Skinner*, 489 U.S. at 618; *Reedy v. Evanson*, 615 F.3d 197 (3d Cir. 2010) (holding that search of blood exceeding scope of consent violated Fourth Amendment).

13

Defendants also seem to argue that Plaintiffs' Fourth Amendment claim fails because Plaintiffs do not allege a *second* search after their blood was seized, tested, and processed. MTD SAC at 27–28 (citing failure to "identify any information that DOH attempted to obtain or share *during the retention period following the initial screening*" (emphasis added)). That's wrong for two reasons.

First, one search or seizure is enough to trigger the Fourth Amendment. Defendants put forward no case law to the contrary. If a court deems that Defendants acted unreasonably, it may hold that their actions violated the Fourth Amendment and order them to destroy or return the fruits of their unconstitutional actions. *See Church of Scientology of Ca. v. United States*, 506 U.S. 9, 13 (1992) (return or destruction of illegally seized tapes a viable remedy); *ADAPT of Phila. v. Phila. Hous. Auth.*, 417 F.3d 390, 393–94 (3d Cir. 2005) (finding "return of the information" a "form of meaningful relief" in privacy invasion case). Likewise, when the government seizes property—as it has seized the children's blood here—it may only hold that property for as long as its initial justification holds force. *Honda Lease Tr. v. Malanga's Auto.*, 152 F.4th 477, 489 (3d Cir. 2025). Once that initial justification dissipates, continued

14

retention and use of the seized item is unreasonable, second search or not. *Id.*

Second, Plaintiffs *do* allege that Defendants conduct a second search. Plaintiffs allege that Defendants use post-testing blood to develop new tests and for quality control. SAC ¶¶ 94–95. Defendants admit they use the blood to "better calibrate its diagnostic tools," "test[] de-identified positive and negative rDBS to ensure the system's integrity," and work to develop new tests. MTD SAC at 33–35. Those actions *are* "second" searches in that they are using children's blood to learn information. *See United States v. Jones*, 565 U.S. 400, 404–05 (2012) (physical interference with possessory interest in order to learn information is a search).

### 2. Plaintiffs Retain Fourth Amendment Interests in Their Blood.

Plaintiffs' Fourth Amendment interests in their blood survive Defendants' initial extraction and screening. Defendants cannot convert Plaintiffs' blood into state property by merely saying so or by pretending the blood on the paper is distinct from the blood in Plaintiffs' veins. Beyond just their blood itself, the Fourth Amendment protects one's security in a person's biological specimens and the data that they contain.

Defendants nevertheless assert the children lose Fourth Amendment protection in their own blood, citing only to this Court's prior order and the Sixth Circuit's decision in *Kanuzewski II*, both of which fault the plaintiffs for failing to plead an interest in their dried blood. *See* MTD SAC at 26–30. Defendants assert by implication—and without additional authority—that persons lose constitutional privacy interests after it is extracted from their veins. *See* MTD SAC at 26–30. But this assertion is foreclosed by Supreme Court precedent, which recognizes that patients retain interests in their bodily fluids, biological specimens, and genetic information even *after* testing is completed.

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001), dispenses with Defendants' presumed point of law. There, a government policy shared with law enforcement the results of drug tests performed on pregnant women admitted to hospitals. *Id.* at 70–72. Although the testing had already been completed, the Court still found the policy unreasonable. In so holding, the Court held that the women retained Fourth Amendment interests in their urine and the information learned therefrom, and that sharing their test results exceeded the scope of those women's consent. *Id.* at 78. Likewise, in *Birchfield*, the Court noted that DNA collection—

16

even if intended for a limited, lawful purpose—"put[s] into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained." 579 U.S. at 463. *Ferguson* and *Birchfield* make clear that a person has a continuing Fourth Amendment interest in biological samples "from which it is possible to extract information[.]" *Id.* at 464.

The Third Circuit has held the same. In *Reedy v. Evanson*, the court considered whether a crime victim, whose blood was tested for diseases, retained a reasonable expectation of privacy in her blood *after it was tested* so as to challenge the state's later use of that blood to prosecute her. 615 F.3d at 224–25. The defendant argued there—as Defendants do here—that the plaintiff "had no reasonable expectation of privacy in her blood because it had left her body," and alternatively that her consent to the disease testing covered the state's later use. *Id.* at 225. The Third Circuit rejected both arguments. Relying heavily on *Ferguson* and *Schmerber*, it concluded that the plaintiff retained an expectation of privacy in her tested, retained blood. *Id.* at 227–30. And it held the defendant's conduct unreasonable because it exceeded the scope of the plaintiff's initial consent. *Id.* at 230.

17

Here, Plaintiffs allege *and Defendants admit* that they take, test, keep and use infants' residual blood without parental consent. SAC ¶¶ 35, 45, 94–97, 101–07; MTD SAC at 5–6, 33. *Ferguson* and *Reedy* together show how that behavior states a Fourth Amendment claim and why Defendants' argument about multiple tests being required misses the mark. *See supra* Part I-A at 13–14. Accordingly, the question to this Court is whether Defendants' post-testing retention and use satisfies a judicially recognized exception to the warrant requirement. As the next section explains, this is not a question capable of resolution on the pleadings, as Defendants have the evidentiary burden of establishing that any warrant exception applies and is satisfied. *See infra* Part I-B.

### B. Defendants' Searches and Seizures of Children's Blood Are Unreasonable.

Defendants retain and use children's residual blood spots without a warrant or parental consent. And under the Fourth Amendment, "[w]arrantless searches and seizures are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies." *United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018). This is an evidentiary burden that the

18

Government must satisfy by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177–78 n.14 (1974).

Defendants argue their policy is reasonable under the "special needs" exception. MTD SAC at 26–29. But Defendants must prove that reasonableness with evidence, since the "special needs" exception presents a mixed question of fact and law requiring a court to carry out "a 'close review' of the scheme at issue." *Ferguson*, 532 U.S. at 81 (quoting *Chandler v. Miller*, 520 U.S. 305, 322 (1997)). For that reason, any "special needs" inquiry occurs either at trial or summary judgment, with a full evidentiary record. *See, e.g.*, *Bd. of Educ. v. Earls*, 536 U.S. 822, 830–38 (2002) (evaluating record evidence after summary judgment). This is true of Defendants' cases too. *See Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 448 (1990) (evaluating checkpoint program only after a "trial, at which the court heard extensive testimony concerning, *inter alia*, the 'effectiveness' of [the checkpoints]"); *Neumeyer v. Beard*, 421 F.3d 210, 211 (2005) (resolving at summary judgment).

And in conducting that "special needs" analysis, it will be crucial for the Court to properly identify the nature of the parties' ongoing dispute. As the Court is aware, Plaintiffs' challenge isn't to Defendants'

19

initial testing, but to the fact that Defendants hold onto and use children's blood after that testing without consent. Yet, in defending that post-testing retention and use, Defendants point to extracting and testing infants' blood *as* the "special need" that justifies their actions. But of course, that "need" dissipates once the blood has been tested.

Defendants' asserted "special need" thus sits on quicksand. The Third Circuit has held that when a seizure's initial justification expires, the government must either end the seizure or identify a new, satisfactory, justification. In *Honda Lease Trust v. Malanga's Automotive*, that court noted that "the government may lawfully seize property if some Fourth Amendment justification exists . . . but this justification can run out." 152 F.4th at 489. The Third Circuit's holding in *Honda Lease* follows the Supreme Court's holding in *United States v. Jacobsen*, 466 U.S. 109 (1984), that a seizure, reasonable at its inception, can become unreasonable if unduly prolonged, *id.* at 124 n.25, and similar decisions from other circuits. *E.g.*, *Asinor v. District of Columbia*, 111 F.4th 1249, 1256 (D.C. Cir. 2024); *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017) (holding "[a] seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force.").

20

Here, Defendants initially seize children's blood for testing. But once testing is complete, Defendants' justification runs out. And Defendants claim DOH keeps and uses Plaintiffs' *residual* blood only "to better calibrate its diagnostic tools." MTD SAC at 33.[3] Going forward, several evidentiary questions about the reasonableness of Defendants' post-testing retention and use jump out as relevant:

- How many blood spots are needed for "quality assurance/quality control"? MTD SAC at 4, 33–34.
- How many blood spots are needed for "new-test development"? MTD SAC at 4, 35.
- What rate of "opt-in" would be needed to achieve Defendants' alleged interests in retention?
- How many blood spots are needed to retain a statistically significant representative sample?
- How many blood spots are needed for a "broad-based range of rDBS that represents the demographics of the State"? MTD SAC at 34.

Ultimately, Defendants must prove both 1) that an opt-in model for storing and using infants' residual blood would somehow frustrate Defendants' "special need" to calibrate their machines and 2) that this "special need" outweighs innocent infants' fundamental right to privacy and

---

[3] Defendants also admit that retained blood is made available to law enforcement officers, but such use is not a "special need." *See Ferguson*, 532 U.S. at 84–86.

bodily integrity in their persons, blood, and genetic information. Defendants have not—and cannot—meet that burden at this stage.

## II. Plaintiffs State a Claim for Relief Under the Fourteenth Amendment.

Parents have the fundamental right to make decisions concerning the care, custody, and control of their children. That right includes the right to make medical decisions—like whether to perform genetic testing—as well as the right to condition how officials may keep and use their children's biospecimens and data. The State violates those fundamental rights by keeping and sharing Plaintiff parents' newborns' blood and associated data without consent. The Parents therefore state a claim under the Fourteenth Amendment.

The Fourteenth Amendment guarantees that no State shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV. This language has been interpreted to "provide[] heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Reno v. Flores*, 507 U.S. 292, 301–02 (1993)). Among these is "the fundamental right of parents to make decisions concerning the care, custody, and control of their children," which "is

22

perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

Parents' fundamental right to consent to medical procedures for their children is well-established. Courts around the country have repeatedly held that parental primacy over medical decisions regarding their children is fundamental. *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (holding that the fundamental rights of parents "include[ ] a 'high duty' to recognize symptoms of illness and to seek and follow medical advice"); *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 156 (3d Cir. 2015) (noting that case law supports the idea that "parents have decision-making authority with regard to the provision of medical care for their children"); *Mann v. County of San Diego*, 907 F.3d 1154, 1160–61 (9th Cir. 2018) (holding that examining child without first obtaining parental consent or judicial authorization violated "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state").

And part of the right to consent to medical procedures includes the right to consent to the foreseeable handling of the biological materials

23

and medical information generated by that procedure. Medical consent is not limited to the moment of physical intervention; it is purpose-bound and conditional. So when children's blood is drawn for diagnostic testing, the retention, storage, and secondary use of the resulting biospecimen or information constitutes a distinct act that itself requires consent. *Moore v. Regents of Univ. of Cal.*, 793 P.2d 479, 483 (Cal. 1990) (holding that failing to advise patient on conditions surrounding secondary use of biospecimens was actionable because failure meant the doctor acted "without first having obtained the patient's informed consent"). The United States Department of Health and Human Services recognizes this principle by requiring that before "involving a human subject in research … an investigator shall obtain the legally effective informed consent of the subject or the subject's legally authorized representative." 45 C.F.R. § 46.116(a)(1) ("General Requirements for Informed Consent"). Those regulations likewise require that researchers get parental consent before "the storage, maintenance, and secondary research use of identifiable private information or identifiable biospecimens." § 46.116(d); *see also Bearder v. State*, 806 N.W.2d 766, 776 (Minn. 2011) (holding that

24

government violated state law by retaining and using children's blood post-testing without parental consent).

None of that happens under Defendants' program. Defendants never ask parents to retain their children's blood for future use. And that violates Third Circuit precedent. *Gruenke v. Seip*, 225 F.3d 290, 302–03 (3d Cir. 2000). In *Gruenke*, the Third Circuit held that a public-school coach violated the Fourteenth Amendment by forcing a student athlete to take a pregnancy test without parental consent and sharing the results with others. *Id.* at 302–04. The court found that the coach's actions were sufficient to "establish an unconstitutional interference with familial relations." *Id.* at 302–05.

Here, Defendants take, test, keep, and share newborns' blood and associated data *without parental consent*. SAC ¶ 26. Their decision *not* to acquire consent before retaining, using, and sharing residual blood *is* a medical decision itself, as *Moore* shows and Plaintiffs allege. SAC ¶¶ 170–74. Ultimately, Defendants' policy interferes with Plaintiff-Parents' rights in the same way that the Third Circuit castigated in *Gruenke*.

Because Defendants' policy burdens parents' fundamental rights to direct their children's medical care, it will survive only if it is "narrowly

25

tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721. Strict scrutiny places an affirmative evidentiary burden on the government, meaning this question requires resolving this case on the merits, not at the pleading stage.

Lastly, Plaintiffs must take issue with Defendants' purported interest for retaining and using post-testing blood. In their brief, Defendants claim that "the State has a compelling interest in preventing the death and disability of newborns." MTD SAC at 39. But just like Defendants' "special needs" argument, Defendants are pointing to the justification for seizing and testing blood in the first place as the justification for holding onto it afterwards. But once testing is complete, that rationale evaporates, and Defendants must identify some other reason to justify their *keeping and using* children's residual blood.

Plaintiffs have stated a claim under the Fourth and Fourteenth Amendments. As the next section shows, those claims are still live, as none of the changes Defendants made to the program have affected the core dispute between the parties.

## III.  The Parents' Fourteenth Amendment Claim Is Justiciable.

The Parents' Fourteenth Amendment claim is justiciable because

26

the Parents have standing to challenge Defendants' nonconsensual retention and use of their children's blood and associated data; the Parents' claims are not moot; and, even if the Parents' claims were moot, mootness exceptions preserve jurisdiction.

### A.    The Parents Have Standing.

As this Court previously observed, "[t]o establish Article III standing, a plaintiff must satisfy three elements: the plaintiff '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendants, and (3) that is likely to be redressed by a favorable judicial decision." Order at 13 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Parents satisfy all three requirements and have standing to bring their Fourteenth Amendment claim on behalf of the class.

**Injury In Fact**: The Parents meet the injury-in-fact requirement regardless of whether this Court assesses standing at the filing of the original complaint or the FAC because at both points Defendants kept the Children's blood and associated data without consent.[4] *See* Order at

---

[4] Plaintiffs assert that the appropriate time for assessing standing in this case is the filing of the original complaint on November 2, 2023. The Third Circuit has recognized "that once a supplemental complaint is granted, it is treated like an amended complaint for purposes of relation

16. As this Court previously concluded, the Parents have established "actual, ongoing harm from the retention of their children's residual dried blood spots" and have "satisfied Article III's injury-in-fact requirement." *Id.* at 18–19 (quotation omitted). The Parents seek declaratory and injunctive relief for that injury in fact—a declaration that Defendants must obtain parental consent to continue to retain the blood and its data and an injunction ordering Defendants to return or destroy them if no consent is obtained. *Id.* at 18–20; *see also* SAC Prayer for Relief ¶¶E–F.

---

back." *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 327 (3d Cir. 2019). And Federal Rule 15(c) says that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading."  Standing is evaluated from time of supplementation if the "claims and requested relief [had been] substantively affected by the alleged post-suit developments"—and "only for the claims and relief substantively affected by the supplementation." *Lutter v. JNESO*, 86 F.4th 111, 125–26 & n.15 (3d Cir. 2023). Because Plaintiffs' claims have remained consistent across all versions of the complaint—Plaintiffs have alleged that Defendants violate their Fourth and Fourteenth Amendment rights and have sought the same relief to remedy those violations—the date of the original complaint should control standing. This Court previously concluded that the FAC complaint controlled, Order at 16, but that ruling is incorrect given that Defendants' policy changes addressed in the FAC did not alter the fundamental issue, that Defendants keep and use the Children's blood without consent.

For prospective relief, Parents Erica and Jeremiah Jedynak have standing to request an injunctive order requiring Defendants to obtain voluntary, informed consent before New Jersey retains any blood spots and data in the future. Both the SAC and the attached declarations show that the Jedynaks intend and are likely to have more children. SAC ¶ 67; J.Jedynak Decl. ¶ 7; E.Jedynak Decl. ¶ 7. In response to this Court's prior assessment that the Parents had not alleged enough facts to show they had an injury entitling them to prospective relief (Order at 18), the Jedynaks detail some of the concrete steps they have taken to show they intend to have more children such as owning a four-bedroom house so they have room for another child and organizing and storing their first child's belongings to repurpose them for their brother or sister-to-be. SAC ¶ 67; J.Jedynak Decl. ¶¶ 8–10; E.Jedynak Decl. ¶¶ 8–10. These actions cost the Jednyaks in time, money, and space and "reflect a concrete intent" to "take future action[.]" *See Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 207 (3d Cir. 2021). To require the Jedynaks to spell out more would be indecent. The Jedynaks have an injury in fact that supports their request for prospective relief.

Defendants' effort to argue that the Parents' injuries are not ripe because they have not identified an instance where Defendants shared their children's blood with third parties misunderstands the Parents' claim. *See* MTD SAC at 25–26. The Parents' injury is Defendants' interference with their right to consent to medical treatment for their children and control their children's biospecimens. *See supra* Part II. Parents need not wait for further misuse of the blood and the associated data through dissemination. The unconsented-to retention and use is what infringes on their Fourteenth Amendment rights.

**Traceability:** The Parents' injuries are traceable to Defendants' actions. For years, Defendants have retained and used children's blood without parental consent. SAC ¶ 26. Plaintiffs' complaint makes explicit that neither the Lovaglios nor Jedynaks ever consented to having their children's blood drawn, tested, and retained for future use. SAC ¶¶ 53, 55–56 (Lovaglio); ¶¶ 63, 65–66 (Jedynak); *see also* J.Jedynak Decl. ¶¶ 4, 6; E.Jedynak Decl. ¶¶ 4, 6. Defendants' nonconsensual extraction, testing, retention and use policy meaningfully violated the Lovaglios' and Jedynaks' fundamental rights as parents to make medical decisions for their children, including the right to control the disposition of their

30

medical information and biospecimens. And, when this lawsuit was filed and the FAC was filed, Defendants undisputedly possessed Plaintiff-children's blood and information because of their mandatory policy. SAC ¶¶ 25, 54, 64.

Defendants complain that Plaintiffs' injury is now their own fault because Defendants offered to destroy the blood after Plaintiffs filed the SAC. MTD SAC at 22–23. But Defendants (1) incorrectly ask this Court to ignore that standing is assessed from the time of the original complaint; (2) attempt to short-circuit Plaintiffs' standing by destroying the evidence of their own wrongdoing (blood); and (3) fail to show, argue, or assert that information derived as fruit of the search and seizure of Plaintiffs' blood, such as electronic data, would also be destroyed.

Allowing a thief to destroy stolen goods while the prosecution is pending obviously makes proving the crime more difficult, but it does not absolve the thief of their crime, nor does it vindicate an owner's right to ask for the goods to be destroyed or returned *wholly independent* from the thief's control over the goods. So too here. Plaintiffs were not obligated to bless Defendants' post-suit destruction of the blood to avoid liability.

31

Because Defendants undisputedly took, kept, and used the Children's blood and associated data without consent, Plaintiffs' harms are traceable to Defendants' conduct.

**Redressability:** The relief that Parents seek would redress their injuries. The Parents request a declaration that Defendants' retention and use of the Children's blood and data violates the Fourteenth Amendment and an injunction compelling the return or destruction of the Children's biospecimens and associated data. Courts regularly order the government to return items and information that it acquired or retained in violation of constitutional rights. *See, e.g.*, *ADAPT of Phila.*, 417 F.3d at 393–94 (citing *Church of Scientology*, 506 U.S. at 13) (finding "return of the information" a "form of meaningful relief" in privacy invasion case); *id.* at 394 (finding appeal not mooted despite disclosure of the information sought to be protected). Granting that relief would vindicate Parents' rights to make medical decisions about their children and control their children's biospecimens and the corresponding data.

## B.    The Parents' Claims Are Not Moot.

Defendants bear a "heavy burden" to establish mootness through voluntary cessation, and they cannot meet it. *See* Order at 27 (quoting

*Fields v. Speaker of Pa. House of Representatives,* 936 F.3d 142, 161 (3d Cir. 2019)). Defendants have cleverly maneuvered their program to try and moot this lawsuit, but the core dispute remains the same: whether the State may keep and use children's blood without consent. Defendants still refuse to get consent and the Children's blood and data remain in the State's hands. The Parents therefore still have a live claim.

Defendants' unilateral, voluntary policy changes prove that the State's retention and use policy is entirely discretionary. No formal rule or statute sets boundaries on how long Defendants can keep children's blood and the associated data or what they can use it for. Tomorrow, for example, Defendants could decide via another Attorney General directive, to sequence the genetics of every newborn blood sample in its possession and sell that data, and nothing would stop them. The point is that nothing prevents Defendants from doing whatever they want with the blood and the data, including keeping it longer. It is this discretion that is the problem; the right to control the blood and its data belongs to Plaintiffs, not Defendants.

Further, the State does not dispute that it will keep the newborn blood and associated data from any future child that the Jedynaks have

33

without asking the Jedynaks for consent. The Jednaks thus have a live claim for prospective relief because they face "a *substantial risk* that the harm [described in their complaint] will occur" absent this Court's involvement. *Rd.-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 355 (3d Cir. 2024) (emphasis in original).

### C. Mootness Exceptions Independently Preserve Jurisdiction.

Even if Defendants' policy changes could moot the Parents' individual claims, established exceptions to mootness apply here.

First, the Parents' claim falls within the "capable of repetition yet evading review" exception, which applies where challenged action is likely to recur but "its duration is too short to be litigated prior to its cessation." *See Praxis Props., Inc. v. Colonial Sav. Bank, S.L.A.*, 947 F.2d 49, 61 (3d Cir. 1991) (citation omitted). As the history of this case illustrates, the two-year retention period is too short to ensure full litigation before the injury dissipates. And the likelihood of repetition is a certainty for Parents who will birth more children—a category in which the Jedynaks fall—because Defendants still refuse to get consent.

Second, Plaintiffs may still proceed on behalf of the putative class even if their individual claims are moot under the inherently transitory

34

exception. Defendants' policy affects every New Jersey newborn—over 100,000 every year[5]—and the history of this case demonstrates that no individual plaintiff could litigate these claims to the stage of class certification before their personal interest expires. *County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991) ("[S]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's interest expires." "In such situations, the dissipation of the named plaintiff's personal stake in the outcome will not deprive the Court of the power to hear the case." *Dittimus–Bey v. Taylor*, 244 F.R.D. 284, 288 (D.N.J.2007). Plaintiffs filed their original complaint on November 2, 2023. ECF 1. It has now been 26 months (or 811 days)—with the case still at the motion to dismiss stage. That history shows that litigation of a constitutional suit of this nature to the point of class certification will exceed the two years during which Defendants mandatorily retain infants' blood under their new policy. Accordingly, Plaintiffs may continue to seek class-wide relief under the inherently transitory exception.

---

[5]   https://www-doh.nj.gov/doh-shad/indicator/view/BirthRate.Year.html (last visited Jan 29, 2026).

## IV.    The Children's Fourth Amendment Claim Is Justiciable.

The Children's Fourth Amendment claim is justiciable for much the same reasons as Parents' claim. They have standing to challenge Defendants' nonconsensual retention and use of their blood and associated data, which is still in Defendants' possession. Moreover, their claims are not moot and, even if they were, the Children may still represent the broader class.

First, like Parents, Children have suffered and continue to suffer an injury-in-fact: the nonconsensual retention and use of their blood and data. *See supra* Part III-A. As with Parents, that injury is directly traceable to Defendants' policy of not seeking consent at any stage of the newborn screening program. And a declaration from this Court holding Defendants' policy unreasonable and an injunction compelling the return or destruction of the Children's biospecimens and associated data would redress the Children's injury.

Second, the Children's Fourth Amendment claim is not moot. *See supra* Part III-B. Defendants *still* have Plaintiff-Children's blood in their possession without parental consent. And as previously discussed, Defendants' voluntary policy changes are subject to revision at any time,

36

meaning they have not met their heavy burden of demonstrating Children's Fourth Amendment claim is moot.

Lastly, even if Defendants' strategic actions could moot Plaintiff-Children's individual claims, they may still proceed to on behalf of the putative class under the inherently transitory exception. *See supra* Part III-C. Over 100,000 children are born in New Jersey each year and, as this case's history shows, it is far from certain that any litigant could reach class certification before their individual claim is moot.[6]

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint should be denied.

---

[6] How the Court proceeds in resolving Defendants' 12(b)(6) motion to dismiss turns, in part, on the Court's view of Plaintiffs' standing. If the Court agrees with Plaintiff Children and Parents that they have standing in their own right, then the Court can proceed to evaluate if their individual claims state a claim. By contrast, if the Court concludes that Plaintiff Children and Parents have no live personal claims, but have standing to represent the putative classes because those class claims are inherently transitory, the Court needs to first decide whether to certify Plaintiffs' proposed Rule 23(b)(2) classes. Only after classes are established may the Court then proceed to whether those classes state a claim for relief. *See Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016) (holding that District Court erred when it denied class certification as "unnecessary" given that it had no jurisdiction to make merits rulings as to validity of putative class's claims).

Dated: February 11, 2026.          Respectfully submitted,

/s/ CJ Griffin
CJ Griffin (NJ Bar No. 031422009)
Pashman Stein Walder Hayden, P.C.
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201) 270-4930
cgriffin@pashmanstein.com

Robert Frommer*
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
rfrommer@ij.org

Christen Mason Hebert*
Daniel Woislaw*
Institute for Justice
816 Congress Ave., Suite 970
Austin, Texas 78701
(703) 682-9320
chebert@ij.org
dwoislaw@ij.org

*Pro Hac Vice Counsel

*Counsel for Plaintiffs Hannah Lovaglio, J.L. and B.L., by next friend, Hannah Lovaglio, Erica Jedynak, Jeremiah Jedynak, and C.J., by next friends, Erica and Jeremiah Jedynak*

38